Case No. 15-1845, -1846, -1847, -1848

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**AFFINITY LABS OF TEXAS, LLC,**

*Plaintiff-Appellant,*

v.

**DIRECTV, LLC, DIRECTV DIGITAL LLC, MLB ADVANCED MEDIA, INC., MLB ADVANCED MEDIA, L.P., NBA MEDIA VENTURES, LLC, TURNER DIGITAL BASKETBALL SERVICES, INC., NHL INTERACTIVE CYBER ENTERPRISES, LLC, NHL ENTERPRISES, INC., NHL ENTERPRISES, L.P.,**

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Texas
In Case Nos. 15-CV-0030, -0031, -0032, -0033, Walter S. Smith Jr.

## OPENING BRIEF FOR APPELLANT
## AFFINITY LABS OF TEXAS, LLC

Ronald J. Schutz  Cyrus A. Morton
Patrick M. Arenz  Brenda L. Joly
Benjamen C. Linden
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402-2015
Tel.: (612) 349-8500

*Attorneys for Plaintiff-Appellant*
September 29, 2015  *Affinity Labs of Texas, LLC*

Form 9

FORM 9.  Certificate of Interest

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Affinity Labs of Texas, LLC _____ v. DIRECTV, LLC, et al. _____

No. 15-1845

15-1846, 15-1847, 15-1848

### CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Affinity Labs of Texas, LLC ___ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

Affinity Labs of Texas, LLC

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

The party named in the caption is the real party in interest.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4. ☑ The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Robins Kaplan LLP: Ronald J. Schutz, Cyrus A. Morton, Patrick M. Arenz, Daniel R. Burgess, Shira T. Shapiro, Kristine A. Tietz, Brenda L. Joly, and Benjamen C. Linden. Naman Howell Smith & Lee, PLLC: John P. Palmer

9/29/2015
Date

/s/ Ronald J. Schutz
Signature of counsel

Ronald J. Schutz
Printed name of counsel

Please Note: All questions must be answered
cc: All Counsel _____

124

# Table of Contents

Table of Authorities .................................................................. iv

Statement of Related Cases ...................................................... 1

Jurisdictional Statement .......................................................... 2

Statement of the Issues ........................................................... 3

Statement of the Case ............................................................. 4

    A. The Inventions in the '379 Patent ................................. 4

    B. The Patent Infringement Actions ................................. 8

        1. The Magistrate Judge's Report and Recommendation to Dismiss the Actions ..................... 9

        2. The District Court's Order Adopting the Magistrate Judge's Report and Recommendation and Dismissing the Actions .................................................. 13

Summary of Argument ........................................................... 16

Standard of Review ............................................................... 19

Argument ............................................................................. 20

I. The Claims of the '379 Patent are Directed to a Concrete and Tangible Invention, Not an Abstract Idea ...................................... 21

    A. The district court erred by creating a new and extremely broad category of abstract idea it called "well-known, longstanding, commercial practices." ...................................... 22

    B. The district court failed to conduct a proper analysis even under its erroneous longstanding practice standard because the district court eviscerated the claimed invention by focusing on the purpose of the invention after a "quick look" at the claims. ...................................... 28

C.  The district court erred by finding under any test or standard that an inherently concrete and tangible broadcast system is "abstract." .................................................. 31

II.  The District Court Erred in Finding that the Claims of the '379 Patent Lacked an Inventive Concept. ............................................. 35

A.  The district court erred in its analysis and application of an unprecedented "technological arts" test. ................................. 36

B.  The claims of the '379 patent include an inventive concept under a proper analysis of step two. ........................................ 38

1.  The over-the-air downloadable application with a graphical user interface for a wireless cellular telephone does not represent generic, well-understood, routine, or conventional activity. ........... 39

2.  By any other measure from this Court's precedent, the claims include an inventive concept ...................... 44

C.  The district court's incorrect step two analysis is evidenced by its faulty preemption analysis. .............................................. 46

III.  The District Court Erred in Granting a Motion to Dismiss Based on Unsupported Factual Findings Outside the Record. .. 50

A.  General historical observations are not appropriate because determining the preemptive scope of the claims-in-suit and whether the claim limitations were generic, routine or conventional is not legislative fact-finding ........... 53

B.  The district court's adjudicative fact finding also does not meet the requirements for use of judicial notice ..................... 56

Conclusion ........................................................................................... 61

# Table of Authorities

## Cases

*ABC, Inc. v. Aereo, Inc.*,
  134 S. Ct. 2498 (2014) ........................................................ 55

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
  728 F.3d 1336 (Fed. Cir. 2013) ....................................... 19, 46

*Alice Corp. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014) ................................................... passim

*Amgen Inc. v. Hoechst Marion Roussel*,
  314 F.3d 1313 (Fed. Cir. 2003) ............................................ 49

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
  788 F.3d 1371 (Fed. Cir. 2015) ....................................... 15, 46

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
  365 U.S. 336 (1961) ............................................................. 28

*Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.*,
  687 F.3d 1266 (Fed. Cir. 2012) ............................................ 19

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................. 19

*Bilski v. Kappos*,
  561 U.S. 593 (2010) ....................................................... passim

*Cal. Inst. of Tech. v. Hughes Commc'ns., Inc.*,
  59 F. Supp. 3d 974 (C.D. Cal. 2014) ....................... 20, 51, 55

*Cloud Satchel v. Amazon.com, Inc.*,
  79 F. Supp. 3d 553 (D. Del. 2014) ....................................... 12

*CLS Bank Int'l v. Alice Corp.*,
  717 F.3d 1269 (Fed. Cir. 2013) ........................... 41, 46, 50, 56

*Colonial Leasing Co. v. Logistics Control Grp. Int'l.*,
  762 F.2d 454 (5th Cir. 1985) ............................................... 58

iv

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
776 F.3d 1343 (Fed. Cir. 2014) ............................................................ 23

*CyberSource Corp. v. Retail Decisions, Inc.*,
654 F.3d 1366 (Fed. Cir. 2011) ............................................................ 35

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ................................................ 36, 44, 46

*Dennison Mfg. Co. v. Panduit Corp.*,
475 U.S. 809 (1986) ................................................................................ 54

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................................ 55

*Dunagin v. City of Oxford, Miss.*,
718 F.2d 738 (5th Cir. 1983) ................................................................ 53

*Fairfield Indus., Inc. v. Wireless Seismic, Inc.*,
No. 4:14-cv-2972,
2014 U.S. Dist. LEXIS 176599 (S.D. Tex. Dec. 23, 2014) ................... 29

*Gonzalez v. Kay*,
577 F.3d 600 (5th Cir. 2009) ................................................................ 19

*Gottschalk v. Benson*,
409 U.S. 63 (1972) ........................................................................... 22, 26

*Hardy v. Johns-Manville Sales Corp.*,
681 F.2d 334 (5th Cir. 1982) ................................................................ 56

*Holloway v. Lockhart*,
813 F.2d 874 (8th Cir. 1987) ................................................................ 58

*In re Bilski*,
545 F.3d 943 (Fed. Cir. 2008),
*aff'd on other grounds*, 561 U.S. 593 (2010) ......................................... 36

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015) ............................................................ 23

*Internet Patents Corp. v. Active Network, Inc.*,
790 F.3d 1343 (Fed. Cir. 2015) ...................................................... 23, 32

*Juniper Networks, Inc. v. Shipley*,
643 F.3d 1346 (Fed. Cir. 2011) ............................................................ 19

v

*KSR Int'l Co. v. Teleflex Inc.,*
    550 U.S. 398 (2007) ................................................................ 25

*Le Roy v. Tatham,*
    55 U.S. 156 (1853) .................................................................. 26

*Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.,*
    969 F.2d 1384 (2d Cir. 1992) .................................................. 58

*Lovelace v. Software Spectrum Inc.,*
    78 F.3d 1015 (5th Cir. 1996) .................................................. 51

*Markman v. Westview Instruments, Inc.,*
    517 U.S. 370 (1996) ................................................................ 28

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
    132 S. Ct. 1289 (2012) ..................................................... passim

*Microsoft Corp. v. i4i Ltd. P'ship,*
    131 S. Ct. 2238 (2011) ............................................................ 50

*Park v. Booth,*
    102 U.S. 96 (1880) .................................................................. 25

*Parker v. Flook,*
    437 U.S. 584 (1978) ................................................................ 22

*Planet Bingo, LLC v. VKGS LLC,*
    576 Fed. App'x. 1005 (Fed. Cir. 2014) ............................ 23, 35

*SiRF Tech., Inc. v. Int'l Trade Comm'n,*
    601 F.3d 1319 (Fed. Cir. 2010) .............................................. 45

*Soley v. Star & Herald Co.,*
    390 F.2d 364 (5th Cir. 1968) .................................................. 59

*Taylor v. Charter Med. Corp.,*
    162 F.3d 827 (5th Cir. 1998) .................................................. 57

*Teva Pharms. USA, Inc. v. Sandoz, Inc.,*
    135 S. Ct. 831 (2015) ....................................................... 18, 54

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.,*
    617 F.3d 1296 (Fed. Cir. 2010) .............................................. 38

*Ultramercial, Inc. v. Hulu, LLC*,
  722 F.3d 1335 (Fed. Cir. 2013),
  *vacated and remanded*, 134 S. Ct. 2870 (2014) ................... 19, 50, 54, 55

*Ultramercial, Inc. v. Hulu, LLC*,
  772 F.3d 709 (Fed. Cir. 2014) ...................................... passim

*United States v. Jones*,
  29 F.3d 1549 (11th Cir. 1994) ............................................ 58

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
  793 F.3d 1306 (Fed. Cir. 2015) .......................................... 32

## Statutes

28 U.S.C. § 1295 ........................................................................ 2

28 U.S.C. § 1331 ........................................................................ 2

28 U.S.C. § 1338 ........................................................................ 2

35 U.S.C. § 101 .................................................................. passim

35 U.S.C. § 102 .................................................................. passim

35 U.S.C. § 103 .................................................................. passim

35 U.S.C. § 112 .................................................................. passim

35 U.S.C. § 282 ...................................................................... 50

## Rules

Fed. R. Civ. P. 12 .............................................................. passim

Fed. R. Civ. P. 52 .................................................................. 54

Fed. R. Evid. 201 .............................................................. passim

# Statement of Related Cases

Pursuant to Federal Circuit Rule 47.5, appellant provides as follows:

(a)    There have been no previous appeals in this case.

(b)    The following cases were consolidated on appeal: *Affinity Labs of Texas, LLC v. DIRECTV, LLC, et al.*, No. 15-1845 (lead case); *Affinity Labs of Texas, LLC v. NBA Media Ventures, LLC, et al.*, No. 15-1846; *Affinity Labs of Texas, LLC v. NHL Enterprises, L.P., et al.*, No. 15-1847; and *Affinity Labs of Texas, LLC v. MLB Advanced Media, L.P., et al.*, No. 15-1848. Plaintiff-Appellant Affinity Labs of Texas, LLC ("Affinity Labs") is not aware of any other cases pending in this or any other court that will directly affect or be directly affected by this Court's decision on this appeal.

1

# Jurisdictional Statement

The district court had jurisdiction over the patent infringement actions underlying this appeal pursuant to 28 U.S.C. §§ 1331 and 1338(a). The district court entered an order dismissing the cases pursuant to Fed. R. Civ. P. 12(b)(6) on July 7, 2015, A5-26, and final judgment was entered on July 8, 2015, in favor of Defendants-Appellees DIRECTV, LLC and DIRECTV Digital LLC ("DirecTV"). A1. Final judgment was entered on July 10, 2015 in favor of Defendants-Appellees NBA Ventures, LLC and Turner Digital Basketball Services, Inc. ("NBA"); NHL Enterprises, L.P., NHL Enterprises, Inc., and NHL Interactive CyberEnterprises, LLC ("NHL"); and MLB Advanced Media, L.P. and MLB Advanced Media, Inc. ("MLB") (collectively, along with DirecTV, the "Sports Leagues"). A2-4. Affinity Labs timely filed notices of appeal on July 8 and July 10, 2015. This Court has jurisdiction over the appeals pursuant to 28 U.S.C. § 1295(a)(1).

# Statement of the Issues

Whether the district court erred when it granted the Sports Leagues' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to claim patentable subject matter under 35 U.S.C. § 101, including when it:

1)    held any patent whose "purpose" relates to a longstanding commercial practice is a patent-ineligible abstract idea under step one of the *Alice* framework instead of determining whether the claims of the asserted patent are actually directed to tangible and concrete inventions;

2)    found that claims reciting concrete and tangible software/hardware elements determined to be novel by the United States Patent and Trademark Office ("USPTO") were nonetheless "routine, conventional, or well-known," and insufficient to provide an inventive concept either alone or in combination under step two of the *Alice* framework; and/or

3)    granted a motion to dismiss on the pleadings after it made unsupported factual findings contrary to the allegations in the complaint, without affording Affinity Labs, the non-movant, an opportunity to present evidence.

# Statement of the Case

## A.   The Inventions in the '379 Patent

Russell White and Kevin Imes invented a broadcast system solving a
problem unique to the computer age including technology, such as a
downloadable application as claimed, that simply did not exist previously.
Only many years later have companies, such as the Sports Leagues, begun
employing such applications for streaming broadcast content. *See* A557 at ¶
7. As in most patent cases, it is important to consider the state of the art at
the time of the invention. The broadcast telecommunication technology in
March 2000 was much more primitive than it is today. *Id*. There was no
iPod; no iPhone; and no App Store. *See id*. Apple eventually released the
iPod over one year later, and the iPhone and App Store finally went public
over seven years later—in June 2007 and July 2008 respectively. *Id*. As a
result, consumers had limited options to access or listen to broadcast media
on-the-go. As U.S. Patent No. 7,970, 379 ("the '379 patent") explains, "[f]or
example, a person living in Houston, Tex. may not be able to receive a
radio broadcast signal from a radio station in Seattle, Wash. utilizing a
conventional radio receiver." A23 at 15:57-67. In fact, there were no
available services streaming radio or television programs in one region of
the country to a user's portable cellular device in a geographically distinct

4

part of the country. *See* A77 at 4:14-18, A79 at 7:14-20, A83 at 15:57-16:2; *see also* A557 at ¶ 10. Russell White and Kevin Imes worked to fill this void.

By March 28, 2000, they had conceived of a solution. As a result of their collaboration and innovation, they invented a multi-faceted digital ecosystem, which included the ability to stream regional broadcasts to a portable electronic device anywhere in the country by way of an over-the-air downloadable application with a graphical user interface. *See* A114 at ¶¶ 15-16. Mr. White and Mr. Imes described their inventions in a comprehensive patent application, No. 09/537,812 (the '812 Application), filed with the USPTO on March 28, 2000. *See* A57, A114 at ¶¶ 14-17.

The advantages of the claimed system include portability, interoperability, and transmission quality over the prior art. The system has the benefit of providing "radio broadcasts without having to use a home computer system or conventional radio receiver." A83 at 15:67-16:2. A consumer could now be "remotely located from a conventional terrestrial communication network." A77 at 4:17-18. Thus, as a result of the claimed inventions, consumers were no longer tethered to radios and computers, and providers were no longer dependent on the reach of terrestrial broadcast channels.

The concept of providing a downloadable application for use on a cell phone was inventive on its own. Neither the Appellees nor the USPTO have pointed to any evidence of the existence of prior art downloadable applications for any purpose, let alone with the expressly claimed features

5

in the '379 patent. *See* 517-28. Moreover, it is a concrete technical invention, not a business method. The '379 patent describes that the downloadable application allows delivery of the media content on "several different types of electronic devices[.]" A81 at 11:26-27. Distinct from the prior art, this downloadable application allowed for processing a media signal on the wireless cellular telephone device rather than on a server. *See* A523 (describing U.S. Patent No. 6,587,127 to Leeke). This improved system for providing broadcast content also overcame limits in sound quality from analog radio, *see* A76 at 1:32-33, and avoided the adoption and standardization problems for digital radio. *Id*. at 1:33-2:7.

The file history is particularly important to the § 101 inquiry in this case. Not only did the USPTO allow the claims in 2011 over more than 600 prior art references, but the addition of the downloadable application led directly to allowance of the claims. *See* A517-28. Far from being routine or conventional computer technology, the downloadable application as claimed did not exist. A523. Specifically, to overcome a § 102(b) rejection, Affinity Labs amended Claim 1 as follows:

> A broadcast system, comprising:
>
> a network based resource maintaining information associated with a network available representation of a regional broadcasting channel that can be selected by a user of a wireless <u style="color:red">cellular</u> telephone device; and
> a <s>computer readable</s> <u style="color:red">non-transitory storage</u> medium including <s>instructions</s> <u style="color:red">an application configured for execution</u>

6

by the wireless cellular telephone device that when executed,
enable enables the wireless cellular telephone device:

to present a graphical user interface comprising at least a
partial listing of available media sources on a display
associated with the wireless cellular telephone device, wherein
the listing includes a selectable item that enables user selection
of the regional broadcasting channel;

to transmit a request for the regional broadcasting channel
from the wireless cellular telephone device; and

to receive a streaming media signal in the wireless cellular
telephone device corresponding to the regional broadcasting
channel, wherein the wireless cellular telephone device is
outside of a broadcast region of the regional broadcasting
channel, wherein the wireless cellular telephone device is
configured to receive the application via an over the air
download.

A519. By issuing a Notice of Allowance following Affinity Labs'
Amendments and Remarks, the Examiner confirmed that these
technological features relating to the over-the-air downloadable application
configured to present a graphical user interface for a wireless cellular
telephone in combination with the rest of the claim elements were not
taught by prior art systems for broadcasting content to a mobile device.
A526; *see also* A523.

The USPTO is not alone in its recognition of Affinity Labs' innovation.
A number of sophisticated companies have since licensed Affinity Labs'
patent portfolio. A115. The most recent licensee is Clear Channel, which is
one of the world's largest radio broadcast companies. Clear Channel
licensed the portfolio after almost three years of litigation on the '379

patent with respect to similar technology that is at issue in these cases, and long after the Supreme Court issued its *Alice* decision. A764, A880.

## B.   The Patent Infringement Actions

Affinity Labs brought patent infringement suits against the Sports Leagues, alleging infringement of the '379 patent based on the Sports Leagues' manufacture, use, sale, and offers to sell streaming video and audio services to customers' mobile devices. A115, A129, A142, A154.[1] The accused services included the NFL Sunday Ticket mobile application and the NFL Sunday Ticket service, the MLB.TV on the Go and the MLB.com At Bat mobile application, the NBA Game Time mobile application and NBA League Pass service, and the NHL GameCenter LIVE service and NHL mobile application. *Id.*

The Sports Leagues jointly moved to dismiss the cases pursuant to Federal Rule of Civil Procedure 12(b)(6) on the basis that the asserted patent failed to claim patentable subject matter under 35 U.S.C. § 101. A406. On June 2, 2015, the magistrate judge issued a report recommending that the Sports Leagues' motion to dismiss be granted. A27-56. Over the objections of Affinity Labs, the district court judge adopted in full the report and recommendation and issued its own order dismissing the cases. A5-A26.

---

[1] The cases were consolidated for pretrial purposes. A442-43.

## 1.   The Magistrate Judge's Report and Recommendation to Dismiss the Actions

The magistrate judge recommended that the district court grant the Sports Leagues' motion to dismiss. For the purposes of the Sports Leagues' motion to dismiss, the parties stipulated that claim 1 of the '379 patent was a representative independent claim. *See* A7, A654:15-655:16. Claim 1 recites:

> A broadcast system, comprising:
>
> a network based resource maintaining information associated with a network available representation of a regional broadcasting channel that can be selected by a user of a wireless cellular telephone device; and
>
> a non-transitory storage medium including an application configured for execution by the wireless cellular telephone device that when executed, enables the wireless cellular telephone device: to present a graphical user interface comprising at least a partial listing of available media sources on a display associated with the wireless cellular telephone device, wherein the listing includes a selectable item that enables user selection of the regional broadcasting channel; to transmit a request for the regional broadcasting channel from the wireless cellular telephone device; and to receive a streaming media signal in the wireless cellular telephone device corresponding to the regional broadcasting channel, wherein the wireless cellular telephone device is outside of a broadcast region of the regional broadcasting channel, wherein the wireless cellular telephone device is configured to receive the application via an over the air download.

A84. The magistrate judge issued a report and recommendation finding representative independent claim 1 and all other claims of the '379 patent,

including all the dependent claims, ineligible subject matter under the *Alice* framework. A27-56.

At the first step of the framework, the magistrate judge erred by identifying a "purpose" of the invention recited at a "reasonably high level of generality." A36. Then, the magistrate judge erred by asking whether the recited purpose was "well-known and historically long-standing." A42. After finding that the purpose of the '379 patent was "the dissemination of regionally broadcasted content to users outside the region," and that "such purpose is a well-known, longstanding, commercial business practice," the magistrate judge concluded "as a matter of law that the claims of the '379 Patent are directed to an abstract idea." A43.

At the hearing, Affinity Labs repeatedly objected to this general purpose/longstanding practice approach because nearly all inventions would be abstract. A675:9-A676:19, A811:1-A812:17. The magistrate judge defended the approach noting that, "95 to 98 percent" of cases post-*Alice* find an abstract idea. A676:11-16. When Affinity argued again that the test would result in finding an abstract idea in "literally every single patent," the magistrate judge agreed, saying "right," and indicated that he was unconcerned with the breadth of this approach. A691:21-A692:13. The magistrate judge clearly believed that it was acceptable to have a test that results in finding a purpose, a mature industry, and an abstract idea in virtually all patents. And, of course, the court never explained how the test

as applied could ever result in any patent passing step one of the *Alice* framework.

At the second—"inventive concept"—step of the *Alice* framework, instead of focusing on the actual claim limitations ignored at step one, the magistrate judge erred by applying a "technological arts" test. A47-48. Citing Judge Mayer's concurrence in the third *Ultramercial* decision, the magistrate judge indicated that to satisfy its applied technological arts test, the "claims must 'not only [1]) describe a technological objective, but [2] set out a precise set of instructions for achieving it.'" A47 (citing *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 721-22 (Fed. Cir. 2014) (Mayer, J. concurring) ("*Ultramercial III*")). Applying the technological arts test, the magistrate judge found that the claims did not include an inventive concept because the claim "limitations … do not identify any specific functionality or explain 'how' they are going to download regionally broadcast content onto a wireless cellular telephone device such that a user outside the region can view the content." A48. At the hearing, counsel from both parties expressed concern with conflating § 101 and § 112. *See* A769:16-A770:10, A727:7-15. Yet just as he suggested at the hearing, A744:20-25, the magistrate judge supported his findings by concluding that "[b]oth the claim and the specification are devoid of any teaching or blueprint explaining how the device can do what it purports to do." A48. The magistrate judge made this decision on the pleadings without taking any evidence—from one skilled in the art or otherwise. *See id.*, A727.

11

Although the magistrate judge acknowledged that the legal issue of invalidity under § 101, "may contain underlying factual issues," A36 (citation omitted), he indicated § 101 "eligibility questions mostly involve general historical observations, the sort of findings routinely made by courts deciding legal questions." A43. Thus, he erred by making factual findings regarding what was "well-known and longstanding" as well as finding that claim elements were "routine and generic" or represented "well-understood, routine, conventional activity." A43-45; *see also* A50-52. The magistrate judge swept aside any concern about making factual findings outside the record on a 12(b)(6) motion by noting the *Ultramercial III* decision and saying "[s]o they did it. Why can't I do it?" A773:18-A774:4. Of course, the record is completely different in this case, but the magistrate judge went on to make factual findings without support or citation to evidence and that were contrary to the USPTO's findings of novelty and utility reflected in the issued patent asserted in the complaint. *See* A49 (citing *Cloud Satchel v. Amazon.com, Inc.*, 79 F. Supp. 3d 553 (D. Del. 2014) and concluding that a graphical user interface comprising "a partial listing of available media sources on a display … wherein the listing includes a selectable item that enables user selection of the regional broadcasting channel" is a generic computer component); *see also generally* A44-52.

The magistrate judge then conducted a preemption inquiry. A52. Rather than asking whether the claims preempted the "purpose" of the

12

claims previously identified in step one of the *Alice* analysis, the magistrate judge erred by instead narrowing the purported abstract idea to whether the claims preempted "the dissemination of regionally broadcasted content to a user outside the region *on an electronic device that utilizes cellular communication*." A53-54 (emphasis added). The magistrate judge then found that the claims did not impose any significant limitation on this idea. A54. As a result, the magistrate judge identified a broad concept in the first instance of the *Alice* framework, but a narrower concept when considering whether the claims imposed any limitations on the application of the abstract idea. *Compare* A42-43, *with* A53-54. Affinity Labs objected to the magistrate judge's report and recommendation. A822.

### 2. The District Court's Order Adopting the Magistrate Judge's Report and Recommendation and Dismissing the Actions

The district court adopted the magistrate judge's report and recommendation and issued an explanatory order overruling Affinity Labs' objections. A5-26. The district court found that the magistrate judge did not err in his analysis of either step one or two of the *Alice* framework. A16-23. The district court "agree[d]" with the magistrate judge's "purpose" method for determining if a claim is directed to an abstract idea and his conclusion that the "purpose of the '379 Patent is for the dissemination of regionally broadcasted content to users outside the region and that such

purpose is a well-known, longstanding, commercial business practice." A17 (alteration from original omitted); *see also* A18. The district court also summarily dismissed Affinity Labs' objections to the magistrate judge's application of step two of the *Alice* framework. A19-23. Like the magistrate judge, the district court's analysis never addressed how the downloadable application claim limitation *as a whole,* or any of the independent or dependent claims *as a whole*, was generic, conventional, well-known or routine as of March 2000. *See id.* Nor did the district court consider whether the actual entire claim language was directed to a tangible and concrete application rather than simply the identified abstract "purpose." *See id.*

The district court overruled Affinity Labs' objection that the magistrate judge made unsupported factual determinations regarding what was conventional, routine, or well-known at the time of the invention. A15, A22. The district court noted that this Court has affirmed decisions invalidating patents under § 101 at the motion to dismiss stage of cases. *Id*. No analysis was conducted of whether the particular fact findings in *this* case were supported or contrary to inferences that must be drawn in non-movant Affinity Labs' favor. And the court ultimately reasoned that making fact findings regarding what is conventional or routine at the time of an invention when determining the legal question of patent eligibility under § 101 must always be acceptable. *See id.* The district court characterized the magistrate judge's fact findings as "taking judicial notice." A22. But the magistrate judge cited to no public records or other

14

support for his findings that one would expect to see when judicial notice is taken. Nor did the magistrate judge indicate he was taking judicial notice of all the claim elements he concluded were conventional, well-known and routine concepts. *See* A45-A52.

The district court also agreed with the magistrate judge's preemption analysis. A24. Regardless of the preemption analysis, the district court found that this Court's decision in *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371 (Fed. Cir. 2015), mooted concerns with any separate inquiry into preemption. A24-25.

## Summary of Argument

The Supreme Court treaded carefully when expanding its § 101 jurisprudence to include some business methods, and cautioned against a broad application of this judicially-created exception lest it swallow all of patent law. Nevertheless, the district court adopted an analysis that would result in finding an abstract idea in most if not all patents, and would completely confuse § 101 with §§ 102, 103 and 112. That approach dictated the result as the district court found, on a 12(b)(6) motion, that claims to a novel out-of-region broadcast system, also known as a "machine" under § 101, are ineligible patent subject matter. The district court's decision was in error and should be reversed for at least three reasons.

First, the '379 patent claims are not directed to an abstract idea as understood by the Supreme Court. The claims are not directed to mathematical equations or to fundamental economic concepts. Nor are the claims similar to those found ineligible by this Court in any of its decisions since *Alice*. The district court erred in this respect by first finding that any well-known commercial practice is by definition an abstract idea. It then compounded that error by eviscerating the claimed invention by using a "quick look" approach to pare down the claims to a "purpose" and ask whether that purpose relates to a well-known commercial practice (*i.e.*, an abstract idea). The district court's approach would find an abstract idea in almost any patent in a longstanding art like, medical devices, automobiles,

or telecommunications. Any such patent would immediately proceed to step two for scrutiny under the "inventive concept" test. Instead, the district court should have found the '379 patent claims eligible because they are directed to an inherently concrete and tangible broadcast system.

Second, even if the claims are directed to an abstract idea, the claims as a whole recite a combination of software and network elements, including an over-the-air downloadable application with a graphical user interface for a wireless cellular telephone, such that application of the abstract idea is to a new and useful end. The patent office allowed the claims when this structural element was added, and there is no evidence in the record that such a downloadable application ever existed, let alone that it was conventional computer technology as of 2000. The district court erred in considering this evidence because it applied a "technological arts" test absent from any Supreme Court or Federal Circuit precedent. The application of the technological arts test imparted additional requirements, such as enablement within the claims, which is improper for a threshold § 101 inquiry. In addition, the district court misapplied the Supreme Court's case law on what it means for limitations to represent well-known, routine, or conventional activity by asking whether elements were in the "prior art" rather than whether the elements were necessary or incidental to implementing the abstract idea in a computing environment. The district court's faulty analysis at step two was underscored by a faulty preemption analysis wherein it used the broad concept of out-of-region broadcasting to

17

find the claims directed to an abstract idea under step one, and a much narrower idea of broadcasting to an electronic device over a cellular communication channel to find preemption in step two.

Finally, the district court erred throughout its analysis by making explicit factual findings that failed to comport with the requirements of either legislative fact-finding or judicial notice under Federal Rule of Evidence 201. The district court's practice in this regard ran afoul of Fifth Circuit—and other Circuit courts—procedural law and allowed it to make unsupported and unrebutted findings while ignoring Affinity Labs' evidence to the contrary. Specifically, the magistrate judge made factual findings regarding preemption and what was conventional, routine, or well-understood at the time of the invention. The only justification offered for these findings was a courts' power to make historical findings when deciding purely legal questions. The Supreme Court in *Teva*, however, dispensed with the notion that legislative fact finding is appropriate in the patent context. And even if judicial notice of certain facts were appropriate at the pleading stage, the magistrate judge failed to give proper notice of its findings under Federal Rule of Evidence 201 and in any event made findings subject to reasonable dispute.

# Standard of Review

The Federal Circuit reviews orders granting motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) under the law of the regional circuit. *Juniper Networks, Inc. v. Shipley*, 643 F.3d 1346, 1350 (Fed. Cir. 2011) (citation omitted). In the Fifth Circuit, motions to dismiss for failure to state a claim are reviewed *de novo. Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009). Patent eligibility under § 101 presents a question of law that is reviewed *de novo. Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013) (citing *Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012)). The legal conclusion "may contain underlying factual issues." *Id*. (citing *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1339 (Fed. Cir. 2013) ("*Ultramercial II*"), *vacated and remanded*, 134 S. Ct. 2870 (2014)). Well-pleaded factual allegations in the complaint must be construed in the light most favorable to Affinity Labs. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

# Argument

This case is emblematic of district court decisions that are dramatically expanding the § 101 doctrine too far and too wide and with no sound justification. All of the typical errors are present including finding an "abstract idea" with no rational basis for understanding what makes any non-business method idea abstract, hopelessly conflating § 101 with §§ 102, 103 and 112, and making numerous factual findings on a 12(b)(6) motion that are actually contrary to the limited record available to the court. Given the recent explosion of the § 101 issue in the court system, it is to be expected that there is little guidance yet on these issues. That explains why district court after district court, including the one below, has noted that there is no clear test, no real definition of an "abstract idea" at the appellate court level, and no guidance as to how much of the written description apparently must now be in the claims to show "how" the invention works. *See, e.g., Cal. Inst. of Tech. v. Hughes Commc'ns., Inc.*, 59 F. Supp. 3d 974, 980, 986, 990 (C.D. Cal. 2014). Affinity Labs asks this Court to address these issues in this case, and correct the errors made below.

This should not be a § 101 case because the claims recite a "machine" under § 101. As the Supreme Court noted in *Alice*, "[t]here is no dispute that a computer is a tangible system (in § 101 terms, a "machine"), or that many computer-implemented claims are formally addressed to patent eligible subject matter." *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2358-59

(2014). In this case, the claims are computer implemented, and recite a concrete implementation of a broadcasting system with a defined novel downloadable application providing new functionality for solving a technical shortcoming in the prior art. It is not a business method, not merely a mathematical formula, not merely sets of data, not a method of organizing human activity, and it cannot be done with a pencil and paper. In short, it is not abstract.

The claims are concrete and tangible at virtually any level of generality one would like to ascribe to them. Even if there were an abstract idea embedded somewhere in the claims, the downloadable application as claimed is clearly not routine or conventional computer technology by the year 2000, and there is zero evidence in the record to suggest otherwise. Accordingly, Affinity Labs seeks reversal of the district court decision, and a remand so that this patent can be addressed as it should be, under the more traditional questions of obviousness and written description, and based upon a complete record.

## I.    The Claims of the '379 Patent are Directed to a Concrete and Tangible Invention, Not an Abstract Idea.

The Supreme Court "tread[s] carefully in construing th[e] exclusionary principle lest it swallow all of patent law." *See Alice*, 134 S. Ct. at 2354. This is because "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id*. (quotation

and alterations from original omitted). The district court plainly ignored these words of warning when it created a new and extremely broad category of abstract ideas, looked only to a generalized purpose of the claims, and ignored the inherent concrete and tangible nature of the invention.

### A. The district court erred by creating a new and extremely broad category of abstract idea it called "well-known, longstanding, commercial practices."

A proper step one analysis begins with the Supreme Court's precedent, and then this Court's precedent. With that backdrop, the district court's improper application and expansion of the abstract idea category will be clear.

The Supreme Court has found two—and only two—types of claims abstract under §101 – mathematical algorithms and some business methods directed to fundamental economic practices. *See Gottschalk v. Benson*, 409 U.S. 63 (1972); *Parker v. Floo*k, 437 U.S. 584 (1978); *See Bilski v. Kappos*, 561 U.S. 593, 612 (2010); *Alice*, 134 S. Ct. at 2356. The Supreme Court in *Bilski* expressly declined to say that all business methods are abstract because new business methods may be patentable. *See Bilski*, 561 U.S. at 612 ("Today, the Court once again declines to impose limitations on the Patent Act that are inconsistent with the Act's text."). Instead, the *Bilski* Court said that some fundamental economic practices like risk hedging are abstract.

22

*Id*. at 611-12. And in *Alice*, the Supreme Court said it "need not labor to delimit the precise contours of the 'abstract ideas' category" because the patent at issue fell squarely within the fundamental economic practice category first recognized in *Bilski*. *Alice*, 134 S. Ct. at 2357. Nothing in these decisions supports the creation of additional categories, as opposed to further refinement of the fundamental economic practice category.

This Court has since found some claimed inventions to include an abstract idea that might arguably fall outside of the two Supreme Court categories. *See, e.g.*, *Planet Bingo, LLC v. VKGS LLC*, 576 Fed. App'x. 1005, 1007 (Fed. Cir. 2014) (invalidating patent directed to managing the game of bingo because the concept "consists solely of mental steps which can be carried out by a human using pen and paper" (citing district court)); *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) (finding claims directed to "the idea of retaining information in the navigation of online forms" to be abstract); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015) (finding claims directed to "tailoring content based on [a] viewer's location or address" to be ineligible subject matter); *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (finding as unpatentable claims "drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory"). These cases appear to have been decided on a case-by-case basis without the express creation of another category of

abstract idea or a boundary to any category. In general, they seem to relate to mental steps that could be performed on paper or perhaps the general accumulation and storage of data in any form.

Certainly none of the above cases stand for the proposition that the Supreme Court intended to create a category called "long-standing commercial practices." Nor do they stand for the proposition that claims are abstract if the "purpose" of the patent as a whole is one that relates to an old industry. Old is not coextensive with abstract. The district court erred in creating this new test and analysis.

The "purpose" and "long-standing commercial practice" test applied by the district court suffers from two fatal flaws. First, the district court's expansion of the abstract idea exception violates the Supreme Court's emphatic teaching that courts "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Alice*, 134 S. Ct. at 2354. Indeed, the Court has always held that "Congress plainly contemplated that the patent laws would be given wide scope." *Bilski*, 561 U.S. at 601 (quoted authority omitted). For this reason, "§ 101 patent-eligibility is *only* a threshold test." *Id*. at 602 (emphasis added). The Patent Act sets forth more stringent standards for patentability beyond § 101, such as § 102 (novelty), § 103 (non-obviousness), and § 112 (particularly

described). *Id.*[2] Thus, the abstract ideas exception is clearly a doctrine of restraint.

The district court's new "longstanding practice" exception fails to respect this restraint. In fact, this new test would risk characterizing almost all inventions as abstract under step one. The Supreme Court has always recognized that innovation occurs through incremental improvements to long standing or conventional technologies. *See, e.g., KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-19 (2007) ("[I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."); *Park v. Booth*, 102 U.S. 96, 102 (1880) ("Modern inventions very often consist merely of a new combination of old elements or devices, where nothing is or can be claimed except the new combination.").

If the question is whether a patent relates to a longstanding commercial practice, then that inquiry will encompass virtually all patents. Inventions in the telecommunications, automotive, aerospace, or medical device arts—all concrete and tangible but mature arts—would be characterized as "abstract" under step one in the district court's new

---

[2] Courts have taken the "threshold" statement out of context repeatedly. For instance, some courts now rely on this quote to suggest that § 101 is a threshold issue to be determined at the start of litigation. But that is not what the Supreme Court said in *Bilski*, as the full quote makes clear. Instead, *Bilski* underscored that patent eligibility was a less stringent standard than §§ 102, 103, and 112. The timeliness of the district court's decision is addressed fully in Section III below.

category. For example, companies have manufactured and sold artificial heart valves for over fifty years. And yet, under the district court's new exception, an improvement to an artificial heart valve in the 21st Century would somehow become "abstract" under step one of the *Alice* test just because medical device companies have a "longstanding practice" of manufacturing and selling these valves. Indeed, whether such improvements are patentable should be determined by § 102 and § 103, not the threshold inquiry of § 101. Nothing in Supreme Court precedent supports the district court's broad expansion.

The second fatal flaw in the district court's new "longstanding practice" exception is that the inquiry is a non sequitur. This Court has defined an abstraction as "an idea, having no particular *concrete* or *tangible* form." *Ultramercial III*, 772 F.3d at 715 (emphasis added); *see also Alice*, 134 S. Ct. at 2354 (quoting *Gottschalk*, 409 U.S. at 93) (explaining that the "abstract idea" exception embodies "the longstanding rule that an idea of itself is not patentable" (alternation in original omitted)); *Le Roy v. Tatham*, 55 U.S. 156, 175 (1853) ("A principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right."). Such ephemeral "inventions" are not concrete or tangible and therefore unpatentable. The "longstanding practice" category advanced by the district court, however, is untethered to this basic inquiry of whether the claimed invention is concrete and tangible, or alternatively abstract. Once again, examples are limitless of

26

concrete and tangible products in our modern economy that would be declared "abstract" under the district court's new test. For instance, automated teller machines (ATMs) have been prevalent in the banking industry for over four decades. But there can be no dispute that ATMs—including current models that are far more technologically advanced than those from the 1970s—are concrete and tangible machines. The fact that they also pertain to a "well-known, longstanding commercial practice" should not factor into whether a patent on an ATM is "abstract" under step one of the *Alice* test. This example—one of many—underscores the extreme over-breadth of the district court's new category, and similarly reflects why this Court should not adopt a "longstanding practices" exception to the two types of "abstract ideas" recognized by the Supreme Court.

The claimed inventions of the '379 patent are a new and novel broadcast system that streams out-of-region broadcast content in connection with an over-the-air downloadable application with a graphical user interface for a wireless cellular telephone. These claims are neither mathematical algorithms nor fundamental economic practices, nor are they in any other way ephemeral. This Court should reverse the district court's expansion of the Supreme Court's precedent on step one of the *Alice* test.

## B. The district court failed to conduct a proper analysis even under its erroneous longstanding practice standard because the district court eviscerated the claimed invention by focusing on the purpose of the invention after a "quick look" at the claims.

The district court failed to consider the claimed invention in its analysis of step one. A proper analysis under step one starts and ends with the claims. *See Ultramercial III*, 772 F.3d at 714 ("We first examine the *claims* because claims are the definition of what a patent is intended to cover.") (emphasis added). But the district court deviated from this analysis. Instead of focusing on the claim language and limitations, the district court conducted only a "quick look" at the claims to determine the "purpose" of the patent in his analysis. *See* A36-41. Even worse, the district court relied on the title, as well as the abstract, of the patent to arrive at the district court's determination of the purpose or concept of the patent. A40. The district court erred in this approach.

As an initial matter, as set forth above, any analysis of whether a claim is patent eligible must start and end with the claim language and limitations. A bedrock principle of patent law is that the claims define the scope of the invention. *See, e.g.*, *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373-74 (1996). All validity analyses, therefore, focus on the claims. And the Supreme Court has long rejected the suggestion that a claimed invention can be reduced to an "essential element," "gist" or "heart." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 345 (1961). Nor has

the Federal Circuit ever adopted such a test. Indeed, a general "purpose" analysis will almost always result in an "abstract idea" without almost any connection to the claim language. *See, e.g.*, *Fairfield Indus., Inc. v. Wireless Seismic, Inc.*, No. 4:14-cv-2972, 2014 U.S. Dist. LEXIS 176599, at *11 (S.D. Tex. Dec. 23, 2014) (recognizing that "any claim, described at a certain level of generality, can be challenged as directed to an abstract idea"). That is what happened in this case.

The district court's determination of the purpose of the invention was so generic that it eviscerated the claimed inventions. Specifically, based in part on the title and abstract of the '379 patent,[3] the district court broadly determined that "the purpose of the '379 Patent is the dissemination of regionally broadcasted content to users outside the region." A40. This broad purpose eviscerated the claimed invention. For example, the following limitations from claim 1 are excluded from the district court's purpose:

---

[3] The district court failed to even consider the full sentence in the abstract that it relied on: "the Abstract describes 'a method for providing broadcast content is disclosed. The method maintains a system to deliver regionally broadcasted content to an electronic device located outside a region of the regionally broadcasted content . . .'" *Compare* A40, *with* A57. The district court's ellipsis left out important aspects of the claimed inventions *within* the Abstract: "provides an application for the electronic device that allows the electronic device to request a streaming media signal representing the regionally broadcasted content even if the electronic device is located outside of the region, and communicates the streaming media signal to the electronic device responsive to a user request." A57.

A broadcast system, comprising:

~~a network based resource maintaining information associated with a network available representation of a regional broadcasting channel that can be selected by a user of a wireless cellular telephone device; and~~

~~a non-transitory storage medium including an application configured for execution by the wireless cellular telephone device that when executed, enables the wireless cellular telephone device: to present a graphical user interface comprising at least a partial listing of available media sources on a display associated with the wireless cellular telephone device, wherein the listing includes a selectable item that enables user selection of the regional broadcasting channel; to transmit a request for the regional broadcasting channel from the wireless cellular telephone device; and~~ to receive a ~~streaming media~~ signal ~~in the wireless cellular telephone device~~ corresponding to the regional broadcasting channel, wherein the ~~wireless cellular telephone~~ device is outside of a broadcast region of the regional broadcasting channel~~, wherein the wireless cellular telephone device is configured to receive the application via an over the air download.~~

The district court, thus, did not consider any reference to the over-the-air downloadable application with a graphical user interface for a wireless cellular telephone under step one. This omission is critical because the over-the-air downloadable application was specifically added to the claims to overcome a prior art challenge. A519-523. And this downloadable application with a graphical user interface allowed at least some of the benefits over the prior art; namely, a user was no longer tied to a

30

conventional home computer to access out-of-region content. A79 at 7:15-20.

The district court's failure to consider the specific claimed inventions compounded its error of identifying a new "longstanding commercial practice" category to the abstract idea doctrine. A41. The analysis ended up, and will always end up, as a tautology. For instance, if a court generalizes a patent to the degree that it omits any consideration of elements that were found to overcome prior art, then the generalization of the patent will always relate to some well-known and longstanding practice. The end result, if the district court's "quick look" of the purpose of a patent is adopted, and if courts may exclude from consideration elements that were the basis for a combination of elements to be new and novel, then the remainder will always relate to something that is longstanding or historical and, therefore, abstract under step one according to the district court. Once again, this result is not what the Supreme Court held or suggested in any of its past jurisprudence on § 101.

## C.    The district court erred by finding under any test or standard that an inherently concrete and tangible broadcast system is "abstract."

The claims of the '379 patent are patent eligible under § 101 because they claim concrete and tangible inventions. Following *Alice*, this Court explained that an abstraction is "an idea, having no particular concrete or

tangible form." *Ultramercial III*, 772 F.3d at 714. For example, the claimed inventions in *Ultramercial* were directed to a business method of "using advertising as an exchange or currency." *Id.* at 715. The same is true for the business methods in *Bilski* (fundamental economic practice of risk hedging) and *Alice* (fundamental economic practice of intermediated settlement). The same is true for this Court's reasoning in *Versata*, when it found that claims directed towards "[u]sing organizational and product group hierarchies to determine a price" was an abstract idea because it "has no particular concrete or tangible form or application." *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1333 (Fed. Cir. 2015); s*ee also Internet Patents*, 790 F.3d at 1348 (finding claims directed to "the idea of retaining information in the navigation of online forms" to be abstract). In all of these cases, in other words, the claimed inventions could be practiced irrespective of any structural requirements, and that is what made the claimed inventions abstract.

The claimed inventions of the '379 patent are fundamentally different than business methods in the cases above. There is no way to practice the claimed inventions of the '379 patent without concrete and tangible components. That is true whether all the claimed limitations are taken into account, or whether the district court's general purpose of the patent is adopted. The following demonstratives reflect this fact.



A910 (tangible application of claimed inventions)



A911 (tangible application of district court's purpose of the invention)

As shown in both demonstratives, the invention and purpose of the invention can only be performed through the use of structural components. There is no way to broadcast regional content to a user outside the region without concrete and tangible structures. If the Sports Leagues wish, they may argue that the claimed inventions of the '379 patent were not new and novel under § 102 and § 103 (despite the PTO's examination of over 600 prior art references to the contrary, A57-66), but there cannot be a dispute that the claimed inventions—or even the district court's broad purpose of the patent"—are a "machine" as set forth in § 101. *See* 35 U.S.C. §101; *see also Alice*, 134 S. Ct. at 2359 ("There is no dispute that a computer is a tangible system (in § 101 terms, a 'machine'), or that many computer-implemented claims are formally addressed to patent-eligible subject matter."). Thus, while at times it may seem that the analysis of what is an abstract idea is similar to Justice Potter's famous "I know it when I see it" expression, the case law of the Supreme Court and this Court is actually much closer to "I know it when I *don't* see it." In other words, you do not see mathematical algorithms, economic practices, or ineligible business methods because they are not physical or tangible. But you can see the servers, mobile devices, receivers, and the claimed media systems in the '379 patent. The claimed inventions are not abstract in any way, and, therefore, are patent eligible.

This Court's alternative tests further compel the conclusion that claims directed to tangible and concrete concepts are patentable. This Court has

recognized that methods performable in the human mind or on pen and paper are directed to unpatentable mental processes. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011); *see also Planet Bingo*, 576 Fed. App'x. at 1007 (finding patent directed to managing the game of bingo unpatentable because the concept "consists solely of mental steps which can be carried out by a human using pen and paper"). Here, there is no dispute between the parties that dissemination of regionally broadcasted content to users outside the region *cannot be performed* in the human mind alone or using only a pen and paper. Nor did the district court make any conclusions to the contrary, which underscores that the inventions claimed in the '379 patent are tangible, concrete, and above all else, patentable.

## II. The District Court Erred in Finding that the Claims of the '379 Patent Lacked an Inventive Concept.

The claims of the '379 patent are patentable under step two of the *Alice* framework because the claims apply the district court's contention of an abstract concept to a new and useful end. *See Alice*, 134 S. Ct. at 2354. At the second *Alice* step, the Court must "consider the elements of each claim both individually and as an ordered combination to determine whether the elements transform the nature of the claim into a patent-eligible application" of the abstract idea or whether the claim elements merely state the abstract idea while adding the words "apply it." *Id.* at 2355, 2357

(internal quotations omitted). The district court's analysis of step two cannot stand on appeal because it applied an unprecedented technological arts test, ignored the novelty of technological elements in the claims and erroneously found other elements conventional, routine, or well known, and erred in its preemption analysis.

## A.  The district court erred in its analysis and application of an unprecedented "technological arts" test.

The district court's analysis of step two was tainted from the start because it applied an incorrect standard. The center point for the district court's step two analysis was a "technological arts" test, which the district court borrowed from a concurring opinion in *Ultramercial III*. *See* A47-48. "[N]o such test has ever been explicitly adopted by the Supreme Court, [the Federal Circuit], or [its] predecessor court…." *In re Bilski*, 545 F.3d 943, 960 (Fed. Cir. 2008) (en banc), *aff'd on other grounds*, 561 U.S. 593 (2010). Since at least the *en banc* decision in *Bilski*, Judge Mayer has urged adoption of this test. *See Bilski*, 561 U.S. at 600. He continued this appeal, for instance, in his concurrence in *Ultramercial III*, *see* 772 F.3d at 721-22 (Mayer, J., concurring), and dissent in *DDR*. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1265 (Fed. Cir. 2014) (Mayer, J., dissenting). Yet no precedential authority has adopted this "technological arts" test. Indeed, those words are not even mentioned in *Alice*—and for good reason. The Supreme Court has consistently refused to invalidate all business method patents, despite

objections from a minority of justices. *See Bilski*, 561 U.S. at 657 (Stevens, J. concurring); *Alice*, 134 S. Ct. at 2360-61 (Sotomayor, J., concurring).

The district court's adoption and application of the technological arts test is more than just semantics. The district court explained that "[i]n order to satisfy the technological arts test, *claims* must 'not only [1]] describe a technological objective, but [2]] set out a precise set of instructions for achieving it.'" A47 (quoting *Ultramercial III*, 772 F.3d at 721-22 (Mayer, J. concurring) (emphasis added). The district court's analysis, therefore, focused on what the claims described and enabled. For instance, the district court determined:

> In the instant case, the *claim limitations* of Affinity's '379 patent, specifically the downloadable application with graphical user interface, do not identify any specific functionality or *explain "how"* they are going to download regionally broadcast content onto a wireless cellular telephone device such that a user outside the region can view the content.

A48 (emphasis added).

The district court, therefore, imparted requirements into a § 101 analysis that do not exist. Section 112 requires the patent holder to describe and enable its claimed inventions *in the specification*, and not the claims. 35 U.S.C. § 112(a); s*ee also Bilski,* 561 U.S. at 620 ("[C]laim specification is covered by § 112, not § 101; and if a series of steps constituted an unpatentable idea merely because it was described without sufficient

specificity, the Court could be calling into question some of our own prior decisions.") (Stevens, J. concurring) (citations omitted).[4] The technological arts test and analysis applied by the district court is at fundamental odds with the Patent Act, and incompatible with the Supreme Court's explanation that § 101 is "only a threshold test," with more stringent requirements set forth later, including § 112. *See Bilski*, 561 U.S. at 602. The district court erred in its step two analysis.

## B.   The claims of the '379 patent include an inventive concept under a proper analysis of step two.

A proper analysis under step two is far less rigorous than the heightened standard required by the district court. The second step of the *Alice* framework is "a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012)). The Supreme Court has

---

[4] If the magistrate judge's technological arts test is correct, then it would at a minimum involve fact issues, especially from the perspective of one of ordinary skill in the art. For instance, it is blackletter law that whether claims meet the enablement requirement "is a question of law with underlying questions of fact regarding undue experimentation." *See, e.g., Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1305 (Fed. Cir. 2010). Questions of enablement, thus, should not ordinarily be decided on the pleadings. *See id*. at 1307.

also instructed that "well-understood, routine, conventional" or generic activities are insufficient to confer patentability. *Id*. at 2359. Here, the claims of the '379 patent provide elements that are far more than the broad purpose of the dissemination of regionally broadcasted content to users outside the region.

### 1. The over-the-air downloadable application with a graphical user interface for a wireless cellular telephone does not represent generic, well-understood, routine, or conventional activity.

The inventive-concept analysis should start with the over-the-air downloadable application with a graphical user interface for a wireless cellular telephone. While the inventive concept test is not coextensive with the test for novelty in § 102, courts recognize that the two tests overlap. *See Mayo*, 132 S. Ct. at 1304 ("We recognize that, in evaluating the significance of additional steps, the § 101 patent eligibility inquiry and, say, § 102 novelty inquiry might sometimes overlap."); *Ultramercial III*, 772 F.3d at 715 ("[A]ny novelty in implementation of the idea is a factor to be considered only in the second step of the *Alice* analysis."). Here, the prosecution history is clear that the over-the-air downloadable application, as combined with the rest of the claim elements, was a point of novelty over 600 prior art references. *See* A517-28, A57-66. The over-the-air downloadable application is anything but generic computer technology; the record in this case makes clear that it did not exist in March 2000. A523, A557 at ¶10. This fact was

confirmed with expert testimony. A557-58 at ¶¶ 8- 10. Thus the distinction between the '379 patent and the 600 pieces of prior art before the examiner was not the fact that the inventors implemented a mobile broadcast system in a computer or Internet environment, but rather that Affinity Labs did so using a specific technical solution that included an over-the-air downloadable application with a graphical user interface for a wireless cellular telephone. *See* A523. The downloadable application is at least an inventive concept, as it is a hallmark of novelty in this case—a lesser standard than what is required by *Alice*. The fact that the district court found new and novel claims to be generic—on the pleadings, no less— underscores how far astray district courts have gone following *Alice*.

The district court's determination that the downloadable application was generic, A49, fails for two main reasons. First, as set forth above, it was factually wrong based on the state of the art, and the district court was at least wrong to make those factual determinations in the first place against Affinity Labs on a motion to dismiss. Second, the district court misapplied the Supreme Court's case law on what is well-known, routine, or conventional.

Whether the claim individually or as a whole recites more than well-understood, routine, or conventional computing elements is not a question of novelty, but one of necessity. This follows from two principles: first, abstract ideas are not rendered eligible by simply stating the abstract idea and including the words "apply it" in a claim, *Alice*, 134 S. Ct. at 2358; *Cf.*

*Mayo*, 132 S. Ct. at 1294; Second, abstract ideas are not patentable by simply "limiting the use of an abstract idea to a particular technological environment." *Alice*, 134 S. Ct. at 2358 (quotation omitted). Thus in the case of computer-implemented inventions, "[s]tating an abstract idea while adding the words 'apply it with a computer' simply combines those two steps, with the same deficient result." *Id*. Thus the question, at step two, should be whether the additional limitations are necessary or incidental to implementing an abstract idea in a given technological environment. *See id*. at 2360 ("As a result, none of the hardware recited by the system claims 'offers a meaningful limitation beyond generally linking the use of the method to a particular technological environment, that is, implementation via computers." *Id*. (quoting *CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269, 1291 (Fed. Cir. 2013)) (internal quotation marks omitted).

*Mayo*—the genesis of the "well-understood, routine, conventional activity" language—is instructive. The claim in *Mayo* was directed to the unpatentable natural law correlating metabolites in the blood to efficacy and toxicity of drug dosages. *Mayo*, 132 S. Ct. at 1295. Of the three claimed steps, the first recited nothing more than the relevant and *pre-existing* audience: doctors who treat patients with the specific drug. *Id*. at 1297. Identifying a specific audience merely limited the use of the natural law to a particular environment. *See id*. (quoting *Bilski*, 561 U.S. at 601). The second simply informed the doctors of the relevant natural correlations. *Id*. And the third step instructed doctors to determine the level of relevant

41

metabolites using existing methods "well known in the art." *Id*. at 1297-98 (citing the patent specification). All told, "the three steps simply t[old] doctors to gather data from which they may draw an inference in light of the correlations." *Id*. at 1298. And in practice "[a]nyone who wants to make use of [the correlations] *must* first administer [the] drug and measure the resulting … concentrations…." *Id*. (emphasis added). Thus the combination amounted to "nothing significantly more than an instruction to doctors to apply the applicable laws when treating their patients." *Id*.

Unlike *Mayo* and *Alice*, the limitations of the '379 patent are not merely necessary or incidental, and they are certainly not generic or routine. In particular, the over-the-air downloadable application with a graphical user interface for a wireless cellular telephone recited in the '379 patent claims is not required, by necessity, to implement the district court's alleged abstract idea. Put another way, the claimed over-the-air downloadable application enabling streaming of a user-specified regional broadcasting channel signal is not the *only* way to disseminate regionally broadcast content to users outside the region in a computing environment. *See infra*, II.C (discussing preemption). A host of other computer implementations could be employed. And in fact, Affinity Labs overcame a rejection at the USPTO over one of those prior art implementations (the '127 patent to Leeke). A523, A528. In response to a § 102(b) rejection based on Leeke, Affinity Labs amended the claims to add an over-the-air downloadable application enabling streaming of a user-specified regional broadcasting channel

signal. A519, A523. The Leeke system used no such over-the-air downloadable application. A523. Instead, Leeke "appear[ed] to rely on a player … that is executed in a server rather than a wireless device." *Id*. This technological distinction led, in part, to issuance of the '379 patent. *See* A528. Even now, there is no piece of art of record that even comes close to disclosing the '379 inventions.

The district court's failure to properly consider the over-the-air downloadable application with a graphical user interface for a wireless cellular telephone was further compounded by its conclusory analysis of the '379 patent dependent claims. A50-52. At a minimum, claim 2 (modification of a device GUI to display information about a song), claim 3 (distributing an FM signal over the Internet), claims 4 and 5 (software directed towards modifying the display on a wireless cellular telephone device to provide certain capabilities), claim 6 (search engine for a selected media information), claim 7 (a programmed log-in feature providing a preferred user environment), claim 10 (programming the GUI to present a listing of media sources), claim 11 (the buffering of streaming media signals), claim 15 (combining and processing signals related to audio and textual information), and claim 19 (software updates), are all additional technical limitations that improve the delivery or presentation of media content to a user of a wireless cellular device. *See* A84-85.

Because the additional limitations are not necessary or incidental to applying the district court's alleged abstract idea to a pre-existing

environment like on a computer or the Internet, the claims include a combination of elements "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S. Ct. at 2355.

## 2.    By any other measure from this Court's precedent, the claims include an inventive concept.

The claims of the '379 patent further evidence an inventive concept for the same reasons set forth by this Court in *DDR*. In that case, this Court concluded that "these claims stand apart [from other computer claims] because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR*, 773 F.3d at 1257. With respect to the '379 patent, the over-the-air downloadable application with a graphical user interface for a wireless cellular telephone similarly set forth a non-conventional (and novel) broadcast system that did not exist in March 2000. A84-85, A517-28, A557. The inventors claimed a technical solution (a broadcast system using particular cellular and network/software technology) to address a problem specifically arising in the realm of broadcast communications (the shortcomings of land lines,

44

satellite, and conventional terrestrial technology for regional broadcasts to mobile devices). *See* A77 at 4:14-18, A79 at 7:14-20, A83 at 15:57-16:2.

The claims of the '379 patent are also patentable under the machine-or-transformation test—a test that this Court has endorsed at step two. *Ultramercial III*, 772 F.3d at 716 (the test "can provide a 'useful clue' in the second step of the *Alice* framework.") (citations omitted). The test is satisfied if a process is "tied to a particular machine or apparatus." *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1332 (Fed. Cir. 2010). Here, the components recited in the claims —*e.g.*, the over-the-air downloadable application, non-transitory storage medium, network-based resource, and wireless cellular telephone—not only permit the remote distribution of regional broadcast content, they are essential to it. *See* A84 at 18:21-44, A85 at 19:20-20:8, A523. None of the claim steps—maintaining a delivery system, providing an over-the-air downloadable application, and communicating a streaming media signal—could be performed by a human alone. *See SiRF Tech.*, 601 F.3d at 1333. Indeed, neither the district court nor the Sports Leagues have contested this fact.

The '379 patent claims satisfy the machine or transformation test, cannot be performed by a human alone, and are directed to a solution rooted in computer technology in order to overcome technical limitations in prior art communications systems. Thus under a proper step two analysis, and on this factual record, the '379 patent claims include an inventive concept.

## C.    The district court's incorrect step two analysis is evidenced by its faulty preemption analysis.

The fundamental policy underlying § 101 is the concern that a patent on an abstract idea will preempt "building blocks of human ingenuity." *Alice*, 134 S. Ct. at 2354. The Supreme Court, in *Alice*, specifically considered preemption as part of its two-step framework. *See id.* at 2358 ("This conclusion accords with the pre-emption concern that undergirds our §101 jurisprudence."). This Court has inconsistent cases on the role of preemption as applied to the *Alice* and *Mayo* frameworks. In *DDR*, for instance, preemption played a significant role in determining that the claims surpassed step two and were patentable subject matter. 773 F.3d at 1259 ("It is also clear that the claims at issue do not attempt to preempt every application of the idea of increasing sales by making two web pages look the same, or of any other variant suggested by NLG."); *see also Accenture*, 728 F.3d at 1341 (explaining that "in the case of abstractness, the court must determine whether the claim poses 'any risk of preempting an abstract idea'" and quoting *CLS Bank*, 717 F.3d at 1282). More recently, this Court suggested that a separate preemption analysis is unnecessary if the court finds that the claims are ineligible for patenting under the two step framework. *See Ariosa*, 788 F.3d at 1378-79.

Like in *Alice* and *DDR*, Affinity Labs submits that preemption should be considered, and that consideration in this case underscores the district

court's error in its step two analysis. The district court erred in its preemption consideration for three main reasons.

First, the district court's preemption analysis was inconsistent with its analysis of the alleged abstract idea under step one. At step one, the magistrate judge found that the '379 patent was directed to the abstract idea of disseminating "regional broadcast content to users outside the region." A41-43. This broad characterization thus suited the magistrate judge's abstract idea test for any "longstanding, commercial practice." Yet when subsequently measuring the preemptive footprint of the '379 patent, the magistrate judge instead found the claims preempted "the dissemination of regionally broadcasted content to a user outside the region *on an electronic device that utilizes cellular communication*." A53-54 (additional material emphasized). Thus, the district court used the broad concept of out-of-region broadcasting for step one, and a much narrower idea of broadcasting to an electronic device over a cellular communication channel in step two. *Compare* A42-43, *with* A53-54. This inconsistent approach ensured that the district court's analysis would be unfavorable to Affinity Labs under both steps. Had the district court instead considered whether the claimed invention preempted "regional broadcast content to users outside the region" (as identified at *Alice* step one), there would have obviously been no preemption concern (as further explained below). At a minimum, the preemption analysis must be applied consistently over both steps. The district court erred in failing to do so here.

47

Second, the district court was factually wrong in its preemption determination. The claimed inventions of the '379 patent do not preempt all avenues of broadcasting regional content to an area outside the region. For example, the claims do not cover innovations in satellite radio, satellite television, or cable television, any of which can be used to broadcast content from one area of the country around the world. They do not cover improvements to streaming over a traditional personal computer. The claims also do not cover the examples of disseminating out of region broadcast content cited by the Sports Leagues and magistrate judge as longstanding practices. *See* A38 (referring to "age-old concept of … someone h[olding] the phone up to the radio so that a distant friend could hear the broadcast"), A42 (referring to live or replay radio station broadcasts of out of region sporting events and cable tv national broadcasts of Atlanta Braves and Chicago Cubs games); *cf.* A84-85.

Even more specifically, the patent does not cover all systems for disseminating regionally broadcasted content to a user outside the region on an electronic device that utilizes cellular communications. For example, if a user were to access content on a cellular device via a built-in FM receiver, rather than through an application available for over-the-air download as claimed by the '379 patent, such an implementation to achieve the abstract idea is not covered by the claims—nor are implementations not involving *streaming* the regional broadcast content. Implementations involving a user accessing media through the cellular

48

device's preloaded web browser are also not covered by the claims. *See* A84-85. There is no risk of preemption according to the fundamental principles underlying a proper § 101 analysis discussed by the Supreme Court and this Court.

Third, any fulsome preemption analysis would require claim construction. Whether a product falls within the scope of a claim necessarily implicates claim construction. It is elementary that the scope of the claims in a patent must be the same for infringement (patent holder's burden) as it is for invalidity (accused infringer's burden). *See, e.g., Amgen Inc. v. Hoechst Marion Roussel*, 314 F.3d 1313, 1330 (Fed. Cir. 2003). That is relevant here because the district court acknowledged that the Sports Leagues had non-infringement positions to offer in this case. *See* A621:25-A622:1; *see also* A790:14-16 (acknowledging that the Sports Leagues had a non-infringement position). Yet the district court refused to address the issue of claim construction for purposes of this motion, even though Affinity Labs repeatedly told the district court the claims as a whole had to be looked at in construing the scope of the claims and analyzing the scope of preemption. A703:7-11, A703:25, A836; *see also* A698 at 1:8 (magistrate judge insisting he was not engaging in claim construction but rather just "want[ed] to get a good feel for the scope of this patent.")

The district court and the Sports Leagues cannot have it both ways. They cannot maintain that the claims of the '379 patent are so broad as to preempt all, or substantially all, regionally broadcasted content to a cellular

device,[5] while also maintaining that the Sports Leagues' products—which indisputably broadcast regional content to a wireless cellular device—are not covered by the claims the '379 patent. The district court's refusal to address this inconsistency demonstrates error in its preemption analysis, and reinforces that the motion was premature in the first place.

## III.  The District Court Erred in Granting a Motion to Dismiss Based on Unsupported Factual Findings Outside the Record.

The motion to dismiss was in error because the district court made independent fact findings unsupported by the record, without affording Affinity Labs the opportunity to rebut those findings. The '379 patent is presumed valid by law, subject to clear-and-convincing evidence of invalidity. *See CLS Bank*, 717 F.3d at 1284 (citing 35 U.S.C. § 282 and *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011)); *id*. at 1304-05; *Ultramercial II*, 722 F.3d at 1338.[6] The lower court's § 101 inquiry relied on subsidiary factual issues related to preemption and what is routine, well-known, and conventional at the time of the invention. *See* A15, A22, A24, A44-54. "Normally, in deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint."

---

[5] The Sports Leagues made similar expansive arguments in their motion. *See* A53, A795-96.

[6] At the hearing, the Sports Leagues agreed that the clear-and-convincing standard should apply. A35, A724:8-13.

*Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996). "However, courts may also consider matters of which they may take judicial notice." *Id*. at 1017-18.

In a pre-hearing teleconference, the magistrate judge indicated that he may request that the parties take judicial notice of certain facts. A1042:6-12. Then at the hearing on the motion to dismiss, the magistrate judge suggested perhaps he could take judicial notice of various public prior art patents from the 1990s and make findings based on those public records. A805-07. The magistrate also indicated, however, he would not be able to "interpret" those patents in order to base findings thereon as a matter of judicial notice. *Id.*

In his subsequent report and recommendation, the magistrate judge did not identify any public record of which he was taking judicial notice. Rather, he stated that "[c]ourts frequently make findings when deciding purely legal questions. Eligibility questions mostly involve general history observations, the sort of findings routinely made by courts deciding legal questions." A35 (quoting *Hughes*, 59 F. Supp. 3d at 978 n.6); *see also* A22, A43. He then proceeded to make a number of factual findings regarding preemption and what was routine, generic, well-understood, or conventional. *See, e.g.,* A45 ("the Court finds the claim merely sets forth routine and generic processing and storing capabilities of computers generally"), A46 ("Similarly, the functions performed by claim 1 … can all be performed by a generic computer."), A51 (finding a "search engine …

51

was a well known generic computer feature as of the year 2000"), *id*. (finding claims 7 and 8 claim "basic computer functions within the prior art that add nothing of practical significance"), A52 ("[N]either claims 11, 12 nor 13 describe anything inventive and not in the prior art."), *id*. (generally stating that dependent claims considered with independent claims, "individually or as an ordered combination, all describe conventional, well known and routine concepts…"), A53-54 (finding the claims "preempt the dissemination of regionally broadcasted content to a user outside the region on an electronic device that utilizes cellular communication, thereby monopolizing the idea on a ubiquitous device…."").

Thus the magistrate judge, perhaps recognizing the limited application of the rule, explicitly did not try to rely on judicial notice under Federal Rule of Evidence 201. In contrast, the district court judge, in dismissing Affinity Labs' objections to the magistrate's report and recommendation, justified the magistrate judge's actions as proper "use of taking judicial notice …." A22. Neither Rule 201, governing judicial notice, or courts' practice of making general historical observations in deciding purely legal questions justifies the unsupported factual findings made in this case regarding adjudicative facts.

## A. General historical observations are not appropriate because determining the preemptive scope of the claims-in-suit and whether the claim limitations were generic, routine or conventional is not legislative fact-finding.

General historical observations or fact-finding done without record support or without compliance with Federal Rule of Evidence 201 regarding judicial notice is appropriate only in the context of "legislative" fact-finding. *See* Fed. R. Evid. 201(a) and its 1972 advisory committee notes. Legislative fact-findings are those which have only "relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body" but which are *not* "simply the facts of the particular case." Fed. R. Civ. P. 201(a) 1972 advisory committee notes. A legislative fact question "is not a question specifically related to this one case or controversy; it is question of social factors and happenings ...." *Dunagin v. City of Oxford, Miss.*, 718 F.2d 738, 748 n.8 (5th Cir. 1983).

Thus, the interpretation of the '379 patent at issue along with prior art in order to determine what was conventional and routine at the time of filing the '379 patent, and also the scope of preemption, cannot be justified as the determination of a legislative fact as to which courts may make general historical observations because it involves inquiry into specific technical matters at the heart of the particular patent dispute. Indeed, the Supreme Court recently rejected the notion that legislative fact finding has

any place in the determination of factual findings underlying other "legal" patent issues such as claim construction and obviousness:

> Neither do we find factfinding in this context sufficiently similar to the factfinding that underlies statutory interpretation. Statutes, in general, address themselves to the general public; patent claims concern a small portion of the public. Statutes typically (though not always) rest upon congressional consideration of general facts related to a reasonably broad set of social circumstances; patents typically (though not always) rest upon consideration by a few private parties, experts, and administrators of more narrowly circumscribed facts related to specific technical matters.

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840 (2015); *see also Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 809, 810-11 (1986) ("the scope and content of the prior art" and "differences between the prior art and the claims at issue" are just some of the subsidiary facts underlying ultimate legal question of obviousness that must be made in accordance with Fed. R. Civ. P. 52(a)). Similarly, this Court recognized in *Ultramercial II* that "[a]lmost by definition, analyzing whether something was 'conventional' or 'routine' involves analyzing facts. … Likewise, any inquiry into the scope of preemption—how much of the field is 'tied up' by the claim— by definition will involve historic facts." 722 F.3d at 1339. Although § 101 is overall a legal determination, these are underlying adjudicative facts, which means dismissal under Rule 12(b)(6) will normally be improper. *See id.*

The magistrate judge's reliance on *Hughes*, a district court decision from the Central District of California, to support its factual findings was in error. *Hughes* notes that courts frequently make fact findings when deciding purely legal issues. 59 F. Supp. 3d at 978 n.6. But § 101 is not a pure legal issue; it "is rife with underlying factual issues." *Ultramercial II*, 722 F.3d at 1339.

The Supreme Court has never said that fact-findings relating to the conventionality or preemptive scope of the claims-in-suit could be made without meeting the requirements for judicial notice of adjudicative facts or properly applying record evidence. *Hughes* refers to *Alice*'s citation to potentially out-of-record evidence showing historical intermediated settlement practice and makes a vague comparative citation to a Supreme Court decision involving interpretation of constitutional provisions and statutes to suggest § 101 eligibility questions "mostly involve general historical observations." *Hughes*, 59 F. Supp. 3d at 978 n.6 (citing *District of Columbia v. Heller*, 554 U.S. 570, 581-92 (2008); *Alice*, 134 S. Ct. at 2356; *ABC, Inc. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014)). Unlike this case where the magistrate cited to nothing to support his various fact findings, the Supreme Court's citation in *Alice* to several publications could potentially be justified as complying with Federal Rule of Evidence 201's requirements for taking judicial notice of adjudicative facts given the identification of accurate sources from which the fact they were cited for could be readily determined. Moreover, *Alice* was an appeal from summary judgment with

a factual record. *See* 134 S. Ct. at 2353; *CLS Bank*, 717 F.3d at 1312 (citing to the record).

The district court's belief that unsupported general historical observations can just be made anywhere in a § 101 analysis is contrary to foundational legal principles. Deciding the conventionality or scope of pre-emption of the claims-in-suit is distinctly not legislative fact-finding.

## B.   The district court's adjudicative fact finding also does not meet the requirements for use of judicial notice.

The district court fact findings do not comply with Federal Rule of Evidence 201. A court may only judicially notice a fact "that is not subject to reasonable dispute." Fed. R. Evid. 201(b). The rule is intended to "limit judicial notice of facts to those so universally…[or] generally known or of such common notoriety within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute and those capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy." *Id.* 1972 advisory committee notes (internal quotations omitted); *see also* Fed. R. Evid. 201(b). "[J]udicial notice applies to self-evident truths that no reasonable person could question, truisms that approach platitudes or banalities." *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 347 (5th Cir. 1982). "Surely where there is evidence on both sides of an issue the matter is subject to reasonable dispute." *Id*. at 348. In such cases, judicial notice is inappropriate. *Id*.

Whether the '379 patent claims cover something that was not conventional and routine in March 2000 is subject to at least reasonable dispute. The USPTO specifically found the claims novel and inventive before issuing them. A57-66, A517-28, A557. Affinity Labs submitted evidence from its expert Joseph McAlexander, that he was unaware of any cell phones in existence in March 2000 that could receive the over-the-air downloadable application claimed by the '379 patent. A557. The district court also certainly did not identify any easily accessible source of indisputable accuracy that supported any of its fact findings regarding the scope of preemption of the claims or the routine and conventional nature of the claims as a whole.

The magistrate judge's findings regarding what was conventional, routine, or well-understood at the time of the invention relies almost exclusively on other court decisions. *See* A44-A54. None of these cited cases involved the same claim limitations at issue here, and thus provide no support for deciding whether the '379 patent claim limitations or claims, in particular, are ineligible. Even if another decision did happen to involve similar claim elements (and a similar time of invention), the Fifth Circuit has expressly held that judicial notice cannot be used take notice of facts found within a legal judgment. *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 831 (5th Cir. 1998) (expressly holding a court cannot take judicial notice of a judgment other than for the limited purpose of taking as true the action of the court in entering judgment). The Fifth Circuit's position is consistent

with several other circuit courts of appeals. *Id*. at 829-30 (citing *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388-89 (2d Cir. 1992), *Holloway v. Lockhart*, 813 F.2d 874, 878-79 (8th Cir. 1987), *United States v. Jones*, 29 F.3d 1549, 1553-54 (11th Cir. 1994)). A court cannot take judicial notice of the factual findings of another court because such facts are not indisputable. Because the district court's decision to dismiss was based impermissibly on factual findings outside of the record, the decision to dismiss was in error.

The district court further erred in not affording Affinity Labs the opportunity to present evidence to the contrary, and ignoring relevant evidence of record. Rule 12 contemplates the situation where matters outside of the pleadings are considered on a Rule 12(b)(6) motion: "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

The central concern underlying this rule is fairness as "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id*. The same idea is embodied in Federal Rule of Evidence 201 which requires giving a party an opportunity "to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed." Fed. R. Evid. 201(e); *see also Colonial Leasing Co. v. Logistics Control Grp. Int'l.*, 762 F.2d 454, 461 (5th Cir. 1985) (noting that court's taking of judicial notice in a post-trial order after the close of evidence "deprived"

litigant of the opportunity to attack a judgment); *Soley v. Star & Herald Co.*, 390 F.2d 364, 367 (5th Cir. 1968) ("We are cognizant of the general rule which permits judicial notice of a court's prior cases to support a motion for summary judgment….But the trial court in this case did not inform the parties as to what he noticed.") (reversing and remanding for further proceedings). Since the magistrate judge never stated it was taking judicial notice of any particular fact, Affinity Labs never had the opportunity to directly address the impropriety of taking judicial notice of a fact of that nature.

To compound its error, the district court ignored relevant evidence of record. The district court did not address or consider the declaration of Affinity Labs' expert, Joseph McAlexander, A555-58, or that the USPTO specifically found the combination of an over-the-air downloadable application with a graphical user interface for a wireless cellular telephone with a broadcast media distribution system patentable over 600 prior art references. *See* A57-66, A523-28. These were both relevant evidence to the questions of preemption, and what was well-understood, conventional, or routine in the art at the time of the invention. The district court's failure to consider this evidence in view of its § 101 analysis, and not giving Affinity Labs the opportunity to submit additional evidence in rebuttal, was reversible error, if not also a violation of due process.

It was unfair for the district court to make generalized, unsupported "findings" that Affinity Labs could neither answer nor rebut on the one

hand, while ignoring particularized evidence on the other. While district courts are sorting out what they perceive to be new issues following *Alice*, they should not be permitted to disregard well-established procedural and evidentiary rules that facilitate the fair resolution of civil disputes, as the lower court did here.

## Conclusion

The '379 patent claims a concrete and tangible invention defining a specific implementation of a broadcast system with a novel downloadable application providing new functionality for solving technical shortcomings in the prior art. For the aforementioned reasons, the district court's grant of the Sports Leagues' motion to dismiss pursuant to Rule 12(b)(6) should be reversed. The case should be remanded for further proceedings.

Dated: September 29, 2015          Respectfully submitted,

_/s/ Ronald J. Schutz_
Ronald J. Schutz
Cyrus A. Morton
Patrick M. Arenz
Brenda L. Joly
Benjamen C. Linden
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402-2015
Tel.: (612) 349-8500

_Attorneys for Plaintiff-Appellant_
_Affinity Labs of Texas, LLC_

# ADDENDUM

# TABLE OF CONTENTS
## TO ADDENDUM

| START | END | DESCRIPTION |
|---|---|---|
| JUDGMENT, ORDER OR DECISIONS IN QUESTION (AND SUPPORTING OPINIONS, MEMORANDUMS, OR FINDINGS AND CONCLUSIONS) | | |
| A1 | A1 | Judgment in Case No. W-15-CV-30 (W.D. Tex.) (Docket No. 60) |
| A2 | A2 | Judgment in Case No. W-15-CV-31 (W.D. Tex.) (Docket No. 23) |
| A3 | A3 | Judgment in Case No. W-15-CV-32 (W.D. Tex.) (Docket No. 22) |
| A4 | A4 | Judgment in Case No. W-15-CV-33 (W.D. Tex.) (Docket No. 21) |
| A5 | A26 | Order (adopting magistrate judge's findings and recommendation and granting defendants' motion to dismiss) (Docket No. 58 in lead case) |
| A27 | A56 | Report and Recommendation of the United States Magistrate Judge (Docket No. 53 in lead case) |
| PATENT-IN-SUIT | | |
| A57 | A85 | United States Patent 7,970,379 |

AO450 (Rev. 5/85)   Judgement in a Civil Case

# UNITED STATES DISTRICT COURT

WESTERN _____ DISTRICT OF _____ TEXAS

**JUDGMENT IN A CIVIL CASE**

AFFINITY LABS OF TEXAS, LLC,
PLAINTIFF

V.

DIRECTV, LLC, DIRECTV
DIGITAL LLC, et al.
DEFENDANT

Case Number:    W-15-CV-30

**Jury Verdict.**  This action came before the Court for a trial by jury.  The issued have been tried and the jury has rendered its verdict.

X  **Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED
ORDERED that the Magistrate Judge's findings and recommendation are ADOPTED.

ORDERED that Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) is GRANTED, and the case is DISMISSED.

ORDERED that Defendants' Motion to Transfer Venue is DENIED as MOOT.

ORDERED that any motions the Court or the Magistrate Judge has not previously ruled upon are DENIED.

July 8, 2015
_____
Date

Jeannette J. Clack
_____
Clerk

_____
(By) Deputy

AO450 (Rev. 5/85)   Judgement in a Civil Case

# UNITED STATES DISTRICT COURT

WESTERN — DISTRICT OF — TEXAS

**JUDGMENT IN A CIVIL CASE**

AFFINITY LABS OF TEXAS, LLC,
PLAINTIFF

V.

DIRECTV, LLC, DIRECTV
DIGITAL LLC, et al.
DEFENDANT

Case Number:    W-15-CV-31

**Jury Verdict.** This action came before the Court for a trial by jury. The issued have been tried and the jury has rendered its verdict.

X  **Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED
ORDERED that the Magistrate Judge's findings and recommendation are ADOPTED.

ORDERED that Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) is GRANTED, and the case is DISMISSED.

ORDERED that Defendants' Motion to Transfer Venue is DENIED as MOOT.

ORDERED that any motions the Court or the Magistrate Judge has not previously ruled upon are DENIED.

July 8, 2015
Date

Jeannette J. Clack
Clerk

(By) Deputy

AO450 (Rev. 5/85)   Judgement in a Civil Case

# UNITED STATES DISTRICT COURT

WESTERN _____ DISTRICT OF _____ TEXAS

## JUDGMENT IN A CIVIL CASE

AFFINITY LABS OF TEXAS, LLC,
PLAINTIFF

V.

DIRECTV, LLC, DIRECTV
DIGITAL LLC, et al.
DEFENDANT

Case Number:   W-15-CV-32

**Jury Verdict.** This action came before the Court for a trial by jury. The issued have been tried and the jury has rendered its verdict.

X **Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED
ORDERED that the Magistrate Judge's findings and recommendation are ADOPTED.

ORDERED that Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) is GRANTED, and the case is DISMISSED.

ORDERED that Defendants' Motion to Transfer Venue is DENIED as MOOT.

ORDERED that any motions the Court or the Magistrate Judge has not previously ruled upon are DENIED.

July 8, 2015
_____
Date

Jeannette J. Clack
_____
Clerk

_____
(By) Deputy

**A3**

AO450 (Rev. 5/85)   Judgement in a Civil Case

# UNITED STATES DISTRICT COURT

WESTERN _____ DISTRICT OF _____ TEXAS

**JUDGMENT IN A CIVIL CASE**

AFFINITY LABS OF TEXAS, LLC,
PLAINTIFF

V.

DIRECTV, LLC, DIRECTV
DIGITAL LLC, et al.
DEFENDANT

Case Number:    W-15-CV-33

**Jury Verdict.** This action came before the Court for a trial by jury. The issued have been tried and the jury has rendered its verdict.

X  **Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED
ORDERED that the Magistrate Judge's findings and recommendation are ADOPTED.

ORDERED that Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) is GRANTED, and the case is DISMISSED.

ORDERED that Defendants' Motion to Transfer Venue is DENIED as MOOT.

ORDERED that any motions the Court or the Magistrate Judge has not previously ruled upon are DENIED.

July 8, 2015
Date

Jeannette J. Clack
Clerk

(By) Deputy

**A4**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TEXAS

### WACO DIVISION

| | | |
|---|---|---|
| **AFFINITY LABS OF TEXAS, LLC,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. W:15-CV-030** |
| | § | |
| **DIRECTV, LLC, DIRECTV DIGITAL** | § | |
| **LLC, et al.,** | § | |
| **Defendants.** | § | |

## O R D E R

Plaintiff Affinity Labs of Texas, LLC ("Affinity") filed the instant patent infringement suit, which was referred to the United States Magistrate Judge for all purposes. Doc. 9. Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rules 1(h) and 4(b) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, the Magistrate Judge submitted a Report and Recommendation to this Court addressing Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6). Doc. 19. After holding oral argument on May 12, 2015, and considering the parties' briefing, the Magistrate Judge concluded that Defendants' Motion is meritorious and recommended that it be granted with respect to all of the asserted claims of U.S. Patent No. 7,970,379 ("the '379 Patent"). Having reviewed the Magistrate Judge's report de novo, Affinity's objections thereto, and Defendants' Response, the Court hereby adopts the

1

**A5**

Magistrate Judge's findings and recommendation. Consequently, Defendants' Motion to Dismiss is **GRANTED**.

### FACTUAL AND PROCEDURAL HISTORY

Affinity is an innovation consulting firm that owns a large portfolio of technology-based patents. Defendants are four companies, all in the business of broadcast media. Affinity filed suit against each Defendant separately,[1] alleging infringement of the '379 Patent. The Magistrate Judge granted the parties' Joint Motion to Consolidate under Rule 42(a). Doc. 22.

The '379 Patent, entitled "Providing Broadcast Content," claims a means for delivering regionally broadcasted radio or television content to an electronic device located outside a region of the regionally broadcasted content. '379 Patent (filed June 30, 2009). According to the specification, the patent addresses the following problem:

> [A] user may want to listen to a radio station located in a remote location wherein conventional radio receivers could not receive the desired broadcast. For example, a person living in Houston, Tex. may not be able to receive a radio broadcast signal from a radio station in Seattle, Wash. utilizing a conventional radio receiver.

*Id.* at col. 15 1. 58-64. The patents claim (1) a method for streaming regional content outside of a specific geographic location ("the method claims"); and (2) a

---

[1] *See Affinity Labs of Texas, LLC v. NBA Media Ventures, LLC*, No. 6:16-CV-031 (W.D. Tex. Apr. 6, 2015); *Affinity Labs of Texas, LLC v. NHL Enterprises, L.P.*, No. 6:15-CV-032 (W.D. Tex. Apr. 6, 2015); *Affinity Labs of Texas, LLC v. MLB Advanced Media, L.P.*, 6:15-CV-033 (W.D. Tex. Apr. 6, 2015). The Court's Order refers to Defendants collectively.

**A6**

system configured to carry out the method on a wireless cellular telephone device ("the system claims"). *Id.* at 57.

At the hearing on Defendants' Motion, the parties agreed that Claim 1 is representative. Claim 1 reads as follows:

> 1. A broadcast system, comprising:
>
> A network based resource maintaining information associated with a network available representation of a regional broadcasting channel that can be selected by a user of a wireless cellular telephone device; and
> a non-transitory storage medium including an application configured for execution by the wireless cellular telephone device that when executed, enables the wireless cellular telephone device:
> to present a graphical user interface comprising at least a partial listing of available media sources on a display associated with the wireless cellular telephone device, wherein the listing includes a selectable item that enables user selection of the regional broadcasting channel;
> to transmit a request for the regional broadcasting channel from the wireless cellular telephone device; and to receive a streaming media signal in the wireless cellular telephone device corresponding to the regional broadcasting channel, wherein the wireless cellular telephone device is outside of a broadcast region of the regional broadcasting channel, wherein the wireless cellular telephone device is configured to receive the application via an over the air download.

*Id.* at col. 18 1. 21-44. Defendants jointly seek to dismiss Affinity's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) on the grounds that the '379 Patent is invalid under 35 U.S.C. § 101 for failing to state a claim patentable subject matter.

Affinity previously asserted the '379 Patent in the Austin Division of the Western District of Texas. *See Affinity Labs of Tex., LLC v. Clear Channel Broad, Inc.*, No. 1:12-CV-205-LY, 2014 WL 1699063 (W.D. Tex. Apr. 29, 2014). In a *Markman* order, Judge Yeakel held that the purpose of the invention described in

the '379 Patent at issue is "to allow a user to consume 'regionally broadcasted content' when the user is physically located outside of the range of that regionally broadcasted content." *Id.* at *6. In *Clear Channel*, Judge Yeakel was not presented with the opportunity to analyze whether the '379 Patent was invalid under § 101.

Here, after holding oral argument and conducting a thorough review of the parties' briefing, the Magistrate Judge's Report and Recommendation recommended granting Defendants' Motion to Dismiss pursuant to Rule 12(b)(6). Doc. 53. In response to the Report and Recommendation, Affinity timely filed objections thereto. Doc. 56. Defendants filed a Response to Affinity's objections. Doc. 57.

## STANDARD OF REVIEW

If a party files specific written objections to a Magistrate Judge's Report and Recommendation, the court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which [an] objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(2) (requiring specific written objections). The objections must be "sufficiently specific to focus the district court's attention on the factual and legal issues which are truly in dispute." *United States v. 2121 E. 30th St.*, 73 F.3d 1057, 1060 (10th Cir. 1996); *Nettles v. Wainwright,* 677 F.2d 404, 410 (5th Cir. 1982) (en banc) ("It is reasonable to place upon the parties the duty to pinpoint

4

**A8**

those portions of the magistrate's report that the district court must specifically consider.").

General, vague, conclusive, or frivolous objections will not suffice. *See Battle v. U.S. Parole Comm'n,* 834 F.2d 419, 421 (5th Cir. 1987). In such cases, the Court will only review the Magistrate Judge's findings to determine if they are clearly erroneous or contrary to the law. *See Gallegos v. Equity Title Co. of America, Inc.*, 484 F. Supp. 2d 589, 591 (W.D. Tex. 2007) (citing *United States v. Wilson*, 864 F.2d 1219, 1221 (5th Cir. 1989)). Objections made with sufficient specificity, however, allow for the district court to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Freeman v. Cnty. of Bexar*, 142 F.3d 848, 852 (5th Cir. 1998) (quoting 28 U.S.C. § 636(b)(1)).

## RELEVANT LAW

Section 101 of the Patent Act defines patentable subject matter. 35 U.S.C. § 101. More specifically, § 101 states that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." *Id.* The Supreme Court has interpreted § 101 to "contain[] an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quotation marks omitted). "[T]he concern that drives this exclusionary principle [i]s one of pre-emption." *Id.* These

5

**A9**

categories are not patent-eligible because "they are the basic tools of scientific and technological work" that are "free to all men and reserved exclusively to none." *Mayo Collaborative Servs. v. Prometheus Labs.*, 132 S. Ct. 1289, 1293 (2012) (quotation marks omitted). Allowing patent claims for laws of nature, natural phenomena, and abstract ideas would "tend to impede innovation more than it would tend to promote it[,]" thereby thwarting the primary object of the patent laws. *Id.* Thus, the Court has "repeatedly emphasized this . . . concern that patent law not inhibit further discovery by improperly tying up the future use of" these building blocks of human ingenuity. *Id.* at 1301. However, the Court has also recognized the need to "tread carefully in construing this exclusionary principle, lest it swallow all of patent law." *Alice*, 134 S. Ct. at 2354.

The Supreme Court has recognized that, at some level, "all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo*, 132 S. Ct. at 1293. Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept. *See Diamond v. Diehr*, 450 U.S. 175, 187 (1981). Applications of such concepts "to a new and useful end" remain eligible for patent protection. *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972).

In *Alice*, the Court identified a "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts[,]" which reflects the two-part test it previously articulated in *Mayo*. 134 S. Ct. at 2355. Under the *Mayo/Alice*

6

**A10**

test, a court must first determine whether the claim is "directed to one of those patent-ineligible concepts[]" (e.g., a law of nature, physical phenomenon, or abstract idea). *Id.* If it is, the court moves to the second step and asks "[w]hat else is there in the claims before us?" *Mayo*, 132 S. Ct. 1297. To answer that question, the court considers the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. *Id.* at 1297-98. This analysis serves as a search for an "'inventive concept,'" which, in other words, is an element or combination of elements "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 1294.

## ANALYSIS

### I.    The Magistrate Judge Did Not Err in Finding that the § 101 Issue Was Ripe for Adjudication.

Affinity argues Defendants' 12(b)(6) Motion is unripe because claim construction and factual disputes existed. Although patent eligibility under § 101 is not determined at the pleadings stage in all cases, it is not error to do so and may "have a number of salutary effects." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718 (Fed. Cir. 2014) (Mayer, J., concurring). These effects include "conserv[ing] scarce judicial resources," "provid[ing] a bulwark against vexatious infringement suits," and "weeding out . . . patents that stifle innovation and transgress the public domain." *Id.* at 718-19. "Issues of patent-eligible subject

matter are questions of law" and are therefore appropriate to address at the pleadings stage of litigation. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011); *see also Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) (affirming the district court's decision granting a motion to dismiss an infringement claim for failure to state patent-eligible subject matter); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1351 (Fed. Cir. 2014) (affirming the district court's decision to grant judgment on the pleadings based on § 101).

While Affinity asserts that the Federal Circuit's "analysis is limited and opaque[,]" it does acknowledge that the court "has affirmed Rule 12 motions on § 101[.]" Doc. 56 at 3 n.1. The Court disagrees with Affinity's characterization of the extent of the Federal Circuit's analysis on this issue; the court recently issued two opinions in which it affirmed the invalidity of patents pursuant to § 101 stemming from 12(b)(6) motions to dismiss for lack of patent-eligible subject matter. *See Internet Patents Corp. v. Active Network, Inc.*, --- F.3d ----, 2015 WL 3852975 (Fed. Cir. June 23, 2015); *OIP Techs., Inc. v. Amazon.com, Inc.*, --- F.3d ----, 2015 WL 3622181 (Fed. Cir. June 11, 2015).

Further, the Federal Circuit has opined that "[a]lthough the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable prerequisite to a validity determination under § 101." *Content Extraction*, 776 F.3d at 1349. In *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, the Federal

8

**A12**

Circuit found that the district court did not err by declaring claims patent ineligible at the pleading stage without first construing the claims or allowing the parties to conduct fact discovery and submit opinions from experts supporting their claim construction positions. 687 F.3d 1266, 1273-74 (Fed. Cir. 2012).

Affinity claims the Magistrate Judge erred in improperly shifting the burden to it to identify a specific claim construction issue for § 101 purposes. Furthermore, Affinity contends the Magistrate Judge failed to conduct a proper, formal claim construction analysis. But when "the parties have not sought construction of any terms in the . . . patent[], . . . this lack of dispute over the proper construction of the asserted claims confirms that it is unnecessary to engage in claim construction before addressing validity under [§] 101." *Open Text S.A. v. Alfresco Software Ltd*, No. 13-cv-04843-JD, 2014 WL 4684429, at *3 (N.D. Cal. Sept. 19, 2014); *cf. Loyalty Conversion v. American Airlines, Inc.*, No. 2-13-cv-655, 2014 WL 4364848, at *4 (E.D. Tex. Sept. 3, 2014) (proceeding with a § 101 determination at the pleading stage after circumstances showed "there [were] no disputed issues of claim construction that would affect the proper analysis of the patentability of the asserted claims, and no other issues of fact that [were] material to the § 101 question"); *see also Clear with Computers, LLC v. Altec Indus., Inc.*, No. 6:14-cv-79, 2015 WL 993392, at *3 (E.D. Tex. Mar. 3, 2015) (stating "neither party has identified any disputes presently ripe for claim construction" and thus "the Court sees no reason to delay its § 101 ruling while the parties continue to expend significant resources which will not impact or aid

**A13**

the Court in reaching this decision"); *Morales v. Square, Inc.*, --- F. Supp. 3d ----, No. 5:13-cv-1092-DAE, 2014 WL 7396568, at *4 (W.D. Tex. Dec. 30, 2014) (finding that "neither separate claim construction proceedings nor further development of the factual record is required before addressing the § 101 issue"); *Morsa v. Facebook, Inc.*, --- F. Supp. 3d ----, 2014 WL 7641155, at *4 (C.D. Cal. Dec. 23, 2014) (explaining that "claim construction is a prerequisite to the § 101 inquiry 'only where claim construction disputes are relevant'") (quoting *Eclipse IP LLC v. McKinley Equip. Corp.*, No. SACV 14-742-GW AJWX, 2014 WL 4407592, at *5 (C.D. Cal. Sept. 4, 2014)).

Here, the Court overrules Affinity's claim construction objections because conducting claim construction was not required. The Magistrate Judge accurately noted that Affinity failed to identify a disputed term requiring construction before deciding the present motion, and thus formal claim construction is rendered unnecessary.[2] The Court agrees with the Magistrate Judge that Affinity had ample opportunity to identify in its briefing or during oral argument a claim term in need of construction before proceeding on to a § 101 analysis. The hearing transcript reflects that the Magistrate Judge stated on the record that Affinity did not identify a single claim term in need of construction. Affinity neither objected to

---

[2] Defendant's Response to Affinity's Objections to the Report and Recommendation also correctly explains that Affinity "fails to identify a single term or construction that the Magistrate Judge allegedly implicitly decided, . . . fails to explain how any term was allegedly construed incorrectly[,] and . . . fails to explain how any term allegedly construed by the Magistrate Judge affected the resulting Report and Recommendation." Doc. 57 at 4. (citations and quotation marks omitted). Defendants argue these objections (as well as the rest of Affinity's objections) lack specificity as Rule 72(b)(2) requires; however, the Court declines to overrule any of Affinity's objections based and this contention.

the Magistrate Judge's statement nor identified a disputed term. Affinity simply failed to bring to light any claim construction issue that needed attention before the court addressed the merits of Defendants' § 101 claims.

The Court also overrules Affinity's objection that Defendants' Motion is not ripe because the Magistrate Judge made unsupported factual determinations regarding what was conventional, routine, or well-known at the time of the invention. The Federal Circuit has invalidated patents under § 101 at the motion to dismiss stage because conventional, routine, or well-known elements did not provide an inventive concept. *See, e.g., Internet Patents*, 2015 WL 3852975, at *5 (analyzing the patent specification to demonstrate that the claim elements were conventional, common, and well-known); *Content Extraction*, 776 F.3d at 1348 ("There is no 'inventive concept' in [plaintiff]'s use of a generic scanner and computer to perform well-understood, routine, and conventional activities commonly used in industry."). Additionally, as the Magistrate Judge explained, courts frequently make findings (e.g., general historical observations) when determining legal questions. *See Cal Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 978 n.6 (C.D. Cal. 2014); Doc. 53 at 17.

Consequently, the Magistrate Judge did not err in proceeding to a § 101 analysis prior to addressing claim construction because there was no indication of a dispute on the matter. The Magistrate Judge's factual determinations were likewise not error.

**A15**

## II.    The Magistrate Judge Did Not Err in Finding that the '379 Patent Claims an Abstract Idea.

Affinity's objections claim that the Magistrate Judge erred in his *Mayo/Alice* step one analysis because: (1) the '379 Patent's claims are tangible and concrete—not abstract; (2) the claims do not fall within any abstract idea category in which the Supreme Court and Federal Circuit have recognized; and (3) the "quick look" at the '379 Patent ignores the actual claimed inventions. Doc. 56 at 10. The Court must first decide whether the '379 Patent's claims are directed to an abstract idea—a patent-ineligible subject matter—before proceeding to step two of the *Mayo/Alice* analysis. In doing so, the Court is instructed to evaluate the patent claims "[o]n their face[.]" *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2356 (2014). At step one, "a detailed examination of the asserted claims, either individually or as an ordered combination[,]" is not required. *Kenexa BrassRing, Inc. v. HireAbility.com, LLC*, No. 12-10943-FDS, 2015 WL 1943826 (D. Mass. Apr. 28, 2015) (citing *Alice*, 134 S. Ct. at 2356); *Mayo Collaborative Servs. v. Prometheus Labs.*, 132 S. Ct. 1289, 1293 (2012). Rather, at step one "the court must identify the purpose of the claim—in other words, determine what the claimed invention is trying to achieve—and ask whether that purpose is abstract." *Enfish, LLC v. Microsoft Corp.*, 56 F. Supp. 3d 1167, 1173 (C.D. Cal. 2014).

Affinity argues that the '379 Patent is tangible and concrete because it uses cell phones and downloadable applications. But under this view, it is difficult

to foresee any patent that utilizes a computer component classified as abstract. The *Alice* opinion discussed as follows:

> The fact that a computer "necessarily exist[s] in the physical, rather than purely conceptual realm" is beside the point. There is no dispute that a computer is a tangible system (in § 101 terms, a "machine"), or that many computer-implemented claims are formally addressed to patent-eligible subject matter. But if that were the end of the § 101 inquiry, an applicant could claim any principle of the physical or social sciences by reciting a computer system configured to implement the relevant concept.

134 S. Ct. at 2358-59.

Here, the Court agrees with the Magistrate Judge's conclusion and method in which he found that "the purpose of the '379 Patent [is for] the dissemination of regionally broadcast[ed] content to users outside the region and that such purpose is a well-known, longstanding, commercial business practice[.]" Doc. 53 at 17. The Court finds Affinity's objection arguing that Patent '379 is tangible and concrete unpersuasive.

In addition, although Affinity argues that the Magistrate Judge "erred by expanding the categories of recognized 'abstract ideas,'" the Supreme Court has declined to "delimit the precise contours of the 'abstract ideas' category . . . ." *Alice*, 134 S. Ct. at 2357. Indeed, nothing in *Alice* prohibits the Court from identifying a patent as an abstract idea that is neither a mathematical algorithm nor a fundamental economic practice. *See id.* The Court agrees with the Magistrate Judge's reasoning that *Alice* allows for "the lower courts to develop the [abstract idea] category on a case-by-case basis." Doc. 53 at 11.

13

**A17**

Finally, the Magistrate Judge did not err in utilizing a "quick look" test in step one before moving to step two of his analysis. *Enfish, LLC v. Microsoft Corp.*, 56 F. Supp. 3d 1167, 1173 (C.D. Cal. 2014) ("Step one is a . . . 'quick look' test, the purpose of which is to identify a risk of preemption and ineligibility. If a claim's purpose is abstract, the court looks with more care at specific claim elements at step two."). The more recent *Internet Patents* case is similarly informative, explaining that "we start [the § 101 analysis] by ascertaining the basic character of the subject matter[.]" *Internet Patents Corp. v. Active Network, Inc.*, --- F.3d ----, 2015 WL 3852975, at *4 (Fed. Cir. June 23, 2015). Sister courts within the Western District of Texas have also accurately followed the Supreme Court and Federal Circuit's precedent in step one. *See Morales v. Square, Inc.*, --- F. Supp. 3d ----, No. 5:13-cv-1092-DAE, 2014 WL 7396568, at *6 (W.D. Tex. Dec. 30, 2014) ("In determining whether a claim is directed to an abstract idea, courts look past the claim language to '*the purpose of the claim*—in other words, what the invention is trying to achieve.'") (quoting *Cal Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 991 (C.D. Cal. 2014) (emphasis added)). The Court overrules Affinity's objection to the Magistrate Judge's application of the "quick look" test for step one of his § 101 analysis.

## III.    The Magistrate Judge Did Not Err in Finding that the '379 Patent Claim Fails to Cite an Inventive Concept.

Affinity contends that the Magistrate Judge erred in his step two analysis because the '379 Patent contains an inventive concept. More specifically,

14

**A18**

Affinity's objections argue that: (1) case law does not support the Magistrate Judge's application of a technological arts test; (2) the over-the-air downloadable application was not generic, conventional, well-known, or routine as of March 2000; (3) the claim elements as a whole were not generic, conventional, well-known, or routine as of March 2000; (4) the disputes on this topic raise factual issues that should not be decided on the pleadings; and (5) the claims of the '379 Patent pass the machine-or-transformation test. Doc. 56 at 16.

The Magistrate Judge did not err in his application of the *Alice* decision by citing to Judge Mayer's opinion, which deemed that *Alice* "for all intents and purposes, set out a technological arts test for patent eligibility." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014) (Mayer, J., concurring). In *Alice*, the Supreme Court found that the asserted method and systems claims did not transform an abstract idea into a patent-eligible invention in part because "the claims at issue amount to 'nothing significantly more' than an instruction to apply the abstract idea . . . using some unspecified, generic computer." 134 S. Ct. at 2360 (citing *Mayo Collaborative Servs. v. Prometheus Labs.*, 132 S. Ct. 1289, 1298 (2012)). In the instant case, the Magistrate Judge followed this precedent in finding that "Claim 1 takes the abstract idea and says 'apply it' to a wireless, cellular telephone device acting as a generic computer." Doc. 53 at 22-23. The Court finds the Magistrate Judge did not err in his reliance upon *Alice* to the extent it set forth a "technological arts" test; the appropriate legal analysis was

applied irrespective of the name of the test in which Affinity would like to attach to it in an effort to articulate an objection.

Additionally, the Magistrate Judge did not err in finding that the over-the-air downloadable application with graphical user interface and claim elements as a whole did not amount to an inventive concept. The Magistrate Judge wrote the following:

> Claim 1 merely states that the application "enables" the device to present a graphical user interface so a user can select what date that user wants to stream. Both the claim and the specification are devoid of any teaching or blueprint explaining how the device can do what it purports to do. The claim is silent as to how the downloadable application with graphical user interface aids the system or method, the extent to which it aids the system or method, nor does it explain the significance of the downloadable application with graphical user interface to performance of the system or method.

Doc. 53 at 22. As a result, the court found that the downloadable application with graphical user interface and the graphical user interface, when considered standing alone, does not amount to an inventive concept. *Id.* at 22-23. The Court agrees, and contrary to Affinity's claim that the Magistrate Jude inquired about requirements reserved for § 112, the Federal Circuit has invalidated patents under § 101 for not qualifying as an inventive concept because it did not specify how the patent performs the steps claimed in the patent. *See Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012). Furthermore, the Court finds that the Magistrate Judge's analysis of *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2014), was not error because the claims "specif[ied]

how interactions with the Internet are manipulated to yield a desired result . . . ." As the Magistrate Judge noted, *supra*, no such explanation as to how the downloadable application disseminates content to a remote user is provided within the '379 Patent claims, and thus *DDR Holdings* is distinguishable from the case at hand.

Affinity's objection contending that the Magistrate Judge failed to consider each claim of the '379 Patent as a whole (and instead only considered each element individually) is without merit. The *Alice* decision instructs courts to consider claim elements both individually and as an ordered combination. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). This is precisely what the Magistrate Judge did. Doc. 53 at 26 ("[T]he . . . claims, . . . either individually *or as an ordered combination*, all describe conventional, well known and routine concepts, accomplished using computer hardware and software recited in 'purely functional and generic' terms and are, therefore, invalid under 35 U.S.C. § 101.") (quoting *Alice*, 134 S. Ct. at 2360) (emphasis added). Regardless, the purpose of considering claims in an ordered combination is to determine whether the claims "'ad[d] [some]thing . . . that is not already present when the steps are considered separately." *Alice*, 134 S. Ct. 2359 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1298 (2012)). Here, Affinity did not specify any combination of elements that were not already present when the well-known and conventional elements are considered

individually. Affinity's contention that the Magistrate Judge erred in considering the claim elements as a whole is overruled.

Affinity's objection to the Magistrate Judge's factual determinations regarding what was conventional and routine at the time of the invention is also without merit. A § 101 determination is a question of law, and "[c]ourts frequently make findings when deciding purely legal questions." *Cal Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 978 n.6 (C.D. Cal. 2014). Patent "[e]legibility questions mostly involve general historical observations, the sort of findings routinely made by courts deciding legal questions[,]" and "[t]he Federal Circuit has noted that § 101 analysis if 'rife with underlying factual issues.'" *Id.* (quoting *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1339 (Fed. Cir. 2013)). Further, several Federal Circuit cases have made general historical observations in ruling on a 12(b)(6) motion. *See, e.g., buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1354-55 (Fed. Cir. 2014); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 722-23 (Fed. Cir. 2014) (Mayer, J., concurring); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014). Therefore, the Magistrate Judge's reliance on the patent specification and use of taking judicial notice of well-known, general historical observations was not error.

As to Affinity's final step two objection, the Court disagrees with its argument that the '379 Patent claims pass the machine-or-transformation test. A claimed process can be patent eligible under the machine-or-transformation test

if: "(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010) (quotation marks omitted). Only the first prong applies in this case. Doc. 53 at 18-19. The Magistrate Judge explained that:

> [A] general purpose computer, coupled with the internet, . . . fail[s] the machine test. . . . In reviewing Claim 1, the Court finds [Patent '379] fails the machine or transformation test. Specifically, in analyzing Claim 1, Affinity merely takes the abstract idea identified above and applies it to a generic, electronic device—in this case, a wireless cellular telephone device operating as a ubiquitous, information-transmitting medium, not a novel machine. . . . [T]he Court finds the claim merely sets forth routine and generic processing and storing capabilities generally. The claim describes a generic network with a non-transitory storage medium—which could be any kind of memory. The claim only further describes that the network sends and receives [regional broadcast] data in a streaming form. I[] find[] Affinity's '379 patent fails the machine or transformation test[.]

*Id.* at 19-20 (citations and quotation marks omitted). Affinity's objection and argument in support fails to persuade the Court to depart from the Magistrate Judge's sound reasoning. The Magistrate Judge did not err in his machine-or-transformation test analysis.

## IV.    The Magistrate Judge Did Not Err in Finding the '379 Patent's Dependent Claims Are Invalid.

Affinity next claims that the Magistrate Judge's analysis of the '379 Patent's dependent claims was conclusory and inadequate; however, Defendants are correct that a court's § 101 analysis of dependent claims that fail to add an inventive concept are generally briefly addressed. *See Internet Patents Corp. v. Active Network, Inc.*, --- F.3d ----, 2015 WL 3852975, at *6 (Fed. Cir.

June 23, 2015); *Content Extraction*, 776 F.3d at 1348-49. The Federal Circuit has even disposed of claims without even a conclusory supporting analysis. *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, --- F.3d ----, 2015 WL 3634649, at *6 (Fed. Cir. June 12, 2015) ("None of the remaining asserted dependent or independent claims differ substantially from [the claims explicitly addressed].").

In the instant case, the Magistrate Judge found as a matter of law that "the dependent claims do not add something to the abstract idea that is an 'integral' or 'significant part' of the invention." Doc. 53 at 26. Because the Court agrees with the Magistrate Judge that the claims in this case "add only trivial limitations insufficient to confer patentability[,]" the Magistrate Judge did not err in his dependent claims analysis. *Id.* at 24.

## V.    The Magistrate Judge's '379 Patent Preemption Analysis Was Not Error.

Affinity's final objection asserts that the Magistrate Judge erred in his preemption analysis, but the Court disagrees. The Magistrate Judge did not err in concluding that "[t]he asserted claims of the '379 Patent preempt the dissemination of regionally broadcasted content to a user outside the region on an electronic device that utilizes cellular communication, thereby monopolizing the idea on a ubiquitous device . . . ." *Id.* at 27-28.

Irrespective of the Court's agreement with the Magistrate Judge's preemption analysis, however, the issue is moot in light of the Court's adoption of the findings and recommendation that the claims are patent ineligible under the

**A24**

two-step *Mayo/Alice* test. The Federal Circuit recently held that, "[w]here a patent's claims are deemed only to disclose patent ineligible subject matter under the Mayo framework, . . . preemption concerns are fully addressed and made moot." *Ariosa*, 2015 WL 3634649, at \*7. Therefore, Affinity's preemption objection is overruled.

## CONCLUSION

The Magistrate Judge, in a thorough review of the case and applicable law, has recommended that Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure be granted and that the case be dismissed. Further, the Magistrate Judge has recommended that Defendants' pending Motion to Transfer Venue to the Western District of Texas, Austin Division be denied as moot.

Having carefully reviewed the report and Plaintiff's objections de novo, the Court is persuaded that the Magistrate Judge's findings and recommendation should be adopted. Accordingly it is

**ORDERED** that the Magistrate Judge's findings and recommendation are **ADOPTED**. It is further

**ORDERED** that Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) is **GRANTED**, and the case is **DISMISSED**. It is further

**ORDERED** that Defendants' Motion to Transfer Venue is **DENIED AS MOOT**. It is further

**A25**

**ORDERED** that any motions the Court or the Magistrate Judge has not previously ruled upon are **DENIED**.

**SIGNED** this _7ᵗ_ day of July, 2015.

WALTER S. SMITH, JR.
UNITED STATES DISTRICT JUDGE

**A26**

FILED

JUN 0 2 2015

CLERK
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TEXAS

### WACO DIVISION

| | |
|---|---|
| **AFFINITY LABS OF TEXAS, LLC,** | § |
| *Plaintiff,* | § |
| | § |
| **VS.** | § |
| | §      Case No.  6:15-CV-0030-WSS-JCM |
| | § |
| **DIRECTV, LLC., DIRECTV DIGITAL** | § |
| **LLC, et al.,** | § |
| *Defendants.* | § |

### REPORT AND RECOMMENDATION OF
### THE UNITED STATES MAGISTRATE JUDGE

**TO:   THE HONORABLE WALTER S. SMITH, JR.,**
**UNITED STATES DISTRICT JUDGE**

This Report and Recommendation is submitted to the Court pursuant to 28 U.S.C. §

636(b)(1)(c) and Rules 1(h) and 4(b) of Appendix C of the Local Rules of the United States

District Court for the Western District of Texas, Local Rules for the Assignment of Duties to

United States Magistrate Judges.

Before the Court is Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6).

Defs.' Mot. (ECF No. 19). The Motion has been fully briefed (Pl.'s Resp. (ECF No. 25) and

Defs.' Reply (ECF No. 33)), and oral argument[1] was held on May 12, 2015. For the reasons that

follow, the undersigned **RECOMMENDS** that Defendants' Motion be **GRANTED** with respect

to all of the asserted claims of U.S. Patent No. 7,970,379.

---

[1] Citations to the hearing transcript are hereinafter referred to as "Tr."

**A27**

# I.      Background

Plaintiff is Affinity Labs of Texas, LLC, ("Affinity"), an innovation consulting firm founded in 2008 by Russell White and Harlie Frost. Affinity is the owner of a large portfolio of technology-based patents. Defendants are four companies, all in the business of broadcast media.

Affinity filed suit against each Defendant separately,[2] alleging infringement of Patent No. 7,970,379 ("the '379 Patent"). The cases were referred to the undersigned for all purposes (ECF No. 9) and subsequently consolidated for pretrial purposes only by joint motion of the parties (ECF No. 22).

The '379 Patent, entitled "Providing Broadcast Content," claims a means for delivering regionally broadcasted radio or television content to an electronic device located outside a region of the regionally broadcasted content. '379 Patent (filed June 30, 2009). According to the specification, the patent addresses the following problem:

> [A] user may want to listen to a radio station located in a remote location wherein conventional radio receivers could not receive the desired broadcast. For example, a person living in Houston, Tex. may not be able to receive a radio broadcast signal from a radio station in Seattle, Wash. utilizing a conventional radio receiver.

*Id.* col. 15 l. 58-64. The patents in suit claim (1) a method for streaming regional content outside of a specific geographic location ("the method claims"), and (2) a system configured to carry out the method on a wireless cellular telephone device ("the system claims"). *Id.* at [57].

At the hearing on Defendants' Motion, the parties agreed that Claim 1 is representative. It reads as follows:

1. A broadcast system, comprising:

---

[2] *See Affinity Labs of Texas, LLC v. NBA Media Ventures, LLC, No. 6:15-cv-00031-WSS-JCM (W. D. Tex. Apr. 6, 2015); Affinity Labs of Texas, LLC v. NHL Enterprises, L.P., No. 6:15-cv-00032-WSS-JCM (W. D. Tex. Apr. 6, 2015); Affinity Labs of Texas, LLC v. MLB Advanced Media, L.P., 6:15-cv-00033-WSS-JCM (W. D. Tex. Apr. 6, 2015).*

**A28**

a network based resource maintaining information associated with a network
available representation of a regional broadcasting channel that can be selected by
a user of a wireless cellular telephone device; and
a non-transitory storage medium including an application configured for
execution by the wireless cellular telephone device that when executed, enables
the wireless cellular telephone device:
to present a graphical user interface comprising at least a partial listing of
available media sources on a display associated with the wireless cellular
telephone device, wherein the listing includes a selectable item that enables user
selection of the regional broadcasting channel;
to transmit a request for the regional broadcasting channel from the wireless
cellular telephone device; and to receive a streaming media signal in the wireless
cellular telephone device corresponding to the regional broadcasting channel,
wherein the wireless cellular telephone device is outside of a broadcast region of
the regional broadcasting channel, wherein the wireless cellular telephone device
is configured to receive the application via an over the air download.

*Id.* at col. 18 l. 21-44. Defendants jointly seek to dismiss Affinity's Complaint pursuant to Fed.

R. Civ. P. 12(b)(6) on the grounds that the '379 Patent is invalid under 35 U.S.C. § 101 for

failing to claim patentable subject matter. In June 2014, the Supreme Court decided *Alice Corp.*

*Pty. Ltd. v. CLS Bank Int'l*, a seminal decision in which the Court held that patent claims

designed to facilitate the exchange of financial obligations between two parties by using a

computer system as a third-party intermediary were drawn to a patent ineligible abstract idea and

thus not patent eligible under § 101. 134 S. Ct. 2347 (2014). *Alice* has engendered a wave of

decisions from lower courts addressing the issue of patent eligibility under § 101.

Affinity previously asserted the '379 Patent in the Austin Division of the Western District

of Texas in *Affinity Labs of Tex., LLC v. Clear Channel Broad., Inc.*, No. 1:12-CV-205-LY, 2014

WL 1699063 (W.D. Tex. Apr. 29, 2014). In a *Markman* order, Judge Yeakel held that the

purpose of the invention described in the '379 Patent at issue is "to allow a user to consume

'regionally broadcasted content' when the user is physically located outside of the range of that

**A29**

regionally broadcasted content." *Id.* at *6. In *Clear Channel*, Judge Yeakel was not presented

with the opportunity to analyze whether the '379 Patent was invalid under § 101.[3]


## II.    Relevant Law

Section 101 of the Patent Act defines patentable subject matter: "Whoever invents or

discovers any new and useful process, machine, manufacture, or composition of matter, or any

new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and

requirements of this title." 35 U.S.C. § 101. Section 101 also "contains an important implicit

exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 134

S. Ct. at 2354 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107,

2116 (2013)) (internal quotation marks omitted). "[T]he concern that drives this exclusionary

principle [i]s one of pre-emption." *Alice*, 134 S. Ct. at 2354 (citing *Bilski v. Kappos*, 561 U.S.

593, 611 (2010)). These categories are not patent-eligible because "they are the basic tools of

scientific and technological work" "free to all men and reserved exclusively to none." *Mayo*

*Collaborative Servs. v. Prometheus Labs.*, 132 S. Ct. 1289, 1293 (2012) (citations omitted).

Allowing patent claims for laws of nature, natural phenomena, and abstract ideas would "tend to

impede innovation more than it would tend to promote it[,]" thereby thwarting the primary object

of the patent laws. *Id.* The Supreme Court has "repeatedly emphasized this . . . concern that

patent law not inhibit further discovery by improperly tying up the future use of" these building

blocks of human ingenuity. *Id.* at 1301; *see also O'Reilly v. Morse*, 56 U.S. 62 (1853). However,

the Court has also recognized the need to "tread carefully in construing this exclusionary

---

[3] Defendants filed a separate joint Motion to Transfer Venue to the Austin Division of the Western District of Texas pursuant to 28 U.S.C. § 1404(a) based on Judge Yeakel's familiarity with the '379 Patent and related technology. (ECF No. 18).

4

**A30**

principle, lest it swallow all of patent law." *Alice*, 134 S. Ct. at 2354. The Supreme Court

recognized that, at some level, "all inventions . . . embody, use, reflect, rest upon, or apply laws

of nature, natural phenomena, or abstract ideas." *Mayo*, 132 S. Ct. at 1293. Thus, an invention is

not rendered ineligible for patent simply because it involves an abstract concept. *See Diamond v.*

*Diehr*, 450 U.S. 175, 187 (1981). Applications of such concepts "to a new and useful end"

remain eligible for patent protection. *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972).

      In *Alice*, the Supreme Court identified a "framework for distinguishing patents that claim

laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible

applications of those concepts." 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1296-97). This

framework reflects the two-part test articulated by the Supreme Court in *Mayo*.

      Under the *Mayo/Alice* test, a court must first ask if the claim is "directed to one of those

patent-ineligible concepts"—a law of nature, physical phenomenon, or abstract idea. *Alice*, 134

S. Ct. at 2355. If it is, the court moves to the second step. At step two, the court asks "[w]hat else

is there in the claims before us?" *Mayo*, 132 S. Ct. at 1297. To answer that question, the court

considers the elements of each claim both individually and "as an ordered combination" to

determine whether the additional elements "transform the nature of the claim" into a patent-

eligible application. *Id.* at 1297-98. This analysis serves as a search for an " 'inventive concept'

"—i.e., an element or combination of elements "sufficient to ensure that the patent in practice

amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 1294.

### III.     Analysis

#### A.  Ripeness and Burden of Proof

Affinity argues that Defendants' Motion is unripe because (1) fact issues exist that cannot

be decided on a 12(b)(6) motion because Defendants' Motion requests the Court find that certain

claim elements and components are "well known" without a proper evidentiary basis for the

conclusion, Pl.'s Resp. at 9-10, and (2) because claim construction has not occurred yet. *Id.* at

11-12. Additionally, Affinity alleges that the proper burden of proof for deciding Defendants'

Motion is the clear and convincing evidence standard. Accordingly, the Court will address the

timeliness of Defendants' Motion and the appropriate standard of proof.[4]

Under Fed. R. Civ. P. 12(b)(6), a court may dismiss an action that fails to state a claim

upon which relief may be granted. In deciding a Rule 12(b)(6) motion to dismiss for failure to

state a claim, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most

favorable to the [nonmovant]." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir.

2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th

Cir. 2004)) (internal quotation marks omitted). To survive the motion, a nonmovant must plead

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a right to relief above the

speculative level, . . . on the assumption that all the allegations in the complaint are true (even if

doubtful in fact)." *Id.* at 555 (internal citations omitted) (parentheticals in original). "A claim has

facial plausibility when the [nonmovant] pleads factual content that allows the court to draw the

---

[4] The Court of Appeals for the Federal Circuit looks to regional circuit law for the resolution of procedural issues, such as the standard of review applied to challenges to a dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) ("We review a district court's dismissal for failure to state a claim under the law of the regional circuit.") (citing *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1331 (Fed. Cir. 2012)).

reasonable inference that the [movant] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Federal Circuit has confirmed that determining patent eligibility under § 101 is appropriate at the pleadings stage. "Issues of patent-eligible subject matter are questions of law." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011). *See, e.g.*, *Content Extraction*, 776 F.3d at 1349 (affirming district court's resolution of a motion to dismiss at the pleading stage); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 711 (Fed. Cir. 2014) (*Ultramercial III*) (Mayer, J., concurring) (affirming district court's decision granting motion to dismiss infringement claim for failure to state patent-eligible subject matter); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1351 (Fed. Cir. 2014) (affirming district court's decision to grant judgment on the pleadings based on § 101). "[S]ection 101 imposes 'a threshold test,' . . . one that must be satisfied before a court can proceed to consider subordinate validity issues such as non-obviousness under 35 U.S.C. § 103 or adequate written description under 35 U.S.C. § 112." *Ultramercial III*, 772 F.3d at 718 (Mayer, J., concurring) (citing *Bilski*, 561 U.S. at 602). "[S]ubject matter eligibility is the primal inquiry, one that must be addressed at the outset of litigation." *Ultramercial III*, 772 F.3d at 717 (Mayer, J., concurring). The Federal Circuit's declaration on this point is rooted in sound policy. Addressing § 101 at the outset of litigation has "a number of salutary effects:" it "conserve[s] scarce judicial resources," "provides a bulwark against vexatious infringement suits," and protects the public at the outset from "patents that stifle innovation and transgress the public domain." *Id.* at 719-20.

Furthermore, in this case the § 101 inquiry is properly addressed prior to claim construction. "Although the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable

7

**A33**

prerequisite to a validity determination under § 101." *Content Extraction*, 776 F.3d at 1349

(citing *Ultramercial III*, 772 F.3d at 714–15); *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of

Canada (U.S.)*, 687 F.3d 1266, 1273–74 (Fed. Cir. 2012) (finding that the district court did not

err by declaring claims patent-ineligible at the pleading stage without first construing the claims

or allowing the parties to conduct fact discovery and submit opinions from experts supporting

their claim construction positions). However, completing claim construction prior to a § 101

analysis may be appropriate under certain circumstances. *See Bancorp*, 687 F.3d at 1273-74.  For

instance, "it will ordinarily be desirable—and often necessary—to resolve claim construction

*disputes* prior to a [§] 101 analysis." *Id.* (emphasis supplied).

To deny Defendants' 12(b)(6) motion as premature because *Markman* has not occurred

makes little sense. As Defendants point out, Affinity has not identified a disputed term requiring

construction and has therefore not demonstrated why claim construction is necessary to

determine whether the patent claims patent-eligible subject matter. Defs.' Reply at 2-3;[5] *see*

*Triplay v. WhatsAPP Inc.*, No. 13-1703-LPS, 2015 WL 1927696, at *6 (D. Del. Apr. 28, 2015)

(citing *Open Text S.A. v. Alfresco Software Ltd*, No. 13-cv-04843-JD, 2014 WL 4684429, at *3

(N.D. Cal. Sept. 19, 2014) ("the parties have not sought construction of any terms . . . and this

lack of dispute over the proper construction of the asserted claims confirms that it is unnecessary

to engage in claim construction before addressing validity under [§] 101")). Furthermore, as

discussed herein, the asserted claims are drawn to an abstract idea and there is no reasonable

construction of any term that would serve to bring the claims within the ambit of patentable

subject matter. Accordingly, this Court's § 101 analysis is appropriate at the pleadings stage.

---

[5] At oral argument, the Court stated on the record that Affinity did not identify—in its brief or otherwise—a single claim term in need of construction. Affinity neither objected to the Court's statement nor attempted to identify any disputed term. *See* Tr. at 100.

A final preliminary issue meriting discussion is what burden of proof is applicable to a §

101 challenge. There is no clear mandate from the Supreme Court or the Federal Circuit in this

regard post-*Alice*, and lower courts are split as to whether the clear and convincing evidentiary

standard should still be applied in a challenge to a patent's eligibility under § 101.[6] At the

hearing, the parties agreed that well-settled law requires application of the clear and convincing

evidentiary standard.[7] However, as discussed above, § 101 involves a legal analysis as to

whether the basic character of the claimed subject matter is patent ineligible and thus largely

implicates questions of law. Therefore, to the extent legal questions bear on the ultimate question

of subject matter eligibility, the court will decide those questions as a matter of law.[8] Although

---

[6] *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1339 (Fed. Cir. 2013) *(Ultramercial II)*, vacated sub nom. *WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014) ("the *only* plausible reading of the patent must be that there is clear and convincing evidence of ineligibility"); *TriPlay*, 2015 WL 1927696, at *5 ("even assuming that the 'clear and convincing' evidence standard is applicable to [§] 101 challenges, it would apply only to the resolution of factual disputes, not to the resolution of pure issues of law") (citing *Microsoft Corp. v. i4i Ltd P'ship*, 131 S. Ct. 2238, 2242-43 (2011) (footnote omitted)); *Trading Techs. Int'l, Inc. v. CQG, Inc.*, No. 05-CV-4811, 2015 WL 774655, at *3 (N.D. Ill. Feb. 24, 2015) ("until the Federal Circuit or the United [States] Supreme Court mandates otherwise, CQG must show by clear and convincing evidence that the patents-in-suit claim patent-ineligible subject matter."); *Bascom Research, LLC v. LinkedIn, Inc.*, No. 12-CV-06293-SI, 2015 WL 149480, at *4 (N.D. Cal. Jan. 5, 2015) ("an alleged infringer asserting an invalidity defense pursuant to § 101 bears the burden of proving invalidity by clear and convincing evidence"); *Enfish, LLC, v. Microsoft Corp.*, 56 F. Supp. 3d 1167, 1170 (C.D. Cal. 2014) ("Federal Circuit precedent requires courts to apply the [clear and convincing evidence] standard to § 101 challenges") (citing *Ultramercial II*, 722 F.3d at 1339); *cf. Content Extraction*, 776 F.3d at 1345-49 (in which the Federal Circuit affirmed a dismissal under § 101 at the Rule 12(b)(6) stage without discussion of any disputed issues of fact); *Ultramercial III*, 772 F.3d at 720–21 (Mayer, J., concurring) ("Although the Supreme Court has taken up several [§] 101 cases in recent years, it has never mentioned—much less applied—any presumption of eligibility. The reasonable inference, therefore, is that while a presumption of validity attaches in many contexts, no equivalent presumption of eligibility applies in the [§] 101 calculus.") (internal citation omitted); *Shortridge v. Found. Constr. Payroll Servs., LLC*, No. 14–cv–04850–JCS, 2015 WL 1739256, at *7 (N.D. Cal. Apr. 14, 2015) ("Although the clear and convincing evidence standard is not applicable to the Motion, Defendants, as the parties moving for relief, still bear the burden of establishing that the claims are patent[-]ineligible under § 101."); *Wireless Media Innovations, LLC v. Maher Terminals, LLC*, No. 14–7004; 14–7006(JLL), 2015 WL 1810378, at *6 (D.N.J. Apr. 20, 2015) ("With no authoritative law binding the Court as to an applicable standard, the Court adopts Judge Mayer's approach and will not afford Plaintiff's Patents the presumption of subject matter eligibility."); *Modern Telecom Sys. LLC, v. Earthlink, Inc.*, No. SA CV 14-0347-DOC, 2015 WL 1239992, at *7 (C.D. Cal. Mar. 17, 2015) ("Because, ordinarily, no evidence outside the pleadings is considered in resolving a motion to dismiss or a motion for judgment on the pleadings, it makes little sense to apply a 'clear and convincing evidence' standard-a burden of proof-to such motions.") (emphasis removed); *Open TV, Inc. v. Apple, Inc.*, No. 14–cv–01622–HSG, 2015 WL 1535328, at *3 (N.D. Cal. Apr. 6, 2015) (rejecting the clear and convincing evidence standard and applying the Rule 12(b)(6) standard).

[7] *See* Tr. at 80-81.

[8] It is within this Court's province to make findings when deciding the legal question of whether the basic character of the claimed subject matter is patent ineligible. "Courts frequently make findings when deciding purely legal questions. Eligibility questions mostly involve general historical observations, the sort of findings routinely made by courts deciding legal questions." *Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*, No. 2:13–cv–07245–MRP–JEM, 2014 WL 5661290, at *20 n.6 (C.D. Cal. 2014) (citations omitted).

**A35**

the issue of invalidity under § 101 presents a question of law, the court recognizes that a legal

conclusion "may contain underlying factual issues." *See Accenture Global Servs., GmbH v.*

*Guidewire Software, Inc.*, 728 F.3d 1336, 1340–41 (Fed. Cir. 2013); *Ultramercial II*, 722 F.3d at

1339 ("[T]he analysis under § 101, while ultimately a legal determination, is rife with underlying

factual issues."). To the extent questions of fact exist, the Court will apply the clear and

convincing evidence standard.

**B.  *Mayo/Alice* Step 1:  Are the claims of the '379 Patent directed to an abstract idea?**

     The Court must first evaluate the patent claims "[o]n their face" and determine whether

the claims are directed to patent-ineligible subject matter—"laws of nature, natural phenomena,

and abstract ideas." *Alice*, 134 S. Ct. at 2355-56. The instant case only presents the question of

whether Plaintiff's patent is directed to an abstract idea.

     The Supreme Court and lower courts have provided some important principles to direct

courts in evaluating whether an idea is abstract. At step one, "the court must identify the purpose

of the claim—in other words, determine what the claimed invention is trying to achieve—and

ask whether that purpose is abstract." [9] *Enfish*, 56 F. Supp. 3d at 1173. "Application of the first

step does not include a detailed examination of the asserted claims, either individually or as an

ordered combination; that analysis is properly lodged within step two." *Kenexa BrassRing, Inc.*

*v. HireAbility.com, LLC*, No. 12–10943–FDS, 2015 WL 1943826 (D. Mass. Apr. 28, 2015)

(citing *Alice*, 134 S. Ct. at 2356 and *Mayo*, 132 S. Ct. at 1297). Instead, courts should recite a

claim's purpose at a reasonably high level of generality. *Enfish*, 56 F. Supp. 3d at 1174; *Cal.*

---

[9] The Supreme Court took this approach in *Alice* (concluding that the steps embodied in the claims were meant to achieve the purpose of mitigating settlement risk); in *Bilski* (characterizing the claims in terms of the invention's purpose—hedging risk); and in *Mayo* (characterizing the claims in terms of the invention's purpose, which was applying a natural law). The Federal Circuit has followed suit: *Content Extraction*, 776 F.3d at 1347 ("data collection, recognition, and storage"); *Ultramercial III*, 772 F.3d at 714 (holding that "the abstract idea at the heart of" the patent-in-suit was "that one can use [an] advertisement as an exchange for currency"); *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1008 ("managing a game of Bingo"); and *Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 992 (Fed. Cir. 2014) ("categorical data storage").

*Inst. of Tech.,* 2014 WL 5661290, at *13. Step one is a "quick look" test, the purpose of which is

to identify a risk of preemption and ineligibility. *Enfish,* 56 F. Supp. 3d at 1173. If a claim's

purpose is abstract, the court looks with more care at the specific claim elements in step two. *Id.*

at 1174; *Cal. Inst. of Tech.,* 2014 WL 5661290, at *13. All of the claim limitations need not be

abstract. The patent may not pass § 101 muster if "the concept embodied by the majority of the

limitations" describes an abstract idea. *See Ultramercial III,* 772 F.3d at 715 (holding that

"[a]lthough certain additional limitations, such as consulting an activity log, add a degree of

particularity, *the concept embodied by the majority of the limitations* describes only the abstract

idea of showing an advertisement before delivering free content.") (emphasis added).

The Supreme Court did not "delimit the precise contours of the 'abstract ideas' category"

in *Alice*—instead, it left the lower courts to develop the category on a case-by-case basis. 134 S.

Ct. at 2357. Nevertheless, over the course of several cases, the Supreme Court has identified

several categories of precluded subject matter. For example, mathematical algorithms, including

those executed on a generic computer, are patent-ineligible.[10] Similarly, certain scientific

principles are patent-ineligible. *See Mayo,* 132 S. Ct. at 1293 (finding that a claim describing

relationships between concentrations of certain metabolites in the blood and the likelihood that a

dosage of a drug will cause harm set forth laws of nature). Additionally, some fundamental

economic and conventional business practices are also abstract ideas. *See Bilski,* 561 U.S. at 609

(finding the "fundamental economic practice" of hedging to be patent ineligible); *Alice,* 134 S.

Ct. at 2356 (finding that a "method of exchanging financial obligations between two parties

---

[10] *See Benson,* 409 U.S. at 71-72 (finding a claim for a method of converting binary-coded decimal numerals into pure binary numerals using a mathematical formula in a general-use computer was a claim on an idea); *Parker v. Flook,* 437 U.S. 584, 586 (1978) (finding a claim for a method of computing an alarm limit in the catalytic conversion of hydrocarbons using a mathematical algorithm included a law of nature); *Diehr,* 450 U.S. at 178 (finding that a process for curing rubber involving use of a mathematic equation encompassed a law of nature).

using a third-party intermediary to mitigate settlement" was a method of "organizing human activity" and therefore abstract).

Since *Alice*, the Federal Circuit has issued seven decisions interpreting § 101. This body of case law has further defined the contours of the abstract ideas category.[11] In addition, recent district court opinions post-*Alice*, including a decision from within this District, have found abstract ideas embodied in claims describing a wide variety of systems and processes.[12]

Defendants contend the '379 Patent is abstract because it is "directed to an age-old concept of making broadcast content from one region available in another region—something performed since the first time someone held the phone up to the radio so that a distant friend could hear the broadcast." Defs.' Mot. at 7. According to Defendants, the availability in one region of programming that originated in another is a "decades-old idea" that "has been a familiar and unremarkable part of the media landscape." *Id.* at 1. Furthermore, Defendants argue the claims do not recite any new technology that makes this possible but merely "present a straightforward description of the conventional business model, accompanied by a generic

---

[11] The Federal Circuit invalidated a patent that claimed the business method of using "an advertisement as an exchange for currency" (*Ultramercial III*, 772 F.3d at 714); a patent directed to another business method that was "a well-known, and widely understood concept—a third party guarantee of a sales transaction—and then applied that concept using conventional computer technology and the Internet" (*buySAFE*, 765 F.3d at 1352 (Fed. Cir. 2014)); a patent directed to a well-known practice in the banking industry of storing and collecting data, a function that "humans have always performed," especially in the banking industry (*Content Extraction*, 776 F.3d at 1347); a patent that managed "a bingo game while allowing a player to repeatedly play the sets of numbers in multiple sessions" because the idea "consists solely of mental steps which can be carried out by a human using pen and paper" (*Planet Bingo*, 576 F. App'x at 1007); a claim describing the process of taking two data sets and combining them into a single data set known as a "device profile" recited the "abstract process of gathering and combining data that does not require input from a physical device" (*Digitech Image Techs., LLC v. Elec. For Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014)); and patent claims directed to identifying alterations of a gene by comparing the patient's gene with a "wild-type" gene and identifying inconsistencies arising therefrom (*In re BRCA1- and BRCA2-Based Hereditary Cancer Test Patent Litig.*, 774 F.3d 755 (Fed. Cir. 2014)). However, in *DDR Holdings v. Hotels.com, L.P.*, the Federal Circuit found that patents directed to systems and methods of generating a composite web page that combines certain visual elements of a "host" website with content of a third-party merchant were patent-eligible. 773 F.3d 1245, 1259 (Fed. Cir. 2014).

[12] *See Morales v. Square, Inc.*, 2014 U.S. Dist. LEXIS 178525, *15 (W.D. Tex. Dec. 30, 2014) (cataloging cases); *see id.* at *14 ("The Federal Circuit's decision in *Digitech Image Techs., LLC v. Elec. For Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014), however, indicates that the abstract ideas category is broad.").

recitation of a conventional cellular phone with its familiar parts (buttons[,] memory, a display, a housing) and an application, downloaded to the phone, that receives a stream of data." *Id.*

In its briefing, Affinity suggests that the universe of patent-ineligible abstract ideas is limited to the two categories the Federal Circuit identified in *DDR Holdings*: "mathematical algorithms" and "fundamental economic and conventional business practices"—neither of which encompasses the '379 Patent. Pl.'s Resp. at 6 (citing *DDR Holdings*, 773 F.3d at 1256). At oral argument, Affinity vehemently objected to the process of ascertaining an invention's purpose at step one and then determining whether that purpose is abstract—particularly when the process involves considering whether the purpose the invention purports to achieve is longstanding or well-known. Affinity argued that, on some level, every invention can be distilled to a general purpose or industry, and if that industry is either longstanding or well-known, the patent is deemed abstract. By taking this approach, Affinity argued, lower courts have ignored the "doctrine of restraint"[13] set forth in the Supreme Court decisions and have dramatically and improperly expanded the limited category of patent-ineligible exceptions in a manner that risks swallowing all of patent law.

At the hearing, the Court offered Affinity the opportunity to identify an alternative test Courts have applied post-*Alice* when evaluating patents for abstractness.[14] The Court also gave Affinity the opportunity to articulate a test that courts *should* apply in lieu of the objected-to approach.[15] In response, Affinity suggested the Court merely look at the patent's claims and ask whether the claims incorporate a concept that is something like one of the practices found patent-ineligible by the Supreme Court in *Bilski*, 561 U.S. 593, *Alice*, 134 S. Ct. 2347, *Benson*, 409 U.S.

---

[13] *See* Tr. at 32.

[14] *See id.* at 36.

[15] *See id.* at 35-36.

**A39**

63, *Diehr*, 450 U.S. 175, and *Flook*, 434 U.S. 1033.[16] Affinity in effect asks the Court to ignore the myriad Supreme Court, Federal Circuit, and district court decisions suggesting that a court must first identify the purpose of the claim when evaluating a patent for abstractness.[17] In sum, Affinity's suggested approach lacks specificity, is difficult to apply because it does not provide any practical guidance, and is not the law. Accordingly, the Court rejects Affinity's position and will ascertain the purpose of the patent.

The Court finds the purpose of the '379 Patent is the dissemination of regionally broadcasted content to users outside the region. In reviewing the system claims, the Court notes the idea embodied by the majority of the limitations,[18] eleven of the thirteen system claims, and prominent in claim 1, is the dissemination of regionally broadcast content to users outside the region. Likewise, the majority of the method claims, and prominent in claim 14, is also the dissemination of regionally broadcast content to users outside the region. Also, the Court cannot help but note that the '379 Patent is entitled, "Providing Broadcast Content." In addition, the Abstract describes "a method for providing *broadcast content* is disclosed. The method maintains a system *to deliver regionally broadcasted content* to an electronic device *located outside a region of the regionally broadcasted content* . . . (emphasis supplied)." '379 Patent, at

---

[16] *See id.* at 27, 38, 45.

[17] *See* n.9; *see also Cal. Inst. of Tech.*, 2014 WL 5661290, at *15 (to determine whether a claim is directed to an abstract idea, the court must first identify the "purpose of the claim"); *Morales*, 2014 WL 7396568, at *6 ("In determining whether a claim is directed to an abstract idea, courts look past the claim language to 'the purpose of the claim—in other words, what the invention is trying to achieve.'" (quoting *Cal. Inst. of Tech.*, 2014 WL 5661290, at *13); *Enfish*, 56 F. Supp. 3d at 1173 (to determine whether a claim is directed to an abstract idea, ". . . the court must identify the purpose of the claim—in other words, determine what the claimed invention is trying to achieve—and ask whether that purpose is abstract.")

[18] *See Triplay*, 2015 WL 1927696, at *10; *see also Hewlett Packard Co. v. ServiceNow, Inc.*, No. 14–cv–00570–BLF, 2015 WL 1133244, at *5–6 (N.D. Cal. Mar. 10, 2015) (applying the "majority of the limitations" language from *Ultramercial III* to hold that a claim was directed to an abstract idea).

[57]. The only reasonable construction of the patent's purpose is the dissemination of regional broadcast content to users outside the region.[19]

The Court next examines whether the purpose is abstract. *See Enfish,* 56 F. Supp. 3d at 1174. As set forth in detail above, courts have invalidated patents claiming mathematical algorithms,[20] scientific relationships,[21] functions humans can perform in the mind or with pen and paper,[22] and fundamental economic and conventional business practices.[23] At issue in the instant case is whether the dissemination of regional broadcast content to users outside the region is a longstanding, commercial practice.

At the hearing, Affinity attempted to distinguish the '379 Patent by arguing that the dissemination of regional broadcast content to users outside a region is not a longstanding, commercial practice like hedging or intermediated settlement at issue in *Bilski* and *Alice,* respectively. In doing so, Affinity again cautioned the Court to avoid overgeneralization and instead urged the Court to focus on the "product."[24] Affinity suggested the product at issue in the instant case is "broadcast," a "concrete and tangible industry, [a] concrete product" that consists of the broadcast tower, the receivers, and the contract between the provider and subscriber.[25] By way of analogy, Affinity compared the broadcast "product" to an indisputably tangible

---

[19] The undersigned does not purport to distinguish its characterization of the '379 Patent's purpose with Judge Yeakel's interpretation of the '379 Patent's purpose in *Clear Channel*. Judge Yeakel's interpretation differs not in substance but merely in semantics.

[20] *Benson,* 409 U.S. at 71-72 (1972); *Flook,* 437 U.S. at 586; *Diehr,* 450 U.S. at 178.

[21] *See Mayo,* 132 S. Ct. at 1293.

[22] *See CyberSource v. Retail Decisions, Inc.,* 654 F.3d 1366, 1371-72 (Fed. Cir. 2011).

[23] *See Bilski,* 561 U.S. at 611; *Alice,* 134 S. Ct. at 2356; *see also* n.11.

[24] *See* Tr. at 50-54.

[25] *See id.* at 51.

product—the MRI machine.[26] An MRI machine, Affinity argued, could be overgeneralized to the extent that the invention is characterized by its purpose—to diagnose a patient or to scan a patient like an X-ray or CAT scan.[27] Diagnosing patients is a longstanding, well-known practice, however, Affinity concluded, "no one would think to bring a 101 motion on an MRI machine, but you could overgeneralize any claim to an MRI machine and say this is a field that's been around" and find that it is patent ineligible under this approach.[28]

Affinity relies on a faulty analogy. The '379 Patent does not claim a concrete or tangible invention like an MRI machine. Instead, the '379 Patent claims only the dissemination of broadcast *content.* Using Affinity's example, the *content* is the product that is transmitted from the broadcast tower to the ultimate receiver, be it a radio, a television, an electronic device or, as described in system claim 1, a "wireless cellular telephone device." As such, both the purpose of the patent and the fundamental economic and conventional business practice at issue in the instant case is the dissemination of regionally broadcast content to users outside the region.

The commercial practice of disseminating regionally broadcast content to users outside the region is both well-known and historically long-standing. A lifelong sports fan, the undersigned has listened to broadcasts over the radio of baseball, basketball, football, and hockey games from other regions throughout my youth to the current day. Additionally, many baseball fans who were cable subscribers in the 1970's remember watching Atlanta Braves games on the TBS superstation despite not living in Atlanta, Georgia, and in the 1980's, watching Harry Caray announce Chicago Cubs games over the WGN superstation. The above examples represent just a

---

[26] See *id.* at 53-54.

[27] *See id.*

[28] *See id.*

few of the many general historical observations that come to mind as evidence of the long-standing practice of disseminating regionally broadcast content to users outside the region.

As a final comment on the step one *Mayo/Alice* analysis, Affinity objects to the Court finding that a practice is "well-known" or a "longstanding commercial practice" on a Rule 12(b)(6) motion on the grounds that such a finding is without evidentiary support and improper at the 12(b)(6) stage. Pl.'s Resp. at 20. The Court notes, however, that "[e]ligibility questions mostly involve general historical observations, the sort of findings routinely made by courts deciding legal questions." *See Cal. Inst. of Tech.*, 2014 WL 5661290, at *2, n.6. Further, at oral argument, the Court directed Affinity to a number of Rule 12(b)(6) and 12(c) cases[29] decided post-*Alice* in which the Federal Circuit made general historical observations in determining whether an abstract idea is well-known and longstanding. When asked why the undersigned could not do the same, Affinity's counsel contended, "I think it's very possible they didn't do it correctly."[30] The undersigned disagrees.

Having found the purpose of the '379 Patent to be the dissemination of regionally broadcast content to users outside the region and that such purpose is a well-known, longstanding, commercial business practice, the Court finds as a matter of law that the claims of the '379 Patent are directed to an abstract idea. Because the Court finds that Plaintiff's claims are drawn to an abstract idea, the Court will move to the second step of the analysis: determining whether the claim includes an inventive concept "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S. Ct. at 2355 (internal brackets omitted).

---

[29] *See, e.g., buySAFE*, 765 F.3d at 1354-55; *Ultramercial III*, 772 F.3d at 722-23 (Mayer, J. concurring); *Content Extraction*, 776 F.3d at 1347.

[30] *See Tr.* at 136.

### C. *Mayo/Alice* step 2: Do the claims contain an "inventive concept"?

#### 1.   Analysis of representative claim 1

The United States Supreme Court has held that if an abstract idea is found, then at step two of the analysis the Court is to:

> examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application.  A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'  *Mayo* made clear that transformation into a patent-eligible application requires "more than simply stat[ing] the [abstract idea] while adding the words 'apply it.'"

*Id.* at 2357 (citations omitted). Further, the Court is to consider claim elements both individually and as an ordered combination. *Id.* at 2355. The "additional features" must be more than "well-understood, routine, conventional activity." *Ultramercial III*, 772 F.3d at 715 (citing *Mayo*, 132 S. Ct. at 1298) (internal quotations omitted). *Alice* also held that the "[m]ere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." 134 S. Ct. at 2358. The Supreme Court held that stating an abstract idea "while adding the words 'apply it with a computer'" amounts to a "mere instruction to 'implemen[t] an abstract idea 'on a computer'" and "cannot impart patent eligibility." *Id.* (quoting *Mayo*, 132 S. Ct. at 1301).

In its brief, Affinity urges the application of the "machine or transformation" test as a "useful clue" in the second step of the *Alice* analysis. Pl.'s Resp. at 18. Under the "machine or transformation" test, a claimed process can be patent eligible if 1) it is tied to a particular machine or apparatus; or 2) if it transforms a particular article into a different state or thing. *See Bilski*, 561 U.S. at 593. During the hearing, Affinity informed the Court that prong one of the "machine or transformation" test is the only relevant prong for analysis because Affinity does not

18

**A44**

claim that the '379 Patent transforms broadcast content into something else.[31] Accordingly, the Court will only apply prong one.

The Court notes that a general purpose computer, coupled with the internet, has been found to be a "ubiquitous, information-transmitting medium, not a novel machine," thus failing the machine test. *Ultramercial III*, 772 F.3d at 716-17. Affinity counters that the '379 Patent provides more than a general purpose computer because the claims reference a "specific combination of hardware and software components[,]" including "an application for 'storage and execution' available for over the air download to a cellular phone" and that none of the claim steps can be performed by a human alone. Pl.'s Resp. at 19. Affinity further contends that Claim 1 recites specialized components such as a "network based resource," "non-transitory storage medium," and the downloadable software application providing a "graphical user interface," with requesting and receiving capabilities which "are essential to the inventors' specific solution to distributing regional broadcast content." *Id.*

In reviewing representative Claim 1, the Court finds it fails the "machine or transformation" test. Specifically, in analyzing Claim 1, Affinity merely takes the abstract idea identified above and applies it to a generic, electronic device—in this case, a wireless cellular telephone device operating as a "ubiquitous, information-transmitting medium, not a novel machine." *Ultramercial III*, 772 F.3d at 716-717. Although Affinity alleges the components in Claim 1 are specialized, the Court finds the claim merely sets forth routine and generic processing and storing capabilities of computers generally. The claim describes a generic network with a "non-transitory storage medium"—which could be any kind of memory. The claim only further describes that the network sends and receives [regional broadcast] data in a streaming form. *See, e.g., Content Extraction*, 776 F.3d at 1348; *TriPlay*, 2015 WL 1927696, at

---

[31] *See id.* at 148-49.

19

**A45**

*14-16; *In re TLI Commc'ns LLC Patent Litig.*, No. 1:14md2534, 2015 WL 627858, at *13 (E.D. Va. Feb. 6, 2015).

In finding Affinity's '379 patent fails the "machine or transformation" test, *In re TLI Communications* is analogous and persuasive. In *TLI Communications,* the Eastern District of Virginia, on motions to dismiss based on § 101, examined a patent which the Court found was clearly directed to the abstract idea of taking, organizing, classifying, and storing photographs. *Id.* at *11. Plaintiff contended that the "inventive concept" within the relevant claim was an "intelligent" server which performs a variety of inventive functions: 1) it receives data—digital images and classification information—entered or inputted by the user; 2) it extracts from the received data the classification information which characterizes the digital images; and (3) it stores the digital images by taking the classification information into consideration. *Id.* at *14. In applying the "machine or transformation" test to the "intelligent" server, the Court held:

> [P]laintiff's argument fails to persuade, because, as noted, *the so-called "intelligent server" is simply a generic computer in disguise because the three functions the server performs—receiving the data, extracting classification information, and then storing digital images by considering the classification information—can all be performed by a generic computer.* Indeed, plaintiff's argument, if accepted, would contradict the express holding in *Alice* that "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea' to a particular technological environment." *It necessarily follows that tethering an abstract idea to a generic computer, as here, is insufficient to pass the machine-or-transformation test.*

*Id.* at *16 (emphasis supplied) (internal citations omitted). Similarly, the functions performed by claim 1 of the '379 Patent—storage of memory, software to execute the program, sending and receiving data—can all be performed by a generic computer. There is not a non-generic function or component contained in the claims that sets forth the blueprint with any degree of specificity of how to disseminate regional broadcast content to a user outside the region over a wireless, cellular telephone device. Although the Court need not look to the specification to resolve the

20

**A46**

issue, a review of the '379 Patent's specification confirms this. In column 10, line 6, the specification provides that "[t]he present invention is not limited to any one specific type of software and may be realized in plurality of ways as can be appreciated by those skilled in the art." Claim 1 does not pass the "machine or transformation" test because the only recited machine in the claim is a wireless, cellular telephone device operating as a generic computer, which does not serve as a meaningful limitation.

Affinity's position is that the inventive concept in the claims, "the number one element to look for,"[32] is the "downloadable application" that can present a "graphical user interface" for selecting what is being maintained on the network resource. At the hearing, the Court directed Affinity to recent Federal Circuit and district court case law holding that, to determine whether something is an inventive concept, a court must look to see if the patent adds something to the abstract idea that is an "integral" or "significant part" of the invention. *Bancorp,* 687 F.3d at 1278; *TLI Commc'ns,* 2015 WL 627858, at *29 n.34. In other words, and as stated by the Supreme Court in *Mayo,* "[w]hat else is there in the claims before us?" *Mayo,* 132 S. Ct. at 1297. In the instant case, the answer is nothing sufficient to transform the patent into a patent-eligible invention.

In *Alice,* the Supreme Court set out a "technological arts"[33] test, finding that the asserted method and system claims: 1) do not "purport to improve the functioning of the computer itself," 2) "nor do they effect an improvement in any other technology or technical field." *Alice,* 134 S. Ct. at 2359. In order to satisfy the technological arts test, claims must "not only [1)] describe a technological objective, but [2)] set out a precise set of instructions for achieving it." *Ultramercial III,* 772 F.3d at 721-22 (Mayer, J., concurring). In determining whether a claim

---

[32] *See id.* at 105-106.

[33] *See Ultramercial III,* 772 F.3d at 721 (Mayer, J., concurring).

21

**A47**

presents an inventive concept, the Federal Circuit and post-*Alice* district courts have examined

whether the inventive concept has a "specific functionality" or explains the "how" as to the

manner in which the inventive concept performs. *See id.*; *see also TriPlay*, 2015 WL 1927696, at

*15; *TLI Commc'ns*, 2015 WL 627858, at *19. In *TLI Communications*, the Eastern District of

Virginia, in examining whether the claimed limitation was an inventive concept, found the

Federal Circuit's decision in *Dealertrack, Inc. v. Huber*, 674 F.3d 1315 (Fed. Cir. 2012)

instructive, wherein the circuit court noted:

> Although the district court construed 'computer aided' as a limitation, the '427
> patent does not specify how the computer hardware and database are specially
> programmed to perform the steps claimed in the patent . . . The claims are silent
> as to *how* a computer aids the method, the *extent* to which a computer aids the
> method, or the *significance* of a computer to the performance of the method. The
> undefined phrase 'computer aided' is no less abstract than the idea of a
> clearinghouse itself.

*Id.* at *18. (citing *Dealertrack*, 674 F.3d at 1333). In the instant case, the claim limitations of

Affinity's '379 patent, specifically the downloadable application with graphical user interface,

do not identify any specific functionality or explain "how" they are going to download regionally

broadcast content onto a wireless cellular telephone device such that a user outside the region

can view the content. On its face, Claim 1 merely states that the application "enables" the device

to present a graphical user interface so a user can select what data that user wants to stream. Both

the claim and the specification are devoid of any teaching or blueprint explaining how the device

can do what it purports to do. The claim is silent as to how the downloadable application with

graphical user interface aids the system or method, the extent to which it aids the system or

method, nor does it explain the significance of the downloadable application with graphical user

interface to performance of the system or method. The bottom line is that Claim 1 takes the

abstract idea and says "apply it" to a wireless, cellular telephone device acting as a generic

**A48**

computer. As such, the downloadable application with graphical user interface does not add something to the abstract idea that is an "integral" or "significant part" of the invention.

Even if the Court were to further break down the limitation and consider only the "graphical user interface" standing alone, the graphical user interface itself does not amount to an inventive concept. By way of function, the claim states that the graphical user interface comprises a "partial listing of available media sources on a display . . . wherein the listing includes a selectable item that enables user selection of the regional broadcasting channel." '379 Patent col. 18 l. 31-35. Similarly, this is a generic computer component that does not contain an inventive concept. *See Cloud Satchel v. Amazon.com, Inc.,* No. 13–941–SLR, 2014 WL 7227942 (D. Del. Dec. 18, 2014). In *Cloud Satchel,* the limitations present in the dependent claims included a "display unit and a graphical user interface." *Id.* at 12, n.9. The defendants contended that such limitations merely recited "generic computer components" or "token postsolution components." *Id.* In finding the patent invalid, the District of Delaware concluded that "the claimed computers and hardware elements of the claimed subsystem are generic." *Id.* Likewise, this Court finds that the "graphical user interface" is a generic computer component.

As a final point on "graphical user interfaces," the Court finds the *Trading Techs.* decision relied upon by Affinity is not applicable. In *Trading Techs.,* the Northern District of Illinois determined that graphical user interfaces designed to display a "static price axis" for commodities trading "recite[d] an invention that is not merely the routine or conventional use of computers or the Internet," but rather "eliminated some problems of prior GUIs relating to speed, accuracy and usability." 2015 WL 774655, at *5. First, the undersigned notes that the Northern District of Illinois initially stated that "the recitation of a GUI in the claims of the patents in suit does not automatically impart patent eligibility." *Id.* Rather, the district court found that the

23

**A49**

"claims are directed to a *technological improvement* of GUIs." *Id.* (emphasis supplied). As such, *Trading Techs.* is distinguishable because unlike in the instant case, the claims of the patent in the case examined by the Northern District of Illinois explained the "how" and "specific functionality" of the graphical user interface resulting in a technological improvement. As explained above, the claims of the '379 Patent present the graphical user interface as merely a generic computer component.

Therefore, the Court finds as a matter of law that Claim 1, the representative claim of the '379 Patent, does not contain an inventive concept in that it does not add something to the abstract idea that is an "integral" or "significant part" of the invention. Since the parties stipulated that system claim 1 is representative of method claim 14, claim 14 is likewise abstract and contains no inventive concept. The Court will now review the dependent claims to determine whether they add anything of substance to Claim 1 sufficient to confer patentability.

**2. Analysis of dependent claims**

The dependent claims of the '379 Patent consist of claims 2-13 of the system claims and 15-21 of the method claims. Defendants allege the dependent claims of the '379 Patent add only trivial limitations insufficient to confer patentability. The Court agrees.

The other asserted claims add little to the substance of claims 1 and 14. The dependent method claims assert routine, well known, and conventional concepts, all existent as of the year 2000. Claims 15 and 16 provide that the streaming media is audio accompanied by information about the content including "at least one of a song title, a song artist, a song decade, and a song genre"—exactly the function of a jukebox. '379 Patent col. 20 l. 9-16. Claim 17 is nothing but transmission of the abstract idea itself. Claim 18 merely defines the regionally broadcasted content as video which is the content television stations have always broadcast. Claim 19

24

**A50**

involves the transmission of a "software update" to the electronic devices that modifies the application; however, the claim fails to state how the update modifies the application. Claim 20 transmits advertisements to the electronic device, and Claim 21 transmits targeted advertisements which are ideas that have been around as long as advertising itself. Each of the above claim limitations is insignificant and conventional.

Likewise, the dependent system claims present limitations which were well known, routine and generic computer-based concepts as of the year 2000 and do nothing either individually, or as an ordered combination, to confer patentability on the '379 Patent. Claims 2, 4, 5, 9, and 10 each recite instructions for either receiving or displaying content or content sources. None of these claims are inventive as claim 2 (presenting information about a song in a "graphical representation"), claims 4 and 5 (both displays of content), and claim 10 (instructions to present media sources within a graphical user interface without use of a web browser) were each discussed in detail above and rejected as an inventive concept in the Court's analysis of a "graphical user display." Claim 9 is nothing but a virtual representation of a radio dial which has been a longstanding feature of radios for years. Claim 6 recites a search engine which was a well known generic computer feature as of the year 2000. Claim 7 describes a private login for the user, and Claim 8, which incorporates the system of claim 7, allows a user to select a playlist, both of which are basic computer functions within the prior art that add nothing of practical significance. Claim 3 recites receiving an FM signal in the wireless cellular telephone device over the internet, but it is devoid of specific functionality and is representative of the type of claims that *Alice* and *Ultramercial III* describe as unpatentable. Finally, claim 11 sets forth buffering of the streaming media signal, claim 12 describes the streaming media signal as video,

**A51**

and claim 13 recites that the electronic device has a network address. Again, neither claims 11, 12 nor 13 describe anything inventive and not in the prior art.

In sum, the dependent system and method claims, considered with Claims 1 and 14, either individually or as an ordered combination, all describe conventional, well known and routine concepts, accomplished using computer hardware and software recited in "purely functional and generic" terms and are, therefore, invalid under 35 U.S.C. § 101. *See Alice,* 134 S. Ct. at 2360. Accordingly, the Court finds as a matter of law that the dependent claims do not add something to the abstract idea that is an "integral" or "significant part" of the invention.

**D. Preemption inquiry**

United States Supreme Court jurisprudence makes clear that the rationale for excluding laws of nature, natural phenomena, and abstract ideas from patentability is the concern of preemption. *See Alice,* 134 S. Ct. at 2354. " '[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it,' thereby thwarting the primary object of the patent laws." *Id.* (quoting *Mayo,* 132 S. Ct. at 1293). In analyzing whether a patent is preemptive, the Supreme Court has stated that the relevant question is "how much future innovation is foreclosed relative to the contribution of the inventor." *Mayo,* 132 S. Ct. at 1303. The concern recognized by the Supreme Court is that "patent law not inhibit further discovery by improperly tying up the future use of" "the basic tools of scientific and technological work" which the Court has found to be the basic "building blocks of human ingenuity." *Alice,* 134 S. Ct. at 2354. Although much of the preemption analysis is subsumed in the two-step *Mayo/Alice* analysis, it will also be addressed separately by the Court. *See Open Text,* 2015 WL 269036, at *4 ("the "preemption concern . . . is [] baked into the Mayo/Alice test").

Affinity argues the claimed inventions of the '379 Patent do not risk preemption of the dissemination of regionally broadcasted content to users outside the region because the patent's claims do not cover satellite radio or television, cable television, media streamed over a traditional, home computer or even by FM signal to a cellular phone. On the other hand, Defendants contend that the '379 Patent is preemptive because it prohibits the use of regionally broadcast content to a user outside the region on arguably any electronic device that involves cellular communication.[34] Defendants further argue that the '379 Patent specification gives rise to "at least ten patents"[35] in that "electronic device" is defined in the specification as "includ[ing] a network radio, a modular device, an audio system, a personal digital assistant (PDA), a cellular phone, or other electronic devices operable to receive information wirelessly communicated by communication engine." Col. 4 l. 27-32.

In determining "how much future innovation is foreclosed relative to the contribution of the inventor," a claim need not tie up the entire field to be preemptive, rather the concern is whether the claim "tie[s] up too much future use" of the abstract idea. *See Mayo*, 132 S. Ct. at 1302. In other words, the "pre-emption inquiry focuses on whether the patent 'would risk disproportionately tying up the use of the underlying ideas.'" *Cloud Satchel*, 2014 WL 7227942 at *13 (citing *Alice,* 134 S. Ct. at 2354; *Mayo,* 132 S. Ct. at 1294).

On the issue of preemption, analysis of steps one and two under the *Mayo/Alice* test leads the Court to side with Defendants. Allowing the asserted claims to survive would curb any innovation related to the implementation of the abstract idea on potentially any electronic device that utilizes cellular communication. The asserted claims of the '379 Patent preempt the dissemination of regionally broadcasted content to a user outside the region on an electronic

---

[34] *See* Tr. at 155-56.

[35] *See id.* at 152.

**A53**

device that utilizes cellular communication, thereby monopolizing the idea on a ubiquitous device as is evidenced by the scope of the definition in the specification. In this case, it is clear neither the system nor method claims, either considered individually or as an ordered combination, impose any significant limitation on the abstract idea and, therefore, disproportionately tie up the future use of that idea.

### E. *DDR Holdings* is distinguishable

In *DDR Holdings*, the Federal Circuit found that patents directed to systems and methods of generating a composite web page that combines certain visual elements of a "host" website with content of a third-party merchant were not invalid. 773 F.3d at 1259. The claimed invention sought to overcome a problem specifically arising in the realm of computer networks—the challenge of "retaining website visitors that, if adhering to the routine, conventional functioning of Internet hyperlink protocol, would be instantly transported away from the host's website." *Id.* at 1257. The Court explained that a claimed solution "that is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of" a specific technology is eligible as opposed to those that "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." *Id.*

In its brief, Affinity suggests that the *DDR Holdings* opinion is "particularly relevant." The Court, however, finds that it is easily distinguishable. First, unlike the instant case, the Federal Circuit concluded that the patent at issue was probably not directed to an abstract idea because "these claims stand apart because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." *Id.* Second, and in contrast to the instant case, the Federal Circuit found that

Case: 15-1845    Document: 27    Page: 126    Filed: 09/29/2015

Case 6:15-cv-00030-WSS    Document 53    Filed 06/02/15    Page 29 of 30

"[u]nlike the claims in *Ultramercial*, the claims at issue here *specify* how interactions with the Internet are manipulated to yield a desired result." *Id.* (emphasis supplied). Specifically, the Court found that the claims recite an inventive concept for resolving a particular "Internet-centric problem." *Id.* at 1258-59. Further, in making this finding, the Federal Circuit cautioned "that not all claims purporting to address Internet-centric challenges are eligible for patent." *Id.* at 1258. At the hearing, the Court asked Affinity's counsel if there is any "internet centric problem with being able to transmit regional broadcast content over streaming media to MLB.com on my home computer in order for me to watch that ball game," and Affinity agreed that there was not.[36] Instead, the '379 Patent merely takes the abstract idea of the dissemination of regionally broadcasted content to a user outside the region and says "apply it" to a wireless, cellular telephone device acting as a generic computer. *See Ultramercial III*, 772 F.3d at 715-17.

## IV.    Conclusion and Recommendations

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 19) be **GRANTED** and that this matter be **DISMISSED.**

The undersigned further recommends that Defendants' pending Motions to transfer Venue to the Western District of Texas, Austin division be **DENIED AS MOOT.**

The parties may wish to file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained

---

[36] *See id.* at 143-145.

29

**A55**

in this Report within fourteen (14) days after the party is served with a copy of the Report shall

bar that party from de novo review by the District Court of the proposed findings and

recommendations in the Report and, except upon grounds of plain error, shall bar the party from

appellate review of unobjected-to proposed factual findings and legal conclusions accepted by

the District Court.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985);

*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc). To the extent that

a party has not been electronically served by the Clerk with this Report and Recommendation

pursuant to the CM/ECF procedures of this district, the Clerk is directed to send such party a

copy of this Report and Recommendation by a national overnight delivery service having

confirmation of pickup and delivery.

　　　　SIGNED this _____ day of June, 2015.

　　　　　　　　　　　　　　　　　　　　　JEFFREY C. MANSKE
　　　　　　　　　　　　　　　　　　　　　U.S. MAGISTRATE JUDGE

30

**A56**



US007970379B2

(12) **United States Patent** (10) **Patent No.:** **US 7,970,379 B2**

White et al. (45) **Date of Patent:** **Jun. 28, 2011**

(54) **PROVIDING BROADCAST CONTENT**

(75) Inventors: **Russell W. White**, Austin, TX (US); **Kevin R. Imes**, Austin, TX (US)

(73) Assignee: **Affinity Labs of Texas, LLC**, Austin, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/495,115**

(22) Filed: **Jun. 30, 2009**

(65) **Prior Publication Data**

US 2009/0318122 A1     Dec. 24, 2009

**Related U.S. Application Data**

(63) Continuation of application No. 12/015,320, filed on Jan. 16, 2008, now Pat. No. 7,778,595, which is a continuation of application No. 10/947,755, filed on Sep. 23, 2004, now Pat. No. 7,324,833, and a continuation of application No. 09/537,812, filed on Mar. 28, 2000, now Pat. No. 7,187,947.

(51) **Int. Cl.**
*H04H 40/00* (2008.01)
(52) **U.S. Cl.** ...................... **455/410**; 455/3.06; 455/3.01
(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,582,926 | A | 6/1971 | Hassan |
| 4,291,749 | A | 9/1981 | Ootsuka et al. |
| 4,314,232 | A | 2/1982 | Tsunoda |
| 4,337,821 | A | 7/1982 | Saito |
| 4,401,848 | A | 8/1983 | Tsunoda |
| 4,407,564 | A | 10/1983 | Ellis |
| 4,419,730 | A | 12/1983 | Ito et al. |
| 4,441,405 | A | 4/1984 | Takeuchi |
| 4,481,584 | A | 11/1984 | Holland |
| 4,536,739 | A | 8/1985 | Nobuta |
| 4,570,217 | A | 2/1986 | Allen et al. |
| 4,582,389 | A | 4/1986 | Wood et al. |
| 4,636,782 | A | 1/1987 | Nakamura et al. |
| 4,716,458 | A | 12/1987 | Heitzman et al. |
| 4,731,769 | A | 3/1988 | Schaefer |
| 4,740,779 | A | 4/1988 | Cleary et al. |
| 4,740,780 | A | 4/1988 | Brown et al. |
| 4,752,824 | A | 6/1988 | Moore |
| 4,795,223 | A | 1/1989 | Moss |

(Continued)

FOREIGN PATENT DOCUMENTS

| CA | 2225910 | 12/1997 |
|---|---|---|

(Continued)

OTHER PUBLICATIONS

*Affinity Labs of Texas, LLC*, Plaintiff, v. *Apple, Inc.*, Defendant, C.A. No. 9:09-cv-00047-RC (Eastern District of Texas), Complaint (pp. 1-7), with Exhibits A, B and C, Filed Mar. 24, 2009. 76 pages in total.

(Continued)

*Primary Examiner* — Erika A Gary

(57) **ABSTRACT**

A method for providing broadcast content is disclosed. The method maintains a system to deliver regionally broadcasted content to an electronic device located outside a region of the regionally broadcasted content, provides an application for the electronic device that allows the electronic device to request a streaming media signal representing the regionally broadcasted content even if the electronic device is located outside of the region, and communicates the streaming media signal to the electronic device responsive to a user request.

**21 Claims, 9 Drawing Sheets**



US 7,970,379 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,802,492 | A | 2/1989 | Grunstein |
| 4,807,292 | A | 2/1989 | Sorscher .......................... 381/86 |
| 4,809,177 | A | 2/1989 | Windle et al. |
| 4,812,843 | A | 3/1989 | Champion, III et al. |
| 4,817,203 | A | 3/1989 | Tsurumoto et al. |
| 4,818,048 | A | 4/1989 | Moss |
| 4,827,520 | A | 5/1989 | Zeinstra |
| 4,837,551 | A | 6/1989 | Iino |
| 4,876,594 | A | 10/1989 | Schiffman |
| 4,905,272 | A | 2/1990 | Van de Mortel et al. |
| 4,914,705 | A | 4/1990 | Nigawara |
| 4,977,509 | A | 12/1990 | Pitchford et al. |
| 4,988,976 | A | 1/1991 | Lu |
| 4,995,258 | A | 2/1991 | Frank |
| 4,996,959 | A | 3/1991 | Akimoto |
| 4,999,622 | A | 3/1991 | Amano et al. |
| 5,006,829 | A | 4/1991 | Miyamoto et al. |
| 5,051,735 | A | 9/1991 | Furukawa |
| 5,070,323 | A | 12/1991 | Iino et al. |
| 5,124,915 | A | 6/1992 | Krenzel |
| 5,164,904 | A | 11/1992 | Sumner |
| 5,179,385 | A | 1/1993 | O'Loughlin et al. |
| 5,198,797 | A | 3/1993 | Daidoji |
| 5,203,499 | A | 4/1993 | Knittel |
| 5,214,413 | A | 5/1993 | Okabayashi et al. |
| 5,214,707 | A | 5/1993 | Fujimoto et al. |
| 5,214,793 | A | 5/1993 | Conway et al. |
| 5,239,700 | A | 8/1993 | Guenther et al. |
| 5,257,190 | A | 10/1993 | Crane |
| 5,270,689 | A | 12/1993 | Hermann |
| 5,274,560 | A | 12/1993 | LaRue |
| 5,278,532 | A | 1/1994 | Hegg et al. |
| 5,293,115 | A | 3/1994 | Swanson |
| 5,299,132 | A | 3/1994 | Wortham |
| 5,307,326 | A | 4/1994 | Osawa |
| 5,327,558 | A | 7/1994 | Burke et al. |
| 5,335,743 | A | 8/1994 | Gillbrand et al. |
| 5,341,350 | A | 8/1994 | Frank |
| 5,345,817 | A | 9/1994 | Grenn et al. |
| 5,351,041 | A | 9/1994 | Ikata et al. |
| 5,361,165 | A | 11/1994 | Stringfellow et al. |
| 5,363,355 | A | 11/1994 | Takagi |
| 5,371,510 | A | 12/1994 | Miyauchi et al. |
| 5,388,248 | A | 2/1995 | Robinson et al. |
| 5,400,045 | A | 3/1995 | Aoki |
| 5,400,246 | A | 3/1995 | Wilson et al. |
| 5,404,443 | A | 4/1995 | Hirata |
| 5,408,686 | A | 4/1995 | Mankovitz |
| 5,410,326 | A | 4/1995 | Goldstein |
| 5,414,439 | A | 5/1995 | Groves et al. |
| 5,416,318 | A | 5/1995 | Hegyi |
| 5,418,962 | A | 5/1995 | Bodin et al. |
| 5,420,573 | A | 5/1995 | Tanaka et al. |
| 5,422,565 | A | 6/1995 | Swanson |
| 5,432,904 | A | 7/1995 | Wong |
| 5,440,428 | A | 8/1995 | Hegg et al. |
| 5,442,553 | A | 8/1995 | Parrillo |
| 5,442,557 | A | 8/1995 | Kaneko |
| 5,450,321 | A | 9/1995 | Crane |
| 5,450,471 | A | 9/1995 | Hanawa et al. |
| 5,450,613 | A | 9/1995 | Takahara et al. |
| 5,475,399 | A | 12/1995 | Borsuk |
| 5,475,835 | A | 12/1995 | Hickey |
| 5,479,157 | A | 12/1995 | Suman et al. |
| 5,483,632 | A | 1/1996 | Kuwamoto et al. |
| 5,486,840 | A | 1/1996 | Borrego et al. |
| 5,488,357 | A | 1/1996 | Sato et al. |
| 5,493,658 | A | 2/1996 | Chiang et al. |
| 5,497,271 | A | 3/1996 | Mulvanny et al. |
| 5,504,482 | A | 4/1996 | Schreder |
| 5,504,622 | A | 4/1996 | Oikawa et al. |
| 5,506,595 | A | 4/1996 | Fukano et al. |
| 5,511,724 | A | 4/1996 | Freiberger et al. |
| 5,519,410 | A | 5/1996 | Smalanskas et al. |
| 5,523,559 | A | 6/1996 | Swanson |
| 5,524,051 | A | 6/1996 | Ryan |
| 5,525,977 | A | 6/1996 | Suman |
| 5,528,248 | A | 6/1996 | Steiner et al. |
| 5,528,496 | A | 6/1996 | Brauer et al. |
| 5,532,684 | A | 7/1996 | Katsu |
| 5,534,888 | A | 7/1996 | Lebby et al. |
| 5,539,645 | A | 7/1996 | Mandhyan et al. |
| 5,539,658 | A | 7/1996 | McCullough |
| 5,539,869 | A | 7/1996 | Spoto et al. |
| 5,543,789 | A | 8/1996 | Behr et al. |
| 5,547,125 | A | 8/1996 | Hennessee et al. |
| 5,553,661 | A | 9/1996 | Beyerlein et al. |
| 5,555,172 | A | 9/1996 | Potter |
| 5,555,286 | A | 9/1996 | Tendler |
| 5,555,502 | A | 9/1996 | Opel |
| 5,557,541 | A | 9/1996 | Schulhof et al. |
| 5,568,390 | A | 10/1996 | Hirota et al. |
| 5,572,442 | A | 11/1996 | Schulhof |
| 5,576,724 | A | 11/1996 | Fukatsu et al. |
| 5,586,090 | A | 12/1996 | Otte |
| 5,587,560 | A | 12/1996 | Crooks et al. |
| 5,594,709 | A | 1/1997 | Nagano et al. |
| 5,594,779 | A | 1/1997 | Goodman |
| 5,596,319 | A | 1/1997 | Spry |
| 5,604,676 | A | 2/1997 | Penzias |
| 5,614,895 | A | 3/1997 | Ohomori et al. |
| 5,616,876 | A | 4/1997 | Cluts |
| 5,619,412 | A | 4/1997 | Hapka |
| 5,621,252 | A | 4/1997 | Bucknam |
| 5,625,608 | A | 4/1997 | Grewe et al. |
| 5,625,668 | A | 4/1997 | Loomis et al. |
| 5,627,547 | A | 5/1997 | Ramaswamy et al. |
| 5,638,305 | A | 6/1997 | Kobayashi et al. |
| 5,639,305 | A | 6/1997 | Brown et al. |
| 5,646,608 | A | 7/1997 | Shintani |
| 5,650,929 | A | 7/1997 | Potter et al. |
| 5,653,386 | A | 8/1997 | Hennessee et al. |
| 5,654,715 | A | 8/1997 | Hayashikura et al. |
| 5,657,221 | A | 8/1997 | Warman et al. |
| 5,661,652 | A | 8/1997 | Sprague et al. |
| 5,664,228 | A | 9/1997 | Mital |
| 5,666,102 | A | 9/1997 | Lahiff |
| 5,670,953 | A | 9/1997 | Satoh et al. |
| 5,677,837 | A | 10/1997 | Reynolds |
| 5,682,525 | A | 10/1997 | Bouve et al. |
| 5,684,490 | A | 11/1997 | Young et al. |
| 5,691,695 | A | 11/1997 | Lahiff |
| 5,694,120 | A | 12/1997 | Indekeu et al. |
| 5,699,056 | A | 12/1997 | Yoshida |
| 5,699,255 | A | 12/1997 | Ellis et al. |
| 5,702,165 | A | 12/1997 | Koibuchi |
| 5,712,640 | A | 1/1998 | Andou et al. |
| 5,715,474 | A | 2/1998 | Burke et al. |
| 5,721,827 | A | 2/1998 | Logan et al. |
| 5,732,216 | A | 3/1998 | Logan et al. |
| 5,734,973 | A | 3/1998 | Honda |
| 5,737,706 | A | 4/1998 | Seazholtz |
| 5,742,226 | A | 4/1998 | Szabo et al. |
| 5,742,893 | A | 4/1998 | Frank |
| 5,752,754 | A | 5/1998 | Amitani et al. |
| 5,754,774 | A | 5/1998 | Bittinger et al. |
| 5,754,775 | A | 5/1998 | Adamson et al. |
| 5,757,359 | A | 5/1998 | Morimoto et al. |
| 5,758,311 | A | 5/1998 | Tsuji et al. |
| 5,760,742 | A | 6/1998 | Branch et al. |
| 5,772,534 | A | 6/1998 | Dudley |
| 5,774,070 | A | 6/1998 | Rendon |
| 5,774,793 | A | 6/1998 | Cooper et al. |
| 5,774,827 | A | 6/1998 | Smith, Jr. et al. |
| 5,777,394 | A | 7/1998 | Arold |
| 5,790,973 | A | 8/1998 | Blaker et al. |
| 5,790,974 | A | 8/1998 | Tognazzini |
| 5,794,164 | A | 8/1998 | Beckert et al. |
| 5,797,089 | A | 8/1998 | Nguyen |
| 5,798,759 | A | 8/1998 | Dahl |
| 5,802,492 | A | 9/1998 | DeLorme et al. |
| 5,806,018 | A | 9/1998 | Smith et al. |
| 5,808,566 | A | 9/1998 | Behr et al. |
| 5,812,870 | A | 9/1998 | Kikinis et al. |
| 5,819,160 | A | 10/1998 | Foladare et al. |
| 5,822,098 | A | 10/1998 | Morgaine |
| 5,835,732 | A | 11/1998 | Kikinis et al. |

**A58**

US 7,970,379 B2

Page 3

| Patent No. | Kind | Date | Name |
|---|---|---|---|
| 5,839,108 | A | 11/1998 | Daberko et al. |
| 5,864,305 | A | 1/1999 | Rosenquist |
| 5,867,494 | A | 2/1999 | Krishnaswamy et al. |
| 5,870,680 | A | 2/1999 | Guerlin et al. |
| 5,875,412 | A | 2/1999 | Sulich et al. |
| 5,878,282 | A | 3/1999 | Mital |
| 5,900,564 | A | 5/1999 | Kurakake |
| 5,908,464 | A | 6/1999 | Kishigami et al. |
| 5,914,941 | A | 6/1999 | Janky |
| 5,917,405 | A | 6/1999 | Joao |
| 5,919,239 | A | 7/1999 | Fraker et al. |
| 5,919,246 | A | 7/1999 | Waizmann et al. |
| 5,926,624 | A | 7/1999 | Katz et al. |
| 5,940,767 | A | 8/1999 | Bourgeois et al. |
| 5,953,005 | A | 9/1999 | Liu |
| 5,953,657 | A | 9/1999 | Ghisler |
| 5,953,659 | A | 9/1999 | Kotzin et al. |
| 5,956,029 | A | 9/1999 | Okada et al. |
| 5,956,651 | A | 9/1999 | Willkie |
| 5,963,916 | A | 10/1999 | Kaplan |
| 5,969,283 | A | 10/1999 | Looney et al. |
| 5,969,826 | A | 10/1999 | Dash et al. |
| 5,974,333 | A | 10/1999 | Chen |
| 5,982,298 | A | 11/1999 | Lappenbusch et al. |
| 5,987,381 | A | 11/1999 | Oshizawa |
| 5,987,394 | A | 11/1999 | Takakura et al. |
| 5,990,803 | A | 11/1999 | Park |
| 5,991,640 | A | 11/1999 | Lilja |
| 5,999,525 | A | 12/1999 | Krishnaswamy et al. |
| 5,999,877 | A | 12/1999 | Takahashi et al. |
| 6,006,115 | A | 12/1999 | Wingate |
| 6,006,161 | A | 12/1999 | Katou |
| 6,007,228 | A | 12/1999 | Agarwal |
| 6,009,355 | A | 12/1999 | Obradovich et al. |
| 6,009,363 | A | 12/1999 | Beckert |
| 6,014,569 | A | 1/2000 | Bottum |
| 6,014,689 | A | 1/2000 | Budge et al. |
| 6,018,571 | A | 1/2000 | Langlois et al. |
| 6,023,232 | A | 2/2000 | Eitzenberger |
| 6,023,241 | A | 2/2000 | Clapper |
| 6,029,064 | A | 2/2000 | Farris et al. |
| 6,032,089 | A | 2/2000 | Buckley |
| 6,041,023 | A | 3/2000 | Lakhansingh |
| 6,047,234 | A | 4/2000 | Cherveny et al. |
| 6,047,327 | A | 4/2000 | Tso et al. |
| 6,055,478 | A | 4/2000 | Heron |
| 6,061,306 | A | 5/2000 | Buchheim |
| 6,084,584 | A | 7/2000 | Nahi et al. |
| 6,088,730 | A | 7/2000 | Kato et al. |
| 6,100,884 | A | 8/2000 | Tomita et al. |
| 6,104,334 | A | 8/2000 | Allport |
| 6,114,970 | A | 9/2000 | Kirson et al. |
| 6,115,669 | A | 9/2000 | Watanabe et al. |
| 6,121,282 | A | 9/2000 | Dominianni et al. |
| 6,122,403 | A | 9/2000 | Rhoads |
| 6,128,559 | A | 10/2000 | Saitou et al. |
| 6,131,060 | A | 10/2000 | Obradovich et al. |
| 6,133,853 | A | 10/2000 | Obradovich et al. |
| 6,144,358 | A | 11/2000 | Narayanaswamy et al. |
| 6,144,848 | A | 11/2000 | Walsh et al. |
| 6,147,938 | A | 11/2000 | Ogawa et al. |
| 6,148,261 | A | 11/2000 | Obradovich et al. |
| 6,150,925 | A | 11/2000 | Casazza |
| 6,151,634 | A | 11/2000 | Glaser |
| 6,157,619 | A | 12/2000 | Ozluturk |
| 6,157,725 | A | 12/2000 | Becker |
| 6,160,551 | A | 12/2000 | Naughton |
| 6,161,071 | A | 12/2000 | Shuman et al. |
| 6,163,079 | A | 12/2000 | Miyazaki et al. |
| 6,163,711 | A | 12/2000 | Juntunen et al. |
| 6,167,253 | A | 12/2000 | Farris et al. |
| 6,169,515 | B1 | 1/2001 | Mannings et al. |
| 6,175,782 | B1 | 1/2001 | Obradovich et al. |
| 6,175,789 | B1 | 1/2001 | Beckert et al. |
| 6,177,950 | B1 | 1/2001 | Robb |
| 6,178,403 | B1 | 1/2001 | Detlef |
| 6,178,514 | B1 | 1/2001 | Wood |
| 6,182,006 | B1 | 1/2001 | Meek |
| 6,185,491 | B1 | 2/2001 | Gray et al. |
| 6,189,057 | B1 | 2/2001 | Schwanz et al. |
| 6,192,340 | B1 | 2/2001 | Abecassis |
| 6,196,846 | B1 | 3/2001 | Berger et al. |
| 6,199,076 | B1 | 3/2001 | Logan et al. |
| 6,201,540 | B1 | 3/2001 | Gallup et al. |
| 6,202,008 | B1 | 3/2001 | Beckert et al. |
| 6,225,984 | B1 | 5/2001 | Crawford |
| 6,230,322 | B1 | 5/2001 | Saib et al. |
| 6,232,539 | B1 | 5/2001 | Looney et al. ............... 84/609 |
| 6,233,430 | B1 | 5/2001 | Helferich |
| 6,236,832 | B1 | 5/2001 | Ito |
| 6,236,918 | B1 | 5/2001 | Sonoda et al. |
| 6,240,297 | B1 | 5/2001 | Jadoul |
| 6,240,347 | B1 | 5/2001 | Everhart et al. |
| 6,243,725 | B1 | 6/2001 | Hempleman et al. |
| 6,246,935 | B1 | 6/2001 | Buckley |
| 6,247,130 | B1 | 6/2001 | Fritsch |
| 6,248,946 | B1 | 6/2001 | Dwek |
| 6,253,061 | B1 | 6/2001 | Helferich |
| 6,255,961 | B1 | 7/2001 | Van Ryzin et al. |
| 6,259,892 | B1 | 7/2001 | Helferich |
| 6,262,724 | B1 | 7/2001 | Crow et al. |
| 6,275,231 | B1 | 8/2001 | Obradovich |
| 6,278,531 | B1 | 8/2001 | Tesavis |
| 6,278,676 | B1 | 8/2001 | Anderson et al. |
| 6,278,884 | B1 | 8/2001 | Kim |
| 6,282,464 | B1 | 8/2001 | Obradovich |
| 6,289,382 | B1 | 9/2001 | Bowman-Amuah |
| 6,292,440 | B1 | 9/2001 | Lee ...................... 369/7 |
| 6,292,743 | B1 | 9/2001 | Pu et al. |
| 6,301,116 | B1 | 10/2001 | Tamura |
| 6,314,094 | B1 | 11/2001 | Boys |
| 6,314,326 | B1 | 11/2001 | Fuchu |
| 6,330,247 | B1 | 12/2001 | Chang |
| 6,332,163 | B1 | 12/2001 | Bowman-Amuah |
| 6,335,927 | B1 | 1/2002 | Elliott et al. |
| 6,338,044 | B1 | 1/2002 | Cook |
| 6,339,706 | B1 | 1/2002 | Tillgren et al. |
| 6,339,832 | B1 | 1/2002 | Bowman-Amuah |
| 8,339,832 | | 1/2002 | Bowman-Amuah |
| 6,344,861 | B1 | 2/2002 | Naughton et al. |
| 6,349,352 | B1 | 2/2002 | Lea |
| 6,353,637 | B1 | 3/2002 | Mansour et al. |
| 6,363,240 | B2 | 3/2002 | Ito |
| 6,377,825 | B1 | 4/2002 | Kennedy et al. |
| 6,396,164 | B1 | 5/2002 | Barnea et al. |
| 6,396,769 | B1 | 5/2002 | Polany |
| 6,401,085 | B1 | 6/2002 | Gershman et al. |
| 6,407,750 | B1 | 6/2002 | Gioscia et al. |
| 6,418,138 | B1 | 7/2002 | Cerf et al. |
| 6,418,330 | B1 | 7/2002 | Lee |
| 6,418,421 | B1 | 7/2002 | Hurtado et al. |
| 6,420,975 | B1 | 7/2002 | DeLine et al. ............. 340/815.4 |
| 6,421,305 | B1 | 7/2002 | Gioscia et al. |
| 6,422,941 | B1 | 7/2002 | Thorner et al. |
| 6,425,018 | B1 | 7/2002 | Kaganas et al. |
| 6,434,459 | B2 | 8/2002 | Wong et al. |
| 6,434,568 | B1 | 8/2002 | Bowman-Amuah |
| 6,434,628 | B1 | 8/2002 | Bowman-Amuah |
| 6,438,594 | B1 | 8/2002 | Bowman-Amuah |
| 6,442,748 | B1 | 8/2002 | Bowman-Amuah |
| 8,442,748 | | 8/2002 | Bowman-Amuah |
| 6,446,080 | B1 | 9/2002 | Van Ryzin et al. |
| 6,449,541 | B1 | 9/2002 | Goldberg et al. |
| 6,453,281 | B1 | 9/2002 | Walters |
| 6,456,892 | B1 | 9/2002 | Dara-Abrams et al. |
| 6,476,825 | B1 | 11/2002 | Croy et al. |
| 6,477,580 | B1 | 11/2002 | Bowman-Amuah |
| 6,477,665 | B1 | 11/2002 | Bowman-Amuah |
| 6,487,663 | B1 | 11/2002 | Jaisimha |
| 8,477,580 | | 11/2002 | Bowman-Amuah |
| 6,493,546 | B2 | 12/2002 | Patsiokas |
| 6,496,205 | B1 | 12/2002 | White et al. |
| 6,496,692 | B1 | 12/2002 | Shanahan |
| 6,496,850 | B1 | 12/2002 | Bowman-Amuah |
| 6,501,832 | B1 | 12/2002 | Saylor et al. |
| 6,501,836 | B1 | 12/2002 | Bowman-Amuah |
| 6,502,213 | B1 | 12/2002 | Bowman-Amuah |
| 6,507,762 | B1 | 1/2003 | Amro et al. |

US 7,970,379 B2

Page 4

| | | | |
|---|---|---|---|
| 6,509,716 B2 | 1/2003 | Yi | |
| 6,510,210 B1 | 1/2003 | Baughan | |
| 6,510,325 B1 | 1/2003 | Mack, II et al. | |
| 6,516,466 B1 | 2/2003 | Jackson | |
| 6,526,335 B1 | 2/2003 | Treyz et al. | |
| 6,529,909 B1 | 3/2003 | Bowman-Amuah | |
| 6,529,948 B1 | 3/2003 | Bowman-Amuah | |
| 6,539,396 B1 | 3/2003 | Bowman-Amuah | |
| 6,549,942 B1 | 4/2003 | Janky et al. | |
| 6,549,949 B1 | 4/2003 | Bowman-Amuah | |
| 6,550,057 B1 | 4/2003 | Bowman-Amuah | |
| 6,559,773 B1 | 5/2003 | Berry | |
| 6,571,282 B1 | 5/2003 | Bowman-Amuah | |
| 6,578,068 B1 | 6/2003 | Bowman-Amuah | |
| 6,584,403 B2 | 6/2003 | Bunn | |
| 6,587,127 B1 * | 7/2003 | Leeke et al. | ............... 715/765 |
| 6,587,835 B1 | 7/2003 | Treyz et al. | |
| 6,591,085 B1 | 7/2003 | Grady | ............................ 455/42 |
| 6,594,723 B1 | 7/2003 | Chapman et al. | |
| 6,594,740 B1 | 7/2003 | Fukuda | |
| 6,594,774 B1 | 7/2003 | Chapman et al. | |
| 6,601,192 B1 | 7/2003 | Bowman-Amuah | |
| 6,601,234 B1 | 7/2003 | Bowman-Amuah | |
| 6,606,082 B1 | 8/2003 | Zuberec et al. | |
| 6,606,660 B1 | 8/2003 | Bowman-Amuah | |
| 6,606,744 B1 | 8/2003 | Mikurak | |
| 6,609,105 B2 | 8/2003 | Van Zoest et al. | |
| 6,615,199 B1 | 9/2003 | Bowman-Amuah | |
| 6,615,253 B1 | 9/2003 | Bowman-Amuah | |
| 6,618,039 B1 | 9/2003 | Grant et al. | |
| 6,622,083 B1 | 9/2003 | Knockheart et al. | |
| 6,629,000 B1 | 9/2003 | Moon et al. | |
| 6,629,197 B1 | 9/2003 | Bhogal et al. | |
| 6,633,932 B1 | 10/2003 | Bork et al. | |
| 6,636,242 B2 | 10/2003 | Bowman-Amuah | |
| 6,639,584 B1 | 10/2003 | Li | |
| 6,640,238 B1 | 10/2003 | Bowman-Amuah | |
| 6,640,244 B1 | 10/2003 | Bowman-Amuah | |
| 6,640,249 B1 | 10/2003 | Bowman-Amuah | |
| 6,640,306 B1 | 10/2003 | Tone et al. | |
| 6,658,247 B1 | 12/2003 | Saito | |
| 6,671,567 B1 | 12/2003 | Dwyer et al. | |
| 6,671,715 B1 | 12/2003 | Langseth et al. | |
| 6,671,745 B1 | 12/2003 | Mathur et al. | |
| 6,671,818 B1 | 12/2003 | Mikurak | |
| 6,675,233 B1 | 1/2004 | Du | |
| 6,678,215 B1 | 1/2004 | Treyz | |
| 6,681,120 B1 | 1/2004 | Kim, II | |
| 6,694,200 B1 | 2/2004 | Naim | |
| 6,697,824 B1 | 2/2004 | Bowman-Amuah | |
| 6,697,944 B1 | 2/2004 | Jones et al. | |
| 6,704,394 B1 | 3/2004 | Kambhatla et al. | |
| 6,707,889 B1 | 3/2004 | Saylor et al. | |
| 6,708,086 B2 | 3/2004 | Richard | |
| 6,715,145 B1 | 3/2004 | Bowman-Amuah | |
| 6,721,489 B1 | 4/2004 | Benyamin et al. | |
| 6,721,710 B1 | 4/2004 | Lueck | |
| 6,725,022 B1 | 4/2004 | Clayton et al. | |
| 6,728,531 B1 | 4/2004 | Lee | |
| 6,731,625 B1 | 5/2004 | Eastep et al. | |
| 6,741,980 B1 | 5/2004 | Langseth et al. | |
| 6,742,015 B1 | 5/2004 | Bowman-Amuah | |
| 6,754,181 B1 | 6/2004 | Elliott et al. | |
| 6,760,916 B2 | 7/2004 | Holtz et al. | |
| 6,772,212 B1 | 8/2004 | Lau et al. | ...................... 709/228 |
| 6,788,528 B2 | 9/2004 | Enners et al. | ................. 361/683 |
| 6,791,907 B2 | 9/2004 | Berhan | |
| 6,792,086 B1 | 9/2004 | Saylor et al. | |
| 6,792,263 B1 | 9/2004 | Kite | ............................ 455/412.1 |
| 6,792,615 B1 | 9/2004 | Rowe et al. | |
| 6,823,225 B1 | 11/2004 | Sass | |
| 6,832,316 B1 | 12/2004 | Sibert | |
| 6,842,906 B1 | 1/2005 | Bowman-Amuah | |
| 6,845,398 B1 | 1/2005 | Galensky et al. | |
| 6,862,357 B1 | 3/2005 | Albus et al. | |
| 6,888,927 B1 | 5/2005 | Cruickshank et al. | |
| 6,888,929 B1 | 5/2005 | Saylor et al. | |
| 6,892,067 B1 | 5/2005 | Sharma et al. | |
| 6,901,067 B1 | 5/2005 | Kalavade | |

| | | | |
|---|---|---|---|
| 6,904,449 B1 | 6/2005 | Quinones | |
| 6,907,112 B1 | 6/2005 | Guedalia et al. | |
| 6,909,708 B1 | 6/2005 | Krishnaswamy et al. | |
| 6,915,272 B1 | 7/2005 | Zilliacus et al. | |
| 6,917,923 B1 | 7/2005 | Dimenstein | |
| 6,956,833 B1 | 10/2005 | Yukie et al. | |
| 6,963,783 B1 | 11/2005 | Bi et al. | |
| 6,963,784 B1 | 11/2005 | Gibbs | |
| 6,975,835 B1 | 12/2005 | Lake et al. | |
| 6,978,127 B1 | 12/2005 | Bulthuis et al. | |
| 8,975,835 | 12/2005 | Lake et al. | |
| 6,990,208 B1 | 1/2006 | Lau et al. | |
| 6,990,334 B1 | 1/2006 | Ito | |
| 7,013,151 B2 | 3/2006 | Hirokawa | |
| 7,020,704 B1 | 3/2006 | Lipscomb et al. | |
| 7,058,376 B2 | 6/2006 | Logan et al. | |
| 7,065,342 B1 | 6/2006 | Rolf | |
| 7,085,710 B1 | 8/2006 | Beckert et al. | |
| 7,120,462 B2 | 10/2006 | Kumar | |
| 7,123,936 B1 | 10/2006 | Rydbeck et al. | |
| 7,124,101 B1 | 10/2006 | Mikurak | |
| 7,130,807 B1 | 10/2006 | Mikurak | |
| 7,145,898 B1 | 12/2006 | Elliott | |
| 7,149,543 B2 | 12/2006 | Kumar, II | |
| 7,149,772 B1 | 12/2006 | Kalavade | |
| 7,200,357 B2 | 4/2007 | Janik et al. | |
| 7,209,943 B1 | 4/2007 | Ching et al. | |
| 7,219,123 B1 | 5/2007 | Fiechter et al. | |
| 7,321,783 B2 | 1/2008 | Kim | |
| 7,321,923 B1 | 1/2008 | Rosenberg et al. | |
| 7,324,833 B2 | 1/2008 | White et al. | |
| 7,339,993 B1 | 3/2008 | Brooks | |
| 7,343,414 B2 | 3/2008 | Lipscomb et al. | |
| 7,346,687 B2 | 3/2008 | Lipscomb et al. | |
| 7,379,541 B2 | 5/2008 | Iggulden et al. | |
| 7,437,485 B1 | 10/2008 | Kruglikov et al. | |
| 7,440,772 B2 | 10/2008 | White et al. | |
| 7,444,353 B1 | 10/2008 | Chen | |
| 7,562,392 B1 | 7/2009 | Rhoads et al. | |
| 7,778,595 B2 * | 8/2010 | White et al. | ................. 455/3.06 |
| 2001/0042107 A1 | 11/2001 | Palm | |
| 2002/0013759 A1 | 1/2002 | Hitson | |
| 2002/0023028 A1 | 2/2002 | Quarendon et al. | ........... 705/26 |
| 2002/0026442 A1 | 2/2002 | Lipscomb et al. | |
| 2002/0046084 A1 | 4/2002 | Steele et al. | |
| 2002/0058475 A1 | 5/2002 | Patsiokas | |
| 2002/0060701 A1 | 5/2002 | Naughton et al. | |
| 2002/0072818 A1 | 6/2002 | Moon et al. | |
| 2002/0144271 A1 | 10/2002 | Behagen et al. | |
| 2002/0164973 A1 | 11/2002 | Janik | |
| 2003/0008646 A1 | 1/2003 | Shanahan | |
| 2003/0105719 A1 | 6/2003 | Hurtado et al. | |
| 2003/0126335 A1 | 7/2003 | Silvester | |
| 2003/0163480 A1 | 8/2003 | Van Der Meulen | |
| 2003/0215102 A1 | 11/2003 | Marlowe | |
| 2004/0078274 A1 | 4/2004 | Aarnio | |
| 2004/0151327 A1 | 8/2004 | Marlow | |
| 2004/0210765 A1 | 10/2004 | Erickson | |
| 2005/0010633 A1 | 1/2005 | Shanahan | |
| 2005/0049002 A1 | 3/2005 | White et al. | |
| 2005/0054379 A1 | 3/2005 | Cao et al. | |
| 2005/0096018 A1 | 5/2005 | White et al. | |
| 2005/0282600 A1 | 12/2005 | Paradice | |
| 2006/0039263 A1 | 2/2006 | Trotabas | |
| 2006/0080741 A1 | 4/2006 | Nair | |
| 2006/0094349 A1 | 5/2006 | Slesak et al. | |
| 2006/0105804 A1 | 5/2006 | Kumar | |
| 2006/0206493 A1 | 9/2006 | Lipscomb et al. | |
| 2007/0150963 A1 | 6/2007 | Lee et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 1218258 A | 6/1999 | |
| CN | 1218258 A | 6/1999 | |
| DE | 4431070 | 3/1996 | |
| DE | 19 651 308 A1 | 10/1996 | |
| DE | 102 05 641 A 1 | 2/2002 | |
| DE | 44 31 070 B4 | 7/2004 | |
| DE | 20 2004 013 65 | 12/2004 | |
| EP | 333330 A1 | 2/1989 | |

**US 7,970,379 B2**

Page 5

| | | |
|---|---|---|
| EP | 0 569 343 A1 | 10/1993 |
| EP | 0569243 | 11/1993 |
| EP | 0 661 676 A1 | 12/1994 |
| EP | 0 675 341 A1 | 4/1995 |
| EP | 0675341 | 10/1995 |
| EP | 0744839 | 11/1996 |
| EP | 0 771 686 A2 | 7/1997 |
| EP | 0 898 378 | 2/1999 |
| EP | 0 920 016 A2 | 2/1999 |
| EP | 0 918 408 A2 | 5/1999 |
| EP | 0 982 732 A1 | 1/2000 |
| EP | 0982732 A1 | 1/2000 |
| EP | 984584 | 8/2000 |
| EP | 1 146 674 A2 | 10/2001 |
| JP | 59085599 | 5/1984 |
| JP | 63-136828 | 6/1988 |
| JP | 63136828 | 6/1988 |
| JP | 1018712 | 1/1989 |
| JP | 2-301330 | 12/1990 |
| JP | H4-261576 | 9/1992 |
| JP | 5077679 | 3/1993 |
| JP | 5-294250 | 11/1993 |
| JP | 6-187597 | 7/1994 |
| JP | 6289118 | 10/1994 |
| JP | 6294659 | 10/1994 |
| JP | 7036282 | 2/1995 |
| JP | 07-129895 | 5/1995 |
| JP | 07-146155 | 6/1995 |
| JP | 7-262493 | 10/1995 |
| JP | 7270171 | 10/1995 |
| JP | H08-6875 | 1/1996 |
| JP | 8-79814 | 3/1996 |
| JP | H08-79814 | 3/1996 |
| JP | 8-110231 | 4/1996 |
| JP | 9-50282 | 2/1997 |
| JP | 9-61514 | 3/1997 |
| JP | 9-74580 | 3/1997 |
| JP | 10-103966 | 4/1998 |
| JP | H08-252076 | 4/1998 |
| JP | 10-143349 | 5/1998 |
| JP | 10-149182 | 6/1998 |
| JP | 10-173737 | 6/1998 |
| JP | 1998-052033 | 9/1998 |
| JP | 3056721 | 12/1998 |
| JP | 11-68685 | 3/1999 |
| JP | 11-73192 | 3/1999 |
| JP | 1168685 | 3/1999 |
| JP | 2901445 | 3/1999 |
| JP | 11-96735 | 4/1999 |
| JP | 11-143791 | 5/1999 |
| JP | 1999-0033393 | 5/1999 |
| JP | 1999-0042565 | 6/1999 |
| JP | H11-164058 | 6/1999 |
| JP | 11-219580 | 8/1999 |
| JP | 11-068685 | 9/1999 |
| JP | 11-242686 | 9/1999 |
| JP | H11-242686 | 9/1999 |
| JP | 11219580 A | 10/1999 |
| JP | H11-288558 | 10/1999 |
| JP | 11-317061 | 11/1999 |
| JP | H11-317061 | 11/1999 |
| JP | 2000-0001465 | 1/2000 |
| JP | 2000-66974 | 3/2000 |
| JP | 2001-0009302 | 2/2001 |
| JP | 2001-0028354 | 4/2001 |
| JP | 2001-128280 | 5/2001 |
| JP | 10-356742 | 10/2002 |
| JP | 3890692 | 12/2006 |
| JP | 2007-207257 | 8/2007 |
| KR | 10-1997-0016743 | 4/1997 |
| KR | 20-1997-0012254 | 5/1997 |
| KR | 0142256 | 3/1998 |
| KR | 1999-024210 | 3/1999 |
| KR | 1999-0033726 | 5/1999 |
| KR | 2019990022030 U | 6/1999 |
| KR | 1999-0048723 | 7/1999 |
| KR | 1999-0055970 | 7/1999 |
| KR | 1999-0073234 | 10/1999 |
| KR | 100242563 B1 | 10/1999 |

| | | |
|---|---|---|
| KR | 2000-0001465 | 1/2000 |
| KR | 20000036680 | 7/2000 |
| KR | 10-0356742 | 10/2002 |
| WO | WO 94/18763 | 8/1994 |
| WO | WO 96/04724 | 2/1996 |
| WO | WO 96/07110 | 3/1996 |
| WO | WO 97/13657 | 4/1997 |
| WO | 98/19480 | 5/1998 |
| WO | WO 98/21672 | 5/1998 |
| WO | WO 98/19480 | 7/1998 |
| WO | WO 98/33102 | 7/1998 |
| WO | WO 98/47252 | 10/1998 |
| WO | WO 99/06910 | 2/1999 |
| WO | WO 99/18518 | 4/1999 |
| WO | WO 99/23856 | 5/1999 |
| WO | WO 99/28897 | 6/1999 |
| WO | WO 99/35009 | 7/1999 |
| WO | 99/43136 | 8/1999 |
| WO | WO 99/43136 | 8/1999 |
| WO | WO 99/12152 | 11/1999 |
| WO | WO 00/07849 | 2/2000 |
| WO | 00/38340 | 6/2000 |
| WO | WO 00/38340 | 6/2000 |
| WO | WO 00/54187 | 9/2000 |
| WO | WO 00/54462 | 9/2000 |
| WO | WO 00/60450 | 10/2000 |
| WO | WO 00/70523 | 11/2000 |
| WO | WO 00/79372 A1 | 12/2000 |

OTHER PUBLICATIONS

Daniel Kumin, Stereo Review, "Jukebox Heaven," Jan. 1999, pp. 64-71.
Audio, "Anthem Five-Channel Amp," Jul./Aug. 1999, p. 15.
Sony webpages in Japanese, "Portable Mini Disc Player MD Recorder," Jul. 21, 1996, pp. 1-5.
Sony, "MD Walkman Operating Instructions—MZ-R4ST," 1996, pp. 1-64.
Sony, "MD Walkman Operating Instructions—MZ-R5ST," 1997, pp. 1-79.
Stereo Review, "New Products," Jun. 1998, 1 page.
Factiva, Hardware Review, "Lost in the Supermarket," 2009, pp. 1-3.
Sony webpages in Japanese, "Portable Mini Disc Player MD Recorder," Oct. 21, 1999, pp. 1-63.
Jamie Sorcher, Stereo Review, "New for the Road," May 1998, 2 pages.
Sony, "MD Walkman Operating Instructions—MZ-R55," 1998, pp. 1-42.
John Whitters, The Advertiser, "Is the cassette doomed?" Jul. 16, 1998, pp. 1-2.
George Cole, Financial Times, "Listen with your eyes: A new music CD format supplies textual information," Oct. 23, 1997, pp. 1-2.
Dana J. Parker, Standard Deviations, "CD-TEXTral Read all about it!", Oct. 1996, pp. 1-2.
Mobile Electronics, "Down the Road," Jul. 2004, pp. 1-2.
Alpine, "Interface Adapter for iPod KCA-420i—Owner's Manual," 44 pages total.
PR Newswire, "Alpine Announces Fall Release of Interface Adapter That Enables iPod Control and Playback From In-Vehicle Sound Systems," Jul. 7, 2004, 2 pages total.
Amy Gilboy, Mobile Electronics, "Apple's iPod Seen Transforming Car Audio Business," 1 page.
Greg Borrowman, The Sydney Morning Herald, "Philips Releases Its Latest DVD," 1999, 2 pages total.
JVC, "Audio/Video Control Receiver, RX-668VBK, Instructions," pp. 1-43.
Sony webpages in Japanese, "Portable MD Recorder," Oct. 1997, 5 pages total.
Sony, "Walkman MZ-R50 Recorder," Oct. 1997 7 pages total.
Sony, "MD Walkman MZ-R55," Oct. 10, 1998, 6 pages total.
Von Herbert Pauler, Funkschau, "Kopierschutz fur MP3-Audio," 1999, 9 pages total.
English Summary, "A device for remotely controlling a car device for playing mp3 files is disclosed . . . ", 1 page.

Franklin N. Tessler, Macworld, "Mobile Mac, Highway Fidelity," Jun. 2004, pp. 1-3.
Barry Collins, The Sunday Times, "High-class high-tech—Buyer's guide," 2001, 2 pages total.
Peter Familari, Herald-Sun, "Clever Deck—CD and mini-disc combination," 1998, 1 page.
JVC, "MD-CD Combination Deck, XU-301BK, Instructions," pp. 1-59.
Amy Gilroy, Mobile Electronics, "OEM Integrators Embrace iPod's Success," 1 page.
JVC, "Portable Minidisc Recorder, XM-R700SL, Instructions," pp. 1-24.
Rio Car, "Car Toy Sole Retailer for Rio Car," May 28, 2001, 1 page.
Amy Gilroy, Twice, "Panasonic Ships First SD MP3," Dec. 4, 2000, 1 page.
Twice, "PhatNoise Readies MP3," Nov. 5, 2001, 1 page.
Kevin Savetz, The Washington Post, "Putting Your MP3 Collection in Drive 1-3. (Final Edition)," Aug. 10, 2001, pp. 1-3.
Twice, "Study Sees Retail Opportunities for Mobile Multimedia," vol. 14, Issue 15, Jun. 28, 1999, pp. 1-2.
Japanese Webpage, www.kcalgo.kr/jsp/main.jsp, 1 page.
Japanese Webpage, www.kca.go.kr—Brochure Free—Microsoft Internet Explorer, 1 page.
Stephen Kempainen, EDN Access for Design, by Design "In-car computing gets personal," Aug. 17, 1998, pp. 1-7.
Japanese Website, MM MPMANIA.com, http/mpmania, x-y.net/bbs/zboard.php?id=products&keyword=1998, 1 page.
Japanese document regarding MP3, May 1999, 1 page.
MPMan, "The portable MP3 player using the Flash Memory and Memory card—MP-F20," in Japanese, pp. 1-34.
Japanese Website, MM MPMANIA.com, http/mpmania, x-y.net/bbs/view.php?id=products&page=1&sn1=&divpage, 1 page.
www.mpman.com, "MP-F30, User's Guide," pp. 2-47.
Mark Moeller, Computing Unplugged Magazine, "Software Review, New software products for the Auto PC," 1999-2009, Zatz Publishing, pp. 1-4.
Mark Moeller, Computing Unplugged Magazine, "Auto PC Power, A survey of resources for Auto PC owners," 1999-2009, Zatz Publishing, pp. 1-5.
Mark Moeller, Computing Unplugged Magazine, "Auto PC Power, A look at the first year of the Auto PC with Microsoft," 1999-2009, Zatz Publishing, pp. 1-5.
Mark Moeller, Computing Unplugged Magazine, "Auto PC Power, Next generation AutoPCs make a big debut at CES," 1999-2009, Zatz Publishing, pp. 1-6.
Mark Moeller, Computing Unplugged Magazine, "Programming Power, Getting started developing software for the Auto PC," 1999-2009, Zatz Publishing, pp. 1-5.
Mark Moeller, Computing Unplugged Magazine, "Behind the Scenes, The AutoPC: Vision vs. Reality," 1999-2009, Zatz Publishing, pp. 1-7.
Mark Moeller, Computing Unplugged Magazine, "Product Preview, A Survey of Auto PC 2.0 for software developers," 1999-2009, Zatz Publishing, pp. 1-7.
Mark Moeller, Computing Unplugged Magazine, "AutoPC Update, Auto PC/Windows CE for Automotive news bites," 1999-2009, Zatz Publishing, pp. 1-4.
Claim Chart for KR19990033393, Claim 17 of U.S. Patent No. 7,324,833, pp. 1-3.
RIO500, Getting Started Guide for Windows 98 and Macintosh OS 8.6, pp. 1-2.
Norbert A. Streitz, et al., "DOLPHIN: Integrated Meeting Support Across Local and Remote Desktop Environments and LiveBoards," Integrated Publication and Information Systems Institute, 1994, pp. 345-358.
Leo Degen, et al., "Working with Audio: Integrating Personal Tape Recorders and Desktop Computers," May 3-7, 1992, pp. 413-418.
H.S. Jun Gibee, "A Virtuakl Information Desk on the Internet," University of Ulsan, Sep. 1999, pp. 265-268.
Steve Whittaker, et al., "TeleNotes: Managing Lightweight Interactions in the Desktop," Lotus Development Corporation, Jun. 1997, pp. 137-168.

R.M. Crowder, et al., "Integration of Manufacturing Information Using Open Hypermedia," Computer in Industry, 1999, pp. 31-42.
Tomas Bostrom, et al., "Mobile Audio Distribution," Royal Institute of Technology, 1999, pp. 166-172.
Alex Poon, et al., Xerox Disclosure Journal, vol. 19, No. 2, "Gestural User Interface Technique for Controlling the Playback of Sequential Media," Mar./Apr. 1994, pp. 187-190.
Deb Kumar Roy, "NewsComm: A Hand-Held Device for Interactive Access to Structured Audio," Massachusetts Institute of Technology, Jun. 1995, pp. 1-12.
Victoria Bellotti, et al., "Walking Away from the Desktop Computer: Distributed Collaboration and Mobility in a Product Design Team," 1996, pp. 209-218.
Upul Obeysekare, et al., "The Visual Interactive Desktop Laboratory," Jan.-Mar. 1997, pp. 63-71.
Asim Smailagic, et al., "MoCCA: A Mobile Communication and Computing Architecture," Institute for Complex Engineered Systems, pp. 1-8.
Sui-Meng Poon, et al., "Integration of Value-Added Audio Playback Capacity Into Computer Network," Nanyang Technological University, 1995, pp. 632-636.
Erdal Paksoy, et al., "A variable-rate celp coder for fast remote voicemail retrival using a notebook computer," DSPS R&D Center, Texas Instruments, 1997, pp. 119-124.
Jeffrey A. Davis, "Use of Personal Computers in Satellite Command and Control Systems," Raytheon Systems Company, Oct. 24, 1999, pp. 283-291.
Niki Davis, "Remote Teaching Via ISDN2 and Desktop Conferencing,"Exeter University School of Education, pp. 1-3.
A. Chan, et al., "The Pep-II Project-Wide Database," Stanford University, 1996, pp. 840-842.
Krishna Bharat, et al., "Migratory Applications," Springer Berlin, vol. 1222, 1997, pp. 1-21.
Empeg Car, "MP3 in your dash," Digital Audio Player User Guide, pp. 1-50.
Microsoft, "Getting Started Microsoft. Windows. 98" Second Edition, 1998, pp. 1-138.
Saul Greenberg, "PDAs and Shared Public Displays: Making Personal Information Public, and Public Information Personal," University of Calgary, Mar. 1999, pp. 1-11.
Naohiko Kohtake, et al., "InfoStick: an interaction device for Inter-Appliance Computing," Keio University, pp. 1-15.
Hewlett Packard, User's Guide, HP Jornada 420, Palm-Size PC, pp. 1-75.
Microsoft, "Introducing Microsoft Windows 95—Certificate of Authenticity," 1995, pp. 1-117.
Sony, "New Technical Theory for Servicing, MZ-R5ST Operation Manual," pp. 1-44.
Richard C. Davis, et al., "A Framework for Sharing Handwritten Notes," 1998, pp. 119-120.
Krishna A. Bharat, et al., "Migratory Applications," UIST '95, Nov. 14-17, 1995, pp. 133-142.
Brad A. Myers, "Collaboration Using Multiple PDAs Connected to a PC," Carnegie Mellon University, 1998, pp. 385-294.
Richard C. Davis, et al., "NotePals: Lightweight Note Sharing by the Group, for the Group," May 15-20, 1999, pp. 338-345.
Jun Rekimoto, et al., "Augmented Surfaces: A Spatially Continuous Work Space for Hybrid Computing Environments," May 15-20, 1999, pp. 378-385.
Dan R. Olsen, Jr., "Interacting with Chaos," Sep. and Oct. 1999, pp. 42-54.
Scott Robertson, et al., "Dual Device User Interface Design: PDAs and Interactive Television," Apr. 13-18, 1996, pp. 79-86.
Symantec Corporation, "pcANYWHERE32 User's Guide," 1993-1997, pp. 1-216.
Krishna Bharat, et al., Migratory Applications, "Mobile Object Systems Towards the Programmable Internet," Springer Berlin/Heidelberg, vol. 1222/11997, 1997, pp. 1-134.
Diamond Multimedia Systems, Inc., "Rio PMP300, User's Guide," 1998, pp. 1-27.
Sony, "Portable MiniDisc Recorder, Operating Instructions, MZ-R55," 1998, pp. 1-42.

Norbert A. Streitz, et al., "i-Land: An Interactive Landscape for Creativity and Innovation," Proceedings of the ACM Conference on Human Factors in Computing Systems, May 15-20, 1999, pp. 120-127.

Norbert A. Streitz, et al., "Roomware for Cooperative Buildings: Integrated Design of Architectural Spaces and Information Spaces," pp. 1-20.

Direct Cable Connection screen shot, "B1U6U4," 10 pages total.

Direct Cable Connection screen shot, 10 pages total.

IBM, "WordPad z50 Cradle Option—User's Guide," 1990, pp. 1-18.

IBM Mobile Systems, "WorkPad z50 Mobile Companion (2608-1Ax), Hardware Maintenance Manual," Mar. 1999, pp. 1-77.

Kevin Jost, Automotive Engineering International, "The car as a mobile-media platform," May 1998, pp. 49-53.

Microsoft Corporation, "Windows CE 2.1 Technical Articles, Developing Applications for an Auto PC," Jun. 1999, pp. 1-13.

Infogation Corporation, "InfoGation Corp. Introduces Software Applications for Next-Generation Smart Car Systems," Jan. 8, 1998, pp. 1-2.

Business Wire, "ORA Electronics Announces USB-Compatible TelCar Mark VII Begins Shipping First Quarter of 1999," Jan. 6, 1999, pp. 1-2.

ORA USA, "ORA Electronics Patents Telcar Cellular Telephone Interface," Jul. 6, 1998, pp. 1-2.

Hewlett Packard, "HP Jornada 430/430se Palm-Size PC, User's Guide," Edition 1, 1999, pp. 1-151.

NEC, "NEC MobilePro 750C, User's Guide," 1998, pp. 1-83.

Microsoft, "Palm PC User's Guide," Microsoft Windows CE, pp. 1-39.

Palm PC User'S Guide, "Chapter 6, Information Backup and Exchange," pp. 69-148.

MPMan, "User's Guide, The Portable MP 3player using the flash memory and SmartMedia card," 1997, pp. 1-35.

Cover Sheet, www.mpman.com, 1 page.

Smart Media Card Slot Diagram, 1 page.

MP Man F20 Logo, 1 page.

MPMan, "User's Guide, The portable MP3 player using the flash memory with variety features including the voice recording, phone/memo browsing, etc.," 1997, pp. 1-47.

Smart Media card diagram and install instructions, pp. 1-4.

Anand Lal Shimpi, Empeg, Ltd., "MP3 meets Car Audio: Empeg Mark II in-dash Car MP3 Player," Sep. 18, 2000, pp. 1-17.

Peter Clarke, EE Times, "Engineers drive craze for MP3 audio players," Feb. 5, 1999, pp. 1-4.

Rio Car Dot Org Geek Guide, "empeg car Mk. 1," Feb. 21, pp. 1-4.

Hugo Fiennes, Rio Car Dot Org Geek Guide, "MP3 Mobile," Feb. 21, pp. 1-4.

Rio Car Dot Org, Frequently Asked Questions, pp. 1-16.

Diamond Multimedia Systems, Inc., "Rio PMP300 User's Guide," 1998, pp. 1-27.

Stephen J. Buckley, et al., "The Car as a Peripheral, Adapting a Portable Computer to a Vehicle Intranet," SAE Technical Paper Series, 98C030, Oct. 19-21, 1998, pp. 1-14.

"The MP3 Mobile," Apr. 8, 1998, pp. 1-13.

12-Volt Business & Technology Solutions, AutoMedia, "How the Intelligent Data Bus will impact the way you do business," Nov. 1998, pp. 1-2.

Press Release, "Creative Labs Launches Nomad Portable MP3 Players," Apr. 15, 1999, pp. 1-5.

BMW, "Betriebsanleitung Bordmonitor mit Navigation und TV," 1995, pp. 1-82.

BMW, "Owner's Manual, On-board monitor with navigation system," 1996, pp. 1-81.

Transperfect/Translations, "True and accurate translation of the 1995 BMW Manual, from German into English," Aug. 16, 2005, pp. 1-80.

Heinz Sodeikat, "Euro-Scout is facing the German 1994 Market," 1994, pp. 551-556.

Pictures of car navigation systems in a car dashboard, pp. 1-11.

BMW, "The BMW On-Board Navigation System—Technology Takes a Remarkable Turn," 2005, pp. 1-9.

Oldsmobile, "1991 Toronado/Trofeo User's Guide," 1991, pp. 1-41.

Yepp, "Digital Sounds—yepp—YP-E32/E64102-291," Oct. 23, 1999, pp. 1-46.

U.S. Appl. No. 60/167,179, entitled "System, Method, and Device for Playing Recorded Music on a Wireless Communications Device," by Devon A. Rolf, filed Nov. 23, 1999, pp. 1-48.

Microsoft, "Getting Started, Microsoft Windows 98, for distribution with a new PC only," 1998, pp. 1-145.

PR Newswire, "Alpine Announces Fall Release of Interface Adapter That Enables iPod Control and Playback from In-Vehicle Sound Systems," Jul. 7, 2004, pp. 1-2.

Ha-Young Park, The Customer Times, "Portable Computer Music, MP3 File and MP3 Player rise as the Next Generation Audio Format," May 1999, pp. 1-2.

"MP3 Players Introduced in the Korean IT Magazines," 1998-1999, pp. 1-15.

MPMan, "MP-F20, User's Guide, Portable MP3 player using the flash memory and a Memory card," pp. 1-16.

PR Newswire Association, Inc., "Delphi's Communiport(R) Technology for Tomorrow, Today Demonstated at Frankfurt Auto Show," Sep. 15, 1999, pp. 1-8.

Crain Communications, Inc., "Products," Agilent Technologies Press Release, Feb. 21, 2000, pp. 1-6.

The Washington Times, LLC, John Hanan, Dallas Morning News, "Cars add computer, audiovisual gear," Jan. 14, 2000, pp. 1-3.

*Affinity Labs of Texas, LLC*, Plaintiff, v. *BMW North America, LLC. et al*, Defendants, Case No. 9:08-cv-00164-RC, Defendant Volkswagen Group of America, Inc's Invalidity Contentions, pp. 1-346.

*Affinity Labs of Texas, LLC*, Plaintiff, v. *Dice Electronics, LLC.*, Defendants, Case No. 9:08-cv-00163-RC; *Affinity Labs of Texas, LLC*, Plaintiff, v. *Hyundai Motor America, et al.*, Defendants, Case No. 9:08-cv-00164-RC; *Affinity Labs of Texas, LLC*, Plaintiff, v. *JVC Americas Corp., Kenwood USA Corporation*, Defendants, Case No. 9:08-cv-00171-RC, Defendant's Joint Invalidity Contentions and Production of Documents Pursuant to Patent Rules 3-3 and 3-4(b), pp. 1-23 and Exhibits A, B1-B34, C and D.

U.S. Patent and Trademark Office, Issue Notification in U.S. Appl. No. 10/947,754, 1 page.

R. Lind, et al. "The Network Vehicle—A Glimpse into the Future of Mobile Multi-Media," Sep. 1999, pp. 27-32.

U.S. Patent and Trademark Office, Order Granting/Denying Request for Ex Parte Reexamination dated Dec. 19, 2008 for U.S. Appl. No. 7,324,833 (request granted), pp. 1-13.

*Affinity Labs of Texas, LLC*, Plaintiff, v. *BMW North America, LLC, et al.*, Defendants, Civil Action No. 9:08-cv-164, Order Denying Defendants' Motion to Stay, Filed Feb. 20, 2009, pp. 1-9.

Yamaha Corporation, "QY Data Filer—Owner's Manual," pp. 1-250, 1997.

*Affinity Labs of Texas, LLC*, Plaintiff, v. *BMW North America, LLC, et al.*, Defendants, C.A. No. 9:08-cv-00164-RC, Affinity's Infringement Contentions, with Infringement Chart Exhibits A-G.

*Affinity Labs of Texas, LLC*, Plaintiff, v. *Alpine Electronics of America, Inc., et al.*, Defendants, C.A. No. 9:08-cv-00171-RC, Affinity's Infringement Contentions, with Infringement Chart Exhibits A-1 to G.

*Affinity Labs of Texas, LLC*, Plaintiff, v. *Dice Electronics, LLC, et al.*, Defendants, C.A. No. 9:08-cv-00171-RC, Affinity's Infringement Contentions, with Infringement Chart Exhibits A-C.

*Affinity Labs of Texas, LLC*, Plaintiff, v. *Dice Electronics, LLC; et al.*, Defendants, C.A. No. 9:08-cv-00163 (Eastern District of Texas), Defendants' Motion to Stay Litigation Pending Reexamination, Filed Jan. 12, 2009, pp. 1-15.

Declaration of John M. Jackson in Support of Defendants' Motion to Stay Litigation Pending Reexamination, Filed on Jan. 12, 2009, pp. 1-2.

Exhibit B to Defendants' Motion to Stay Litigation Pending Reexamination (Ex Parte Reexamination Communication Transmittal Form and Order Granting Request for Ex Parte Reexamination, Issued by the U.S. Patent and Trademark Office on Dec. 12, 2008, pp. 1-16).

Exhibit C to Defendants' Motion to Stay Litigation Pending Reexamination (Affinity Labs of Texas website, http://www.afflabstx.com/, printed on Dec. 29, 2008, Filed on Jan. 12, 4 pages total).

Exhibit D to Defendants' Motion to Stay Litigation Pending Reexamination (United States Patent and Trademark Office, Ex Parte Reexamination Filing Data, Sep. 30, 2008, pp. 1-2).

*Affinity Labs of Texas, LLC*, Plaintiff, v. *BMW North America, LLC, et al.*, Civil Action No. 9:08-cv-00164 RC (Defendants' Joint Motion to Stay Litigation Pending Reexamination, Filed on Jan. 13, 2009, pp. 1-8).

Proposed Order on Defendants' Motion to Stay Litigation Pending Reexamination, Filed on Jan. 13, 2009, 1 page total.

J. Braunstein, "Airbag Technology Takes Off," Automotive & Transportation Interiors, Aug. 1996, p. 16.

I. Adcock, "No Longer Square," Automotive & Transportation Interiors, Aug. 1996, pp. 38-40.

M. Krebs, "Cars That Tell You Where to Go," The New York Times, Dec. 15, 1996, section 11, p. 1.

L. Kraar, "Knowledge Engineering," Fortune, Oct. 28, 1996, pp. 163-164.

S. Heuchert, "Eyes Forward: An ergonomic solution to driver information overload," Society of Automobile Engineering, Sep. 1996, pp. 27-31.

"OnStar" brochure by General Motors Corp., 1997.

Sun Microsystems, Inc., "Why Jini Now?", Aug. 1, 1998, pp. 1-14.

Sun Microsystems, Inc., "What is Jini?",—Summary.

Clohessy, Kim, Object Technology, Inc., Virtual Machine Technology: Managing Complexity and Providing Portability for Embedded Systems, 2001, pp. 58-60.

Mobile GT, "The Architecture for Driver Information Systems."

Request for Ex Parte Reexamination Under 35 U.S.C. §302 for U.S. Patent No. 7,324,833, Filed on Nov. 7, 2008 (pp. 1-21).

Richard Menta, "1200 Song MP3 Portable Is A Milestone Prayer," Jan. 11, 2000, pp. 1-3.

U.S. Appl. No. 60/167,179, filed Nov. 23, 1999.

U.S. Appl. No. 09/234,259, filed Jan. 20, 1999.

U.S. Appl. No. 10/947,754, filed Sep. 23, 2004.

U.S. Appl. No. 60/167,179, filed Nov. 23, 1999.

U.S. Appl. No. 09/234,259, filed Jan. 20, 1999.

"Philips PSA [128MAX]," PC Authority Reviews, May 1, 2003, 1 pg.

"Sony Network Walkman NW-MS70D," PC Authority Reviews, Oct. 8, 2003, 1 pg.

"Targa TMU-401," PC Authority Reviews, Oct. 8, 2003, 1 pg.

"Targa TMU-604," PC Authority Reviews, Oct. 8, 2003, 1 pg.

"Request for Inter Partes Reexamination of U.S. Patent No. 7,324,833 Pursuant to 37 CFR 1.915," Requestor: Volkswagen Group of America, Inc., filed Aug. 21, 2009, pp. 1-61 with Certificate of Mailing, and Claim Charts A-HH.

Yamaha Corporation, "Yamaha Music Sequencer, QY70, Owner's Manual," Chapters 1-11, 1997.

Multi Technology Equipment, "Neo Car Jukebox, Installation and Instruction Manual," pp. 1-30.

The United States Patent and Trademark Office, Office Action Mailed Aug. 5, 2009, in a related application.

"Universal Serial Bus Specification," Revision 1.1, Sep. 23, 1998, pp. ii-106.

Reply to Office Action Mailed Aug. 5, 2009 in Reexamination U.S. Appl. No. 90/010,333 of U.S. Patent No. 7,324,833 (along with a Supplemental Reply and Second Supplemental Reply).

Response to Notice of Failure to Comply with Inter Partes Reexamination Request Filing Requirements (37 CFR 1.915(d)) filed Sep. 22, 2009. Requestor: Volkswagen Group of America, Inc. with Replacement Request for Inter Partes Reexamination of U.S. Patent No. 7,324,833 and Claim Charts A-JJ.

The United States Patent and Trademark Office, Office Action Mailed Nov. 12, 2009 in related U.S. Appl. No. 12/015,320.

The United States Patent and Trademark Office, Office Action Mailed Nov. 9, 2007 in related U.S. Appl. No. 10/947,755.

IEEE Standard 802.11a, 1999 Edition (Wireless LAN Medium Access Control and Physical Layer Specifications: High-Speed Physical Layer in the 5GHz Band), 1999, 91 pages.

Rod Underhill & Nat Gertler, "The Complete Idiot's Guide to MP3: Music on the Internet," 1999, 44 pages.

Bill Mann, "I Want My MP3! How to Download, Rip, & Play Digital Music," McGraw-Hill 2000, 175 pages.

IEEE Standard 802.11, 1997 Edition (Wireless LAN Medium Access Control and Physical Layer Specifications), 1997, pp. 1-145.

Rio 600 User Guide, Mar. 2001, pp. 1-38.

IBM Wireless Modem for Cellular/CDPD—Quick Reference, Oct. 1995, pp. 1-20.

Creative Sound Blaster Live! Platinum product, documentation, and software: Creative Technology Ltd., Creative Sound Blaster Live! Platinum Getting Started, Sep. 1999, 93 pages.

psa[play Getting Started Guide, (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)), pp. 1-16.

psa[play Getting Started Guide, 2000, pp. 1-16.

Rio 800 User Guide, 2001, pp. 1-38.

Rio 800 Digital Audio Player—Getting Started, 2000, pp. 1-19.

Rio 600 Getting Started Guide, 2001, pp. 1-169.

Cai, Jian, et al., "General Packet Radio Service in GSM," IEEE Communications Magazine, Oct. 1997.

RealNetworks, "RealPlayer Plus G2 Manual," Copyright 1998-1999.

Rathbone, Andy, "MP3 for Dummies," IDG Books Worldwide, Copyright 1999.

*Affinity Labs of Texas, LLC* v. *BMW North America, LLC, et al.*, C.A. No. 9:08CV164 and *Affinity Labs of Texas, LLC* v. *Alpine Electronics of America, Inc, et al.*, C.A. No. 9:08CV2171, Eastern District of Texas, Order Construing Claim Terms of United States Pates No. 7,324,833, Dec. 18, 2009, pp. 1-31.

Exhibit B to Third Party Requester's Comments to Patent Owner's Supplemental Reply of Jul. 26, 2010 filed Sep. 25, 2010 in Reexamination U.S. Appl. No. 95/001,262 (Declaration of Dr. Bruce Maggs dated Aug. 25, 2010).

Exhibit A to Third Party Requester's Comments to Patent Owner's Reply of Sep. 9, 2010 filed Oct. 12, 2010 in Reexamination U.S. Appl. No. 95/001,263 (Declaration of Dr. Bruce Maggs dated Oct. 12, 2010).

Nokia, "Quick Guide—Accessories Guide," Copyright 1999.

U.S. Patent and Trademark Office, Office Action in Inter Partes Reexamination of Patent No. 7440772, Reexamination U.S. Appl. No. 95/001,266, Office Action issued on Aug. 2, 2010, 14 pages.

U.S. Patent and Trademark Office, Office Action in Inter Partes Reexamination of Patent No. 7486926, U.S. Appl. No. 95/001,263, Office Action issued Jul. 9, 2010, 20 pgs.

U.S. Patent and Trademark Office, Office Action in Inter Partes Reexamination dated Jun. 14, 2010 in U.S. Appl. No. 95/001,223.

U.S. Patent and Trademark Office, Ex Parte Reexamination Communication Transmittal Form dated Jun. 14, 2010 providing "Decision, Sua Sponte, to Merge Reexamination Proceedings," in U.S. Appl. No. 95/001,223.

U.S. Patent and Trademark Office, Office Action in Inter Partes Reexamination mailed on May 24, 2010, in reexamination U.S. Appl. No. 95/001,262.

*Affinity Labs of Texas, LLC*, Plaintiff, v., *BMW North America, LLC, et al.*, Civil Action No. 9:08CV164, *Affinity Labs of Texas, LLC*, Plaintiff, v., *Alpine Electronics of America, Inc., et al.*, Civil Action No. 9:08CV171, Order Construing Claim Terms of Unites States Patent No. 7,634,228, filed May 10, 2010, pp. 1-27.

D. Peters, et al., "Car Multimedia—Mobile Multimedia for the 21st Century," Oct. 5-6, 2000, pp. 1-58.

Stephan Hartwig, et al., "Mobile Multimedia—Challenges and Opportunities Invited Paper," Jun. 19, 2000, pp. 1-12.

John Hanan, "Car Audio Has Come Far since the 8-Track," Knight Ridder/Tribune Business News, Dec. 17, 1999. pp. 1-2.

Business Wire, "Lobjects Announces New Digital Audio Player Technology for the Next-Generation Auto PC," Aug. 4, 1999, pp. 1-2.

Jason Meserve, "Windows Media Player now available for WinCe, (from Microsoft) (Product Announcement)," Network World, Mar. 6, 2000, pp. 1-2.

Business Wire, ""HUM" MP3 Software Turns Windows CE Handheld Computers Into Portable Music Players," May 24, 1999, pp. 1-2.

Chris De Herrera, "Windows CE 2.0 Auto PC Pictures," Chris De Herrera's Windows CE Website, Revised Jan. 11, 1999, pp. 1-3.

John Murray, "Inside Microsoft Windows CE," Microsoft Press, 1998, pp. 1-20.

Compaq, Intel, Microsoft, NEC, "Universal Serial Bus Class Definition for Audio Devices," Release 1.0, Mar. 18, 1998, pp. 1-130.

Compaq, Intel, Microsoft, NEC, "Universal Serial Bus Specification," Revision 1.1, Sep. 23, 1998, pp. 1-327.

US 7,970,379 B2

Page 9

VESA, Video Electronics Standards Association, "VESA Plug and Display (P&D) Standard," Version 1, Revision 0, Jun. 11, 1997, pp. 1-109.
*Affinity Labs of Texas, LLC*, Plaintiff, v., *BMW North America, LLC. et al*., Defendants, Case No. 9:08-cv-00164-RC, First Amended Answer and Counterclaim of Defendant Volkswagen Group of America, Inc. To Third Amended Complaint, filed Apr. 9, 2010, pp. 1-57.
*Affinity Labs of Texas, LLC*, Plaintiff, v., *BMW North America, LLC, et al*., Defendants, Case No. 9:08-cv-00164-RC, Amended Answer and Counterclaim of Defendants Hyundai Motor America, Hyundai Motor Manufacturing Alabama, LLC, and KIA Motors America, Inc. To Plaintiff Affinity Labs of Texas, LLC's Third Amended Complaint, filed Apr. 9, 2010, pp. 1-22.
*Affinity Labs of Texas, LLC*, Plaintiff, v., *BMW North America, LLC, et al*., Defendants, Case No. 9:08-cv-00164-RC, Plaintiff's Reply to Amended Answer and Counterclaim of Defendants Hyundai Motor America, Hyundai Motor Manufacturing Alabama, LLC and KIA Motors America, Inc. To Plaintiff Affinity Labs of Texas, LLC's Third Amended Complaint, filed Apr. 27, 2010, pp. 1-7.
*Affinity Labs of Texas, LLC*, Plaintiff, v., *BMW North America, LLC, et al*., Defendants, Case No. 9:08-cv-00164-RC, Plaintiff's Reply to First Amended Answer and Counterclaim of Defendant Volkswagen Group of America, Inc. To Third Amended Complaint, filed Apr. 27, 2010, pp. 1-7.
Panasonic, "Portable DVD/Video CD/CD Player, Operating Instructions, DVC-L10D," 1998, pp. 1-84.
Clarion Car Audio and Beyond, "1998 Car Audio & Security Product Catalog," 1998, pp. 1-24.
Clarion Car Audio and Beyond, "1999 Car Audio & Security Product," 1999, pp. 1-60.
Jamie Anderson, "Driving our way soon: the e-car," The Times, Nov. 9, 2000, pp. 1-4.
Clarion Auto PC, "Clarion Auto PC Owner's Manual," 1998, pp. 1-177.
Delphi Automotive Systems, "The Personal Productivity Vehicle," 1998, pp. 1-2.
Delphi Delco Electronics Systems, "On-Board Architecture," 1997, pp. 1-2.
Janet Braunstein, "Diversified Software Industries: Enabling digital instrument panels," Jan. 10, 2001, pp. 1-2.
Microsoft PressPass, "Microsoft Previews New Devices Using Windows CE for Automotive 2.0," Jan. 2000, pp. 1-2.
John Townley, "Countdown to Clarion," Automedia, pp. 1-4.
Gina Hertel, "A Voice-Activated Co-Pilot: ICES," Odds & Ends, Jan. 2000, vol. 8, Issue 1, pp. 1-5.
Kami Buchholz, "Diversified Software launches IVIS," Automotive Engineering Online, 2009, one page.
EMPEG Car webpage, http://web.archive.org/web/19990430033318/www.empeg.com/main.html, Apr. 30, 1999, one page.
Clarion AutoPC, "Frequently Asked Questions," 1998, pp. 1-3.
Clarion AutoPC, "Frequently Asked Questions," 1999, pp. 1-9.
Stereophile, "Clarion Debuts World's First Automobile PC/Stereo," Dec. 5, 1998, pp. 1-3.
Steve Whalley, "Peripherals To Go: USB in AutoPC." pp. 1-2.
Gregory L. White, "After AutoPC's Hard Ride, Detroit Tries Rebooting In-Car Computers," The Wall Street Journal, pp. 1-3.
*Affinity Labs of Texas, LLC*, Plaintiff, v., *BMW North America, LLC, et al*., Defendants, Civil Action No. 9:08-CV-164, Order Denying Defendant's Motion to Dismiss, filed Sep. 2, 2009, pp. 1-7.
*Affinity Labs of Texas, LLC* (Plaintiff) v. *BMW North America, LLC, et al*. (Defendants), Case No. 9:08-cv-00164-RC, Answer and Counterclaim of Defendant Volkswagen Group of America, Inc., to Third Amended Complaint, filed Apr. 1-48, filed Jan. 15, 2010.
*Affinity Labs of Texas, LLC* (Plaintiff) v. *Alpine Electronics of America, Inc., et al*. (Defendants), Civil Action No. 9:08-cv-171, Order Denying Without Prejudice Defendants' Motion for Summary Judgment, one page, filed Feb. 25, 2010.
*Affinity Labs of Texas, LLC* (Plaintiff) v. *BMW North America, LLC. et al*. (Defendants), Civil Action No. 9:08CV164 and *Affinity Labs of Texas, LLC* (Plaintiff) v. *Alpine Electronics of America, Inc., et al*.,

Civil Action No. 9:08CV171, Order Construing Claim Terms of United States Patent No. 7,324,833, issued on Dec. 18, 2009, pp. 1-31.
Real Networks, Inc., RealJukebox Plus Manuel, 1999, pp. 1-90.
Nokia 9110 Communicator User Manual, Copyright 1999.
Sony, "Sony Notebook Computer User Guide PCG-717/719," User Guide, 1997.
AirCard, "Sierra Wireless Announces First Cellular Network Interface Card for Notebook PCs," Jun. 21, 1999.
MusicMatch Internet Music System, "MusicMatch Jukebox Reviews," Mar. 4, 2000, May 8, 1999, Aug. 29, 1999, May 8, 1999, Feb. 4, 1997, Aug. 12, 1999, Jan. 24, 2000, Jan. 25, 2000, Feb. 22, 2000, pp. 1-32.
Bluetooth, "Specification of the Bluetooth System, Profiles," Dec. 1, 1999.
J. Schneidawind, "Big Blue Unveiling," USA Today, Nov. 23, 1992, p. 2B.
Nokia Suomi, "Range of suspension GSM products unveiled: Nokia's innovations offer a new dimension to mobile communication," Mar. 13, 1996, 1 page.
Nokia 9000i User's Manual, Copyright 1996-1997.
FCC Website, "Broadband PCS," available at http://wireless.fcc.gov/services/index.htm?job=service_home&id=broadband_pcs accessed Nov. 9, 2009).
RealNetworks, "RealPlayer plus, RealPlayer 7 Plus User Manual," Copyright 2000, Mar. 6, 2000.
David Pogue, "SoundJam MP Digital Audio System Manual," 1999.
iTunes Wikipedia Page, http://en.wikipedia.org/wiki/iTunes, accessed Jul. 31, 2009.
K. Jost. "The Car as a Mobile-Media Platform," Automotive Engineering International, May 1998, pp. 49-53.
S.K. Kirschner, "Wired Wheels," Popular Science, Mar. 1998, pp. 54-55.
R. Lind, et al., "The Network Vehicle—A Glimpse into the Future of Mobile Multi-Media," 17th AIAA/IEEE/SAE Digital Avionics Sys. Conference Proceedings, Oct. 31 to Nov. 7, 1998, at 121-1 to 121-8.
Request for Inter Partes Reexamination of U.S. Patent No. 7,187,947, filed Nov. 13, 2009, with accompanying Claim Charts.
Request for Inter Partes Reexamination of U.S. Patent No. 7,440,772, filed Nov. 13, 2009, with accompanying Claim Charts.
Request for Inter Partes Reexamination of U.S. Patent No. 7,324,833, filed Nov. 13, 2009, with accompanying Claim Charts.
Request for Inter Partes Reexamination of U.S. Patent No. 7,486,926, filed Nov. 13, 2009, with accompanying Claim Charts.
Request for Inter Partes Reexamination of U.S. Patent No. 7,634,228, filed Feb. 3, 2010, with accompanying Claim Charts.
U.S. Patent and Trademark Office, Office Action mailed May 24, 2010 with Reply filed Jul. 23, 2010 and supplemental reply filed Jul. 26, 2010 for reexamination U.S. Appl. No. 95/001,262.
Third Party Requester's Comments to Patent Owner's Supplemental Reply of Jul. 26, 2010 Pursuant to 37 C.F.R 1.947, filed on Aug. 25, 2010 for reexamination U.S. Appl. No. 95/001,262.
U.S. Patent and Trademark Office, Office Action mailed Aug. 2, 2010 with Reply filed Oct. 1, 2010 for reexamination U.S. Appl. No. 95/001,266.
U.S. Patent and Trademark Office, Office Action mailed Jul. 7, 2009 with Reply filed Sep. 9, 2009 for reexamination U.S. Appl. No. 95/001,263.
Third Party Requester's Comments to Patent Owner's Supplemental Reply of Sep. 9, 2010 Pursuant to 37 C.F.R 1.947, filed Oct. 12, 2010 for reexamination U.S. Appl. No. 95/001,263.
U.S. Patent and Trademark Office, Office Action mailed Sep. 2, 2010 with Reply filed Nov. 2, 2010 for reexamination U.S. Appl. No. 95/001,281.
Third Party Requester's Comments to Patent Owner's Reply of Oct. 1, 2010 Pursuant to 37 C.F.R 1.947, filed Nov. 1, 2010 for reexamination U.S. Appl. No. 95/001,266.
The Rio 500 Getting Started Guide, 1999, pp. 1-2.
"Visteon's Mobile Office Solutions Give Busy Commuters More of What They Need—Time," Canada Newswire, Sep. 15, 1999, 3 pages.
Hiatt, "RIAA Sues Napster, Claiming 'Music Piracy'," MTV News, Dec. 8, 1999, 3 pages.

**US 7,970,379 B2**

Page 10

Sony VAIO Notebook Computer User Guide PCG-731/PCG-735, 1998, pp. 1-131.

Sony VAIO Notebook Computer User Guide PCG-812, 1998, pp. 1-144.

Sony VAIO Notebook Computer User Guide PCG-838, 1999, pp. 1-121.

Sony Service Manual PCG-731/735/737, 1997, pp. 1-22.

Sony Service Manual PCG-723/729, 1998, pp. 1-22.

Boehlart, "Artists to Napster: Drop Dead" Salon.com, Mar. 24, 2000. 3 pages.

Sony Service Manual PCG-812/818, 1998, pp. 1-22.

Sony Service Manual PCG-838, 1999, pp. 1-22.

"Digital Download Provider Musicmaker.com Partners With Download Directory Listen.com; Offers Nearly 100,000 Downloadable Tracks Via the Online Directory," PR Newswire, Sep. 15, 1999, pp. 1-3.

MP3.com prospectus, Jul. 21, 1999, pp. 1-81.

Ana Orubeondo, "Trim AirCard 300 Eases Power Demands," InfoWorld, vol. 21, Issue 48. Nov. 29, 1999. p. 46 & 50.

"Net Music Firms to Tap Public Market," Billboard. Jul. 17, 1999. pp. 1-2.

"Cellular for Notebook PCs." CIO Vo-. 13, No. 1. Oct. 1, 1999, p. 90.

"Briefs," Network World. vol. 16, No. 24. Aug. 23, 1999, p. 27.

The MusicMatch.com website (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)) 32 pages.

The MusicMaker.com website (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)), 10 pages.

Qualcomm QCP-1960 User Manual. Apr. 1999, pp. 1-76.

Samsung SCH-3500 User Manual. 1999, pp. 1-108.

Motorola Digital StarTAC User Guide. Mar. 1999, pp. 1-118.

Nokia 9110 Quick Guide/Accessories Guide. 1999, pp. 1-31.

"MP3.com and i-drive.com Join Forces to Store and Manage MP3 Files," Business Wire, Oct. 7, 1999, pp. 1-3.

Nomad User Guide, Jun. 1999, pp. 1-34.

Nomad II Getting Started Manual, Jan. 2000, pp. 1-38.

GSM 03.64 version 6.2.0 Release 1997, European Telecommunications Standards Institute, 1999, pp. 1-42.

The i-Drive.com website (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)) 6 pages.

GSM 03.64 version 7.0.0 Release 1997, European Telecommunications Standards Institute, 1999, pp. 1-42.

Riocar.org, "rio car dot org Geek Guide," empeg car Mk.1, Jul. 16, 2010, 4 pages.

The MP3.com website (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)) Screenshots from MP3.com website (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)), 8 pages.

MP3.com and i-drive.com Join Forces to Store and Manage MP3 Files, Business Wire, Oct. 7, 1999, pp. 1-3.

The EMusic.com website (formerly www.goodnoise.com) (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)) 2 pages.

EMusic.com prospectus, Sep. 24, 1999, pp. 1-61, F1-F41.

"Logging On; Setting Sound Free From the CD," The Washington Post, Mar. 3, 2000, pp. 1-3.

"Music Factory; Retailers Struggle to Expand Listening Options Online," Contra Costa Times Mar. 19, 2000, pp. 1-2.

The MyPlay.com website (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)) 1 page.

Myplay.com Launches Today, PR Newswire. Oct. 13, 1999, pp. 1-2.

Myplay, Inc. Launches Consumer Online Music Service, PR Newswire, Oct. 13, 1999, pp. 1-3.

Empeg.com, "Does Your Car Stereo Run Linux," (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)), 2 pages.

TIA/EIA Interim Standard, Cellular Digital Packet Data, System Specification—Part 403, Mobile Data Link Protocol, Telecommunications Industry Association. Dec. 1997, 83 pages.

"The Listen Up Player from Audio Highway" 1996. 1 page.

"Audio Highway Announces the Listen Up Player," Audio Highway Press Release, Sep. 23, 1996, 2 pages.

MPMan F-10 and F-20 digital audio players and review article "MP3 Player Saehan MPMan F20 Review", X-bit labs, Jul. 14, 1999. 6 pages.

Menta, "RIAA Sues Music Startup Napster for $20 Billion" Newswire, Jan. 11, 2000, 4 pages.

Sony Corporation, Sony Portable MiniDisc Recorder MZ-R90/MZ-R91 Operating Instructions, Doc. No. 3-867-571-22(1), 1999, pp. 1-55.

Empeg Car User Guide, 1999, pp. 1-19.

Empeg Car User Guide (2000) pp. 1-48.

Crowe, Mike. Empeg Car Beta 10a, Mar. 25, 2000, 3 pages.

Emplode Help, (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)) 25 pages.

"MP3 Portable Player Goes Elite" The Mac Observer, Nov. 17, 1999, 3 pages.

"MP3 in Your Car Has Arrived" (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)) 1 page.

Photos from Comdex Fall 1999, Nov. 1999, 9 pages.

Photos from LinuxWorld Expo, Winter 1999, Mar. 1-4, 1999, 22 pages.

Craig Knudsen, "MP3 Linux Players," Linux Journal, Jul. 1, 1999, pp. 1-3.

riocar.org—Empeg Car History, (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)), 4 pages.

"Visteon: For Your Listening Pleasure—Any Music, Any Time, Anywhere," Presswire, Jan. 5, 2000, 1 page.

Photographs in email to Hugo Fiennes, Sep. 22, 1999, 4 pages.

HP Jornada 420 User's Manual, 1999, pp. 1-142.

IEEE Standard 802.11b, 1999 Edition (Wireless LAN Medium Access Control and Physical Layer Specifications: Higher-Speed Physical Layer Extension in the 2.4 GHz Band) Sep. 16, 1999, 96 pages.

RealPlayer Plus G2 Manual, 1999, pp. 1-81.

*Affinity Labs of Texas, LLC,* v. *BMW North America, LLC, et al.,* Civil Action No. 9:08CV164, Order Denying Defendant's Motion for Summary Judgment of Non-Infringement of the '833 Patent, filed Oct. 7, 2010, pp. 1-5.

*Affinity Labs of Texas, LLC,* v. *Hyundai Motor America, Inc.; Hyundai Motor Manufacturing Alabama LLC.; Volkswagen Group of America, Inc.; and Kia Motors America, Inc.,* Civil Action No. 9:08CV164, Jury Verdict Form, filed Oct. 28, 2010, pp. 1-16.

*Affinity Labs of Texas, LLC,* vs. *BMW North America, LLC, et al.,* Docket 9:08CV164, Oct. 27, 2010, vol. 8 of, pp. 2100 Through 2633, Reporter's Transcript of Jury Trial, pp. 1-88.

*Affinity Labs of Texas, LLC,* vs. *BMW North America, LLC, et al.,* Docket 9:08CV164, Oct. 28, 2010, vol. 9 of, pp. 2634 Through 2824, Reporter's Transcript of Jury Trial, pp. 1-19.

*Affinity Labs of Texas, LLC,* Plaintiff and Counter-Claim Defendant, vs. *Apple Inc.,* Defendant and Counter-Claim Plaintiff, Case No. 09-4436-CW, Apple Inc.'s First Invalidity Contentions Pursuant to Patent Local Rule 3-3, filed Jan. 5, 2011, pp. 1-25, with accompanying Appendixes A-G.

* cited by examiner



*FIG. 1*

Case: 15-1845    Document: 27    Page: 139    Filed: 09/29/2015



*FIG. 2*



*FIG. 3*



FIG. 4



FIG 5A

FIG 5B

500

501

502

510

511

512



*FIG. 6*



*FIG. 7*



FIG. 8

FIG 9



US 7,970,379 B2

**1**

**PROVIDING BROADCAST CONTENT**

This application is a continuation of U.S. patent application Ser. No. 12/015,320, filed, Jan. 16, 2008, which is now U.S. Pat. No. 7,778,595, which issued on Aug. 17, 2010 entitled "Method for Managing Media," which is a continuation of Ser. No. 10/947,755, filed Sep. 23, 2004, which is now U.S. Pat. No. 7,324,833, which issued on Jan. 29, 2008, which is a continuation of Ser. No. 09/537,812, filed Mar. 28, 2000, which is now U.S. Pat. No. 7,187,947, which issued on Mar. 6, 2007, the disclosures of which are all hereby incorporated herein by reference in their entirety for all purposes.

**FIELD OF THE DISCLOSURE**

The present disclosure relates to digitally stored content and, more specifically, to a content delivery system and method.

**BACKGROUND**

The first commercial radio stations in the United States began operation around 1920. Today, there may be as many as 12,000 radio stations in the United States programming in several distinct formats. When broadcasting their respective signals, these radio stations often use an analog signal, which may be modulated based on frequency or amplitude. Frequency modulated (FM) radio appears to be the dominant entertainment medium while amplitude modulated (AM) radio seems to be a popular outlet for news and information.

Unfortunately, analog radio may be unable to provide the sound quality and consistency that radio listeners desire. As such, several broadcasting related companies have begun to consider a movement to digital radio. Unlike analog radio reception, digital radio reception may be able to provide compact disk (CD) quality sound while remaining virtually immune to interference. Being immune to interference may result in reducing static growls or "multipath" echoes, echoes caused by signal reflections off buildings or topographical features.

Some countries, like Canada and many European countries, may choose to have digital radio operate in a single digital radio band such as the L-band between 1452-1492 megahertz (MHz). This band would allow the reception of both terrestrially and satellite-originated signals. By comparison, FM radio typically operates between 88 and 108 MHz while AM radio typically operates between 0.525 and 1.705 MHz. Neither of these bands allows for easy transmission via satellite.

Canada proposed using the L-Band for digital radio as early as 1992. Several countries throughout the world have since agreed to use the L-Band for digital radio with one notable exception. It appears the United States has chosen not to operate its digital radio within the L-Band. In the United States, the L-Band may already be committed for military uses. Apparently, the United States plans to adopt a system called in-band on-channel, or IBOC, which fits within the AM and FM frequencies.

IBOC technology may offer some advantages over L-Band transmissions. For example, there may be no need for new spectrum allocations. There may be backward and forward compatibility with existing AM and FM systems on both the transmitter and receiver sides, and there may be a low-investment upgrade to digital systems. Unfortunately, a workable IBOC solution is yet to be seen though technology may someday make IBOC digital radio commercially possible.

**2**

Even if an IBOC solution becomes commercially available in the United States, IBOC digital radio may suffer from several shortcomings. For example, there may global standardization problems. Though the United States favors IBOC, the European and Canadian communities seem to favor L-Band making the establishment of a global standard difficult.

**BRIEF DESCRIPTION OF THE DRAWINGS**

A more complete understanding of the present embodiments and advantages thereof may be acquired by referring to the following description taken in conjunction with the accompanying drawings, in which like reference numbers indicate like features, and wherein:

FIG. **1** depicts a general system for wirelessly communicating selective information to an electronic device in accordance with one aspect of the present invention;

FIG. **2** illustrates a block diagram of a method of wirelessly communicating selected information to an electronic device;

FIG. **3** illustrates an electronic device operable to receive selected audio information in accordance with the teachings of the present invention;

FIG. **4** illustrates a graphical user interface (GUI) for displaying selectable audio information according to one aspect of the present invention;

FIG. **5A** illustrates a portable radio system having a mount for an electronic device according to one embodiment of the present invention;

FIG. **5B** illustrates an automobile console having a mount for coupling an electronic device according to one aspect of the present invention;

FIG. **6** illustrates a block diagram of a system for communicating voice mail messages using email according to one embodiment of the present invention;

FIG. **7** illustrates a flow chart for providing voice email messages according to one embodiment of the present invention;

FIG. **8** illustrates a flow diagram of a method for providing selected audio information to an electronic device according to one embodiment of the present invention; and

FIG. **9** illustrates an automobile console having a mount for an electronic device according to one embodiment of the present invention.

**DETAILED DESCRIPTION**

The conceptual groundwork for the present invention includes wirelessly communicating selective information to an electronic device. According to one aspect, a user may interact with the Internet to select information, such as audio information, and wirelessly communicate the selected information to an electronic device. The electronic device receives the information via a wireless communications network and processes the information accordingly. In a particularized form, a user may select information from an Internet website operable to allow selectivity of audio information such as songs, on-line radio stations, on-line broadcasts, streaming audio, or other selectable information. Upon selecting the audio information, information or data associated with the selected audio information is wirelessly communicated to an electronic device. The electronic device may then be used to process the selected audio information. In this manner, a user may receive selective audio information via a wireless electronic device.

In one form, the electronic device may be operable to communicate with an individual's automobile audio system.

3

A user may select audio information utilizing a personal computer with access to a website operable to display selectable audio information. The selected audio information may then be wirelessly communicated to the electronic device associated with an automobile's audio system. Therefore, upon receiving the selected audio information, a user may access and play the received audio information utilizing the electronic device in association with the automobile's audio system.

The present invention is not limited to communicating only audio information. One skilled in the art can appreciate that other types of information, such as video, textual, etc. may be communicated utilizing the systems and methods disclosed herein without departing from the spirit and scope of the present invention. Additionally, it will be understood that information may be formatted in a plurality of ways at different phases of communication without loosing the underlying content of the selected information. For example, an audio file may be formatted, segmented, compressed, modified, etc. for the purpose of providing or communicating the audio invention. Therefore, the term "audio information" or "information" is used in a general sense to relate to audio information in all phases of communication.

FIG. 1 depicts a general system for wirelessly communicating selective information to an electronic device in accordance with one aspect of the present invention. The system, illustrated generally at 100, includes a digital engine 101 coupled to a communications engine 102. Communications engine 102 is remotely coupled to an electronic device 103. Digital engine 101 may be directly or indirectly coupled to storage device 105 operable to store information. Digital engine 101 maintains information or data associated with selected information in a digital format. The information may be stored within storage device 105 or other storage devices operable to maintain data or information associated with the selected information.

Communications engine 102 is communicatively coupled to digital engine 101 and operable to wirelessly communicate the selected information to electronic device 103. During operation, audio information may be selected by a user utilizing a personal computer or other devices operable to communicate with an information network. Digital engine 101 is operable to maintain information associated with the selected audio information. For example, the information could be several songs or titles configured as an audio file and formatted in a digital format such as an MP3 file, wave file, etc. The maintained information may also be a reference to a network location where an audio file may be stored, a network location where a network broadcast of audio information may be located, etc. or other network locations having information associated with the selected audio information. Therefore, digital engine 101 may maintain a plurality of different types of information or data associated with the selected audio information.

System 100, utilizing communication engine 102, may wirelessly communicate data or information associated with the selected audio information to electronic device 103 thereby providing wireless communication of selected information to an electronic device operable to receive wireless communications. In one embodiment, digital engine 101 may be used in association with an Internet website configured to provide access to selectable information. The Internet website operably associated with digital engine 101 allows a user to select information to be wirelessly communicated to electronic device 101 utilizing a network environment. The Internet website may include several different types of information related to audio information.

4

FIG. 4, described in greater detail below, illustrates one embodiment of providing an Internet website for displaying selectable audio information. For example, the Internet website may include music and/or artist search engines, playlists, top 10 charts, artists by genre, and other information associated with audio information. A user may select information associated with the audio information and digital engine 101 can maintain the information or data associated with the selected information in a digital format. Communications engine 102 coupled to digital engine 101 may wirelessly communicate data associated with the selected audio information to electronic device 103. Therefore, a user may access and select audio information via an Internet website and wirelessly communicate the data to an electronic device. As such, system 100 advantageously allows for wireless communication of selected audio information to electronic devices that may be remotely located from a conventional terrestrial communication network.

Electronic device 105 may be configured in a plurality of ways for receiving wireless communication of selected audio information. In one embodiment, electronic device 105 may be operable as a component configured to receive a cellular signal comprising the selected information communicated by the communication engine. For example, a device having a cellular modem may be operable to receive the information at specified intervals. Upon receiving the information the electronic device may process the received information. Electronic devices are described in more detail below and may include a network radio, a modular device, an audio system, a personal digital assistant (PDA), a cellular phone, or other electronic devices operable to receive information wirelessly communicated by communication engine 102.

Communications engine 102 may be operable to wirelessly communicate selected information to electronic device 103 in a plurality of ways. The present invention advantageously allows for several different embodiments of wirelessly communicating selected audio information to electronic device 103 and is not limited to any specific configuration described below. Several different types or combinations of wireless communication may be realized by the present invention. Communications engine 102 may be operable to wirelessly communicate the selected information from an information network, such as the Internet, to an electronic device operable to receive wireless communications. In one embodiment, communications engine 102 may comprise a conduit to interface information with a wireless communication network. The conduit may configure the information located within the information network into a format operable to be transmitted via wireless communication.

For example, a wireless device may be operable to receive packets of information having a specific size and in a specific format. In such an embodiment, communications engine 102 could format the information into a desirable format for wirelessly communicating the information to electronic device 103. Several types of wireless communication may be used by communications engine 102 to communicate the selected information to an electronic device. Communications networks such as GSM, Digital Satellite communication, SB, Radio bands, DRC, SuperDRC or other systems or types of transmission such as TDMA, CDMA, spread spectrum, etc. or frequencies such as between about 1.7 GHz and 2.0 GHz may be realized by the present invention for communicating information or data representing the selected audio information to electronic device 103.

In one embodiment, the selective information may be communicated using a digital broadcast signal. Digital broadcast includes providing information via a signal such as AM, FM,

US 7,970,379 B2

5

and the like. Digital information may be included or encoded as a sub-carrier within the broadcast signal and received by electronic device **103**. A digital sub-carrier may include a selective bandwidth of frequencies for a specific radio station (i.e., 6 MHz for FM). The selective information may be wirelessly communicated to electronic device **103** utilizing a communication engine **102** operable to communicate the selective information via a digital FM signal. In this manner, selective information may be communicated within digital FM sub-carriers to an electronic device operable to receive the information. For example, a user may subscribe to communicate the information via an FM sub-carrier and receive the selective data through wireless communication via a specified FM sub-carrier.

In one embodiment, the selected information may be formatted and transmitted to achieve a desirable transmission rate. For example, conventional systems may transmit information at a speed of 10 kilobits per second. Therefore, for 1 megabyte of information to be communicated to an electronic device, a transmission time of approximately 800 seconds may be required. The present invention may allow for a relative increase in transmission speed by removing the requirement that information be communicated asynchronously to an electronic device. For example, conventional wireless communication utilizes a specified frequency to communicate information in two directions (i.e., cellular phones). As such, information is communicated across a channel in an asynchronous manner to provide a continuous audio signal to the recipient.

The present invention advantageously allows for signals to be transmitted to an electronic device in a less than asynchronous manner. For example, if a user selected a song to be wirelessly communicated to an electronic device, system **100** could communicate the information in a less than asynchronous manner allowing the selected information to be transmitted efficiently thereby decreasing the overall download time for the selected audio information. In one embodiment, the selected information may be compressed and transmitted across the same frequency but at different phases thereby allowing plural signals having different phases to be wirelessly communicated to an electronic device. Therefore, the electronic device may be operable to receive multiple phased signals and process the selective information accordingly.

In one embodiment, the information may be wirelessly communicated at a relatively slow transmission rate. For example, a user may schedule when the selected audio information may be used by electronic device **103**. The user may select several different audio tracks or songs to be transmitted to an electronic device associated with the user's vehicle such that the user can listen to the user selected audio information during the drive home at the end of a workday. Therefore, it may be desirable to utilize a slower transfer speed due to the extended amount of time available prior to actual use of the selected audio information. In this manner, communications networks having less or slower transfer rates may be used to wirelessly communicate the selected audio information to the electronic device.

In another embodiment, high-speed wireless communication networks may be used to communicate the selected audio information. For example, a user may want to listen to an Internet broadcast of an Internet radio station. Therefore, high-speed communication may be required to wirelessly communicate or stream the selected audio information to an electronic device. In another embodiment, a hybrid of wireless communication rates may be deployed depending on the requirements of the selected audio information and/or the electronic device. For example, the selected audio informa-

6

tion may first be transmitted to the electronic device via high-speed communication until enough information has been wirelessly communicated and buffered into a memory device operably associated with the electronic device. Upon communication of a certain percentage of the selected audio information, slower communication speeds may then be used to communicate additional selected audio information.

Therefore, system **100** may be configured in a plurality of ways to communicate selected information to electronic device **103**. Digital engine **101** may be used to maintain data or information associated with the selected information and communication engine **102**, communicatively coupled to digital engine **101**, may wirelessly communicate selected information to electronic device **103**.

FIG. **2** illustrates a block diagram of a method of wirelessly communicating selected information to an electronic device. The method may be used in association with the system illustrated in FIG. **1** or other systems operable to utilize the method of FIG. **2**.

The method begins generally at step **200**. At step **201**, selectable audio information may be accessed utilizing a network communications device. For example, selectable audio information may be displayed at an Internet website accessible by a personal computer. In another embodiment, the selectable information may be accessed utilizing a wireless communications device such as, a cellular phone, a PDA device, or other devices operable to provide access to the selectable audio information.

Upon accessing the selectable information, the method proceeds to step **202** where a user can identify or select audio information to be wirelessly communicated to an electronic device. For example, a user may select an entire album to be wirelessly communicated to a PDA device.

Upon the user selecting the audio information, the method proceeds to step **203** where the method maintains information associated with the selected information. In one embodiment, the information may be an audio file, such as a wave file, and MP3 file, etc. representative of the selected audio information. In another embodiment, a network location that comprises a file representing the selected information may be maintained. Another example may include a network location of a network broadcast of audio information. Therefore, the method at step **203** may maintain several different types of information associated with the selected audio information.

Upon maintaining information or data associated with the selected information, the method proceeds to step **204** where the method wirelessly communicates information associated with the selected information to an electronic device. For example, if an audio file associated with the selected audio information was maintained, the method would communicate the audio file to the electronic device. In another embodiment, a link or network address broadcasting the selected audio information may be accessed and, at step **204**, wirelessly communicated to an electronic device. In another embodiment, a combination of different types of audio information may be wirelessly communicated to an electronic device. Upon transmitting the selected audio information, the method proceeds to step **205** where the method ends.

Selected audio information may be communicated in a plurality of ways as described above including communicating via a cellular communications network to an electronic device operable to receive cellularly-communicated signals. For example, the information may be selected from a website operable to display selectable information. Upon selecting the audio information, a data file representing the selected audio information may be wirelessly communicated to an electronic device thereby allowing a user to select audio infor-

7

8

mation via the Internet and wirelessly communicate the information to an electronic device.

In some embodiments, the wireless communication to an electronic device may occur in an off-line environment. For example, a user may go "on-line" to access a website and select information and then go "off-line" or end the browsing session. The wireless communication may then occur while the user is off-line thereby removing the confines of using an active or on-line browsing environment (i.e. Internet radio broadcast, streaming audio, etc.) for accessing selected information. Therefore, the method of FIG. **2** allows for information, such as audio information, to be communicated from a network location such as a web site, to an electronic device "via" wireless communication. The present invention advantageously allows users to access and download information accessible by a network location to an electronic device operable to receive wireless communications thereby reducing the need for land lines, terrestrial communication networks, etc. for communicating selective information.

In one embodiment, the method of FIG. **2** may be deployed in association with an Internet website operable to display selectable links for downloading information. The information may include audio information, such as MP3s, streaming audio, streaming, Internet broadcasts, etc. are selectable by a user and operable to be wirelessly communicated to an electronic device. By providing a user with a website of selectable audio information operable to be wireless communicated to an electronic device, a user may customize information communicated to an electronic device. In one embodiment, a user may communicate information to an electronic device that may not be owned by the user. For example the method of FIG. **2** could be modified to allow a user to wirelessly communicate audio information to a plurality of electronic devices that may or may not be owned by the user.

FIG. **3** illustrates an electronic device operable to receive selected audio information in accordance with the teachings of the present invention. Electronic device **300** includes a communication module **301** such as a transceiver coupled to storage medium **303** such as a high speed buffer, programmable memory, or other devices operable to store information. Electronic device **300** may also include processor **302** operably associated with communication module **301** and storage medium **303**. Processor **302** may be operable to process wirelessly communicated selected information and in one embodiment may be integrated as part of communication module **301** of storage medium **303**. In the same manner, as larger scale integration of electronic devices proliferate, communication module **301**, processor **302**, and storage medium **303** may be integrated into one communication component or device operable as electronic device **300**.

Processor **302** may be operable using software that may be stored within storage medium **303**. In one embodiment, software upgrades may be communicated to electronic device **300** via wireless communication allowing for efficient system upgrades for electronic device **300**. Storage medium **303** may include one or several different types of storage devices. For example, storage medium **303** may include programmable gate arrays, ROM devices, RAM devices, EEPROMs, minidisks or other memory devices operable to store information.

During use, electronic device **300** receives wireless communications of selective information. The information may be transmitted via a wireless communications network and received by electronic device **300** via transceiver **301**. Transceiver **301** may be operable to convert the received wireless communication signal into a desirable format and store the

received information within storage medium **303**. The received information may then be processed by electronic device **300**.

In one embodiment, electronic device **300** may be operable as an audio player configured to play digital representations of music. For example, electronic device **300** may also include an MP3 player operable to process the received information into an audio signal. Therefore, electronic device **300** may be used to receive wirelessly communicated MP3 audio files and play these files using an MP3 player when desired. In another embodiment, electronic device **300** may be configured as a PDA wherein the PDA includes a web browser operable to wirelessly communicate with the Internet. The PDA device may include a user interface allowing a user to select information to be wirelessly communicated to electronic device **300**.

By providing a website of selectable information, the PDA devices may provide an efficient embodiment for electronic device **300** in that is allows a user to access and select information using a wireless communication network and receive the selected information using the same or different wireless communication network. In yet another embodiment, electronic device **300** may be configured as a component operable to receive selective information via wireless communication and communicate the information to a second electronic device such as an automobile sound system, home stereo, etc.

For example, electronic device **300** may utilize transceiver **301** to receive wirelessly communicated information. Electronic device **300** may then be coupled to an automobile sound system using an interface and communicate the received information to the automobile sound system. In this manner, electronic device **300** may be used to provide the automobile sound system with audio files received via wireless communication.

In another embodiment, electronic device **300** may be operable to communicate the received audio information to an audio system via a localized communications-signaling network. One such network may include utilizing "Bluetooth" communication standard, used to provide communication between electronic devices in a proximal setting. In one embodiment, electronic device **300** may be integrated into an audio component such as a radio receiver. Electronic device **300** integrated into an audio component may be configured to process digital audio files wirelessly communicated to an audio component. In another embodiment, electronic device **300** may be operable to communicate with an analog receiver at a predetermined frequency.

For example, a specific frequency may be selected (i.e., 93.7 MHz) for communicating the wireless received selected information from electronic device **300** to a localized audio system. Electronic device **300** communication of the wirelessly received information allows a conventional receiver to receive the selected audio information. In one embodiment, the conventional receiver may be configured to receive a digital sub-carrier, on-carrier, or other within a specified frequency. Therefore, electronic device **300** may be operable to locally transmit the signal at a specific frequency thereby allowing the conventional receiver to receive the information. In another embodiment, electronic device **300** may be operable to scan plural bandwidths to receive the selective information. For example, transceiver **301** may be operable to receive selective information across several frequencies and process the received information accordingly.

In another embodiment, electronic device **300** may be operable to scan several frequencies to obtain the desirable information. For example, a user may select several Internet broadcasts comprised of streaming audio information. There-

US 7,970,379 B2

9                                                    10

fore, the information may be transmitted across several wireless frequencies receivable by electronic device **300**. Electronic device **300** may then be operable to allow a user to scan wirelessly communicated Internet broadcast signals thereby providing a user selected virtual broadcast radio network. In another embodiment, electronic device **300** may include a user interface operable to communicate with an Internet website operable to display selectable audio information. The Internet website may be configured as a user-preferred environment displaying a users selected audio information. Internet broadcast selections, streaming audio selections, etc.

With a display device for displaying a Website having selectable information, electronic device **300** may allow a user to select audio information via a user interface and receive the selected information via wireless communication thereby providing a customizable WebRadio device for the user. In another embodiment, electronic device **300** may be a modular device configured to be coupled to, for example, a portion of a cars interior. For example, electronic device **300** may be mounted to a portion of a car's console thereby providing a removably coupled electronic device operable to wirelessly receive selected audio information. As a removable device, electronic device **300** may also be coupled to a home audio system, a portable radio system or other systems thereby providing a versatile electronic device operable to receive wirelessly communicated selected audio information.

In another embodiment, electronic device **300** may be operable as a PDA and/or a cellular phone that may be mounted to an automobile's console. Electronic device **300** may then integrate with a user's automobile to provide an all-encompassing communications device. For example, electronic device **300** configured as a PDA and cellular phone may allow for communication with a user's email account, voice mail account, the Internet, as well as allowing for the receipt of selected audio information via wireless communication. Electronic device **300** may be operable in a hands-free mode allowing a user to maintain safe driving fundamentals. During use, electronic device **300** may be processing selective audio information for communicating with an automobile audio system and may further be operating to receive incoming cellular calls.

Electronic device **300** may be set-up by the user to pause the music being played and allow the received cellular call to be communicated either via an independent speaker or utilizing the automobiles "audio system." Additionally, electronic device **300** may be operable to adjust the listening level of an automobile's audio system, it may play received voice mail messages, allow a user to view the Internet, etc. In one embodiment, electronic device **300** may be operable as a dual mode electronic device capable of receiving both digital and analog wireless communication signals. In this manner, electronic devices may efficiently utilize available bandwidth for receiving selected information from a communications engine. For example, transceiver **301** may be a wireless communications modem operable to receive digital or analog signals.

FIG. **4** illustrates a graphical user interface (GUI) for displaying selectable audio information according to one aspect of the present invention. The GUI may be operable with a computer system, cellular device, PDA, or other electronic devices or systems operable to display the GUI of FIG. **4**. The GUI, shown generally at **400**, may be displayed using a conventional web browser **402** such as Microsoft.®. Internet Explorer, a WAP browser, or other browsers operable to display the audio information. Browser **402** includes browser functions, shown collectively at **403**, for navigating a network such as the Internet or an intranet. Homepage **401** may be

displayed using browser **402** and may include several functions, features, information, etc. related to audio information. Home page **401** may be developed using several different types of programming (i.e., HTML, XML, Java, etc.) used to developing a network location or website.

The present invention is not limited to any one specific type of software and may be realized in plurality of ways as can be appreciated by those skilled in the art. Homepage **401** may also include login region **410** allowing a user to log into homepage **401** and display a user-preferred environment. For example, a user may want Radio Dial **412** to appear when a user logs into homepage **401**. In another embodiment, a user may want to view a current playlist selected by the user or the status of wirelessly communicated playlist. A user may also provide demographic information allowing advertisers to access the demographic information and provide advertisements based upon the demographic information. For example, an advertiser may want to target Hispanic females in the 21-25 year old age group.

Through providing demographic information to advertisers, when a user logs into homepage **401** selective advertising can be "targeted" for a group of users. Homepage **401** may also include several tabs for efficiently navigating homepage **401**. Library tab **405** may be provided to allow a user to browse available audio information that may be presented by title, genre, artist, decade, culture, etc. Store tab **407** may also be provided for locating items available for purchase such as CDs, PDA devices, MP3 players, wireless communication hardware, interfaces, software or other types of products that may be purchased while on-line. Chat tab **408** may also be provided allowing a user to chat with other users of home page **401**. For example, a guest musical artist may be available to chat with visitors of home page **401** via a chat page associated with chat tab **408**. Home page **401** may also include contest tab **409** for displaying current contests, prizes, and/or winners.

Radio tab **406** may also be provided for displaying audio information. For example, radio tab **406** may display a collective menu **411** of selectable functions or features associated with audio information. Top ten lists may be provided to a user based on several different billboard polls or genres. A search engine may be provided allowing a user to search for a specific type of audio information such as an artist, song title, and genre. Internet radio station, etc. In one embodiment, a user may input the lyrics to a song within the search engine. As such, the search engine may locate several different songs having the desirable lyrics and allow a user to select the search results. A user may also use a select a device feature that allows a user to select a destination device for communicating selected audio information. For example, a user may want to communicate a playlist to several different devices such as a PDA, a home computer system, a work computer system, etc.

As such, a user can communicate selective information to several devices without having to download the information separately for each device. A send a friend link may also be provided allowing a user to send selective audio information to a friend's electronic device. A user may also join a group comprised of individuals that select a certain genre of music to be communicated to the user's electronic device. For example, a user may want to join a group that plays only 50s swing music. As such, the user could communicate the group's selected songs to the user's electronic device. A user may also utilize an email account provided by homepage **401** allowing a user to correspond with others via email. A user may also access a list of guest DJs that may provide playlists of songs chosen by the guest DJ and selectable by a user.

US 7,970,379 B2

**11**

In one embodiment, a user's radio dial **412** may be provided when a registered user logs into homepage **401**. As such, radio dial **412** may include several functional buttons similar to conventional systems such as a volume control and a station control. However, radio dial **412** surpasses the limitations of conventional systems through providing a programmable radio dial of user customized audio information. Radio dial **412** includes several stations that may be programmed using program interface **413**. The preset stations may include several different types of user customized preset information such as user selected playlists, Internet broadcast stations, top lists, group playlists, artist-selected lists, on-line radio station, conventional radio stations. Internet phone, cellular phone, etc. and other functions, features, or information associated with audio information.

Radio dial **412** may also be displayed as a separate user interface and in some embodiments, does not require a "browsing" environment to view radio dial **412**. For example, an electronic device, such as a PDA, having a display may graphically present radio dial **412** to a user. One example may be using electronic device in association with an automobile audio system. Electronic device may display radio dial **412** and may allow a user to navigate, modify, select, adjust volume, access daytimer, access phone lists, etc. or perform other functions while the electronic device is used in association with an automobile sound system. Therefore, radio dial **412** may be operable as an application for use with several different types of electronic devices (i.e., computer systems, portable computing devices, cellular phones, etc.) operable to display radio dial **412** and in come embodiments may be wirelessly communicated to an electronic device.

In another embodiment, homepage **401** may allow a user to select when to download the information to an electronic device. For example, a user may want to listen to a certain genre of music at a specific time of day thereby allowing a user to select the information. As such, a user may select a different playlist for every day of the week thereby allowing a user to listen to different songs on different days of the week. The user can further identify when the selected playlist should be available for listening. For example, if a user wanted to listen to "playlist #1" on Monday morning during the drive into work between 8:00 am and 9:00 am, the user would enter the time and the day "playlist #1" would be available for listening. In this manner, the playlist may be communicated to the electronic device thereby allowing a user to listen to selective audio information at a desirable time.

FIG. **5A** illustrates a portable radio system having a mount for an electronic device according to one embodiment of the present invention. Portable radio **500** includes a mount **501** operable to receive electronic device **502**. Mount **501** may include a connector operable to provide communications and power to electronic device **502**. During use, electronic device **502** when mounted within portable radio **500** communicates with portable radio to provide remotely received selective audio information. In one embodiment, electronic device **502** may include a user interface allowing a user to access the Internet. Therefore, selective audio information located on the Internet may be accessed by the user and remotely communicated to electronic device **502** coupled to portable radio **500**.

In another embodiment, portable radio **500** may include memory operably located within for storing downloaded information. For example, portable radio **500** may include 32 MB of RAM allowing electronic device **502** to receive selective information and download the selective information to memory located within portable radio **500**. In this manner, the

**12**

downloaded music may be operable to be played within portable radio **500** while allowing electronic device to be removed from portable radio **500**. Therefore, portable radio **500** including electronic device **502** allows a user to communicate selected audio information to portable radio **500**.

FIG. **5B** illustrates automobile console having a mount for coupling an electronic device according to one aspect of the present invention. Console **510** includes mount **511** operable to receive electronic device **512**. Mount **511** may be located in many different locations within an automobile such as coupled to a sun visor, center console, dashboard, floorboard, etc. Mount **511** allows the user to couple electronic device **512** to the automobile and provide an interface for communication between electronic device **512** and the automobile audio system. Mount **511** may also include a power connection that allows electronic device **512** to use the automobiles power during use. The power connection may also be used in association with a recharging circuit operable to recharge a power supply within the electronic device. During operation, electronic device **512** coupled to mount **511** may receive selected audio information via wireless communication and communicate the selective information to the automobile audio system.

In one embodiment, the automobile may include memory operable associated with the automobile for storing-information. The memory may be used in association with mount **511** and electronic device **512** to store the selected audio information. In this manner, voluminous audio information can be stored within the memory allowing electronic device **512** to receive additional information. In one embodiment, a mount may be provided for a home audio system (not shown) for downloading selected audio information for use with a home audio system. For example, a mount device may be coupled to a home stereo system such that the upon placing an electronic device such as electronic device **500** within the mount, selected audio information may be communicated to the home audio system thereby allowing a home audio system to be used in association with an electronic device.

FIG. **6** illustrates a block diagram of a system for communicating voice mail messages using email according to one embodiment of the present invention. The system, indicated generally at **600**, includes email server **601** coupled to a voice mail storage device **602**. System **600** further includes a computer system or network terminal **603** such as a computer coupled to network **604**. System **600** further includes mount **605** for mounting electronic device **606** for hardwire communication of information. Device **606** may also communicate with network **604** using a wirelessly communication network operably associated with network **604** and coupled, for example, via tower **607**.

During operation, system **600** communicates voice mail messages to a user utilizing email server **601**. For example, if a user receives a voice mail message, email server **601** would be notified and a voice mail message would be sent to the user's email account in the form of an email message. For example, a voice mail message would be sent to a user's email account within intranet **604** in the form of an audio file as an attachment to the email. Upon receiving the email, a user may click on the audio file representing the voice mail message to hear the message left by a caller.

In one embodiment, a user may be accessing the Internet via a phone line and, as such, be unable to receive notification that a voice mail message has been received. System **600** would receive the voice mail message and send an email comprising the voice mail message to the user email account. In this manner, a user can remain connected to the network and receive voice mail without having to log off or disconnect

**13**

from the Internet. In one embodiment, a user may receive the voice mail message via a portable electronic device. For example, a user may be using remote device **605** operable to receive wirelessly communicated information. System **600** would receive the voice mail message and forward the voice mail message to a user's portable electronic device **606**. In this manner, a user may be capable of receiving voice emails at remote locations.

In another embodiment, a user may subscribe to use an Internet email account that may be operably associated with system **600**. Utilizing an Internet email account may allow a user the flexibility to check voice email messages from any location in the world. For example, a user may access a "Hotmail" email account while traveling on business in a foreign country. The user, upon gaining access to the "Hot-mail" account, would be able to listen to voice mail messages sent to the user via the "Hotmail" email account. Through utilizing an email account to receive voice mail messages, a user may be afforded great flexibility in communicating voice mail messages. For example, a user may be able to forward a voice mail message received in the form of an email to one or a plurality of other email accounts. In this manner, a voice email message may be sent efficiently to other email users.

For example, a user may maintain a distribution list of individuals working on a particular project that may have a need to hear certain voice email messages. In this manner, a user may efficiently disseminate information to other individuals while adding additional textual information to the body of the email allowing a user to comment on the original voice email message. In another embodiment, a user may forward a received voice email message to another account operable to receive forwarded voice email messages. For example, system **600** may be operable to receive an email message having a voice mail message as an attachment. The system would then be operable to forward the voice mail message to specified phone number, separate email account, and/or voice mail account, etc. thereby providing a user flexibility in receiving voice email.

In one embodiment, a user may utilize an email account to establish an answering service for voice mails. For example, a user's telephone number may be operable with an email account to provide an answering service. A user may record a message for a specified phone number or extension and, upon receiving an incoming call; the recorded message may be played back to incoming the call's initiator. System **600** would then forward the received voicemail message via an email account to the user. For example, a user may have an account set up at a residence for receiving voicemail messages via a user-defined email account. The user could then forward all received voice mails from the home account to an email account at a place of work. Therefore, the user may have complete access to received voicemail messages. In the same manner, a user could set up their work phone number to forward a voicemail message to the user's home email account thereby allowing a user to receive a voicemail at a home email account. Therefore, system **600** may be operable in a plurality of ways to provide email messages comprised of voicemail messages received via a voice mail or email account.

FIG. **7** illustrates a flow chart for providing voice email messages according to one embodiment of the present invention. The method begins at step **701** where a voice mail message is left for a user. The message could be at a residence, place of business, etc. The method then proceeds to step **702** where the message may be stored as an audio file within a database operable to store a file comprised of the voice mail message. Upon storing the file, the method proceeds to step

**14**

**703** where an electronic mail message may be generated. The electronic mail message may be addressed to the recipient of the voice mail message. The method then proceeds to step **704** where the audio file representing the voice mail message is attached to the electronic message.

Upon attaching the audio file, the method then proceeds to step **705** where the email message may be sent to the email address. Upon sending the email message the method proceeds to step **706** where the method determines if the email message should be sent to a wireless electronic device. If the message is not to be sent to a wireless device, the method proceeds to step **720** where the method ends. If the message is to be sent to a wireless electronic device, the method proceeds to step **707** where a signal may be sent to the wireless electronic device and at step **708** an indication is provided to the electronic device indicating that a voicemail message has been received via a user's email account. The method may then proceed to step **709** where the user decides whether or not to listen to the voice email message. If the user decides not to listen to the voice email message, the method may proceed to step **710** where the method ends. If the user decides to listen to the voice email message, the method proceeds to step **711** where a request may be sent by the electronic device requesting the voice email message be forwarded to the user's electronic device.

At step **712**, the voicemail message may be sent to the user's electronic device. Upon forwarding the voicemail message to the user the method may proceed to step **720** where the method ends. As such, FIG. **7** depicts one method of providing an email message comprised of a voice mail message. Certainly, other methods may be deployed as advancements in technology are made and without departing for the spirit and scope of the present invention.

FIG. **8** illustrates a flow diagram of a method for providing selected audio information to an electronic device according to one embodiment of the present invention. The method begins at step **800** where a user accesses a webpage via the Internet. The webpage may be a home page illustrated in FIG. **4** or other web pages operable to display selectable references to audio information. The method proceeds to step **801** where a user selects desirable audio information. For example, a user may select a single song, a plurality different songs, an entire album, a broadcast station, streaming audio, etc. or other selectable audio information. Upon the user selecting a reference to audio information, the method may proceed to step **802** where a playlist may be created that represents the user's selected audio information.

The playlist may be variable in size and comprised of a plurality of different types of available audio information. Upon creating a playlist, the method may proceed to step **803** where information associated with the playlist is obtained. For example, a list of network or URL locations comprised of the desirable audio information may be obtained. In this manner, desirable audio information may be obtained from many different sources such as URLs, network addresses, hard drives, databases comprised of audio information, etc. The sources may be accessed to obtain the selected audio information.

Upon obtaining data associated with the customized playlist, the method may proceed to step **804** where the user is prompted for a destination for the playlist. For example, a user may want to communicate the selected audio information to a remote electronic device, an automobile audio system, a home stereo system, a home computer, an electronic device coupled to a home network or computer system, etc. or other locations or devices operable to receive the selected audio information. In one embodiment, a user may select a

US 7,970,379 B2

**15**

device owned by a friend to accept the selected audio information. For example, a husband may want to send a romantic playlist to his wife on their anniversary. In this situation, the husband would select his wife's electronic device as the receiving device for the selected audio information.

Upon selecting a device, the method proceeds to step **805** where the method determines the destination of the selected audio information. If the information is to be sent to a device via a wire line connection, the method proceeds to step **813** where playlist data is sent to a user via a wire line connection. The method may then proceed to step **814** where the playlist is executed at the device. If the information is to be sent to a device requiring wireless communication, the method proceeds to step **806** where the information is formatted for communicating the information to a wireless electronic device. For example, a wireless PDA device may be selected as a destination device for the selected audio information. The PDA device may include an audio player, such as an MP3 player operable to play or execute MP3 audio files. In such an embodiment, the method could format the information such that the information may be wirelessly communicated and subsequently played by the MP3 player.

Upon formatting the information, the method may then proceed to step **807** where the audio information is wirelessly communicated to the selected device. In some embodiments, the device may be operable to receive a limited amount of information based upon storage capacity of the device (i.e., 16 MB). In such a case, the method may divide the information into component parts and periodically communicate the component parts, such as packets, to the electronic device. Upon communicating the audio information, the method may then proceed to step **808** where the signal may be received by the destination or electronic device.

The method may then proceed to step **809** where the method determines if all of the audio information has been received. For example, if 16 MB or 32 MB of selected audio information was initially transmitted due to capacity limitations of the selected device, the method may query the selected device to determine if capacity is available. If available memory exists, the method may proceed to step **807** where the method may communicate additional audio information based upon the amount of available memory. The method repeats until all of the selected audio information has been transmitted.

Upon communicating the selected information, the method may proceed to step **810** where the playlist may be executed. For example, a user may select a continuous communication of selected audio information (e.g., several hours of music, Internet broadcast, etc.). As such, the method may continuously play or execute the received audio information. In another embodiment, the method may proceed to step **811** where the method may store or buffer the received information until it is desirable to execute the received selected audio information. As such, upon executing the selected audio information, the method may proceed to step **809** where the method may repeat. In one embodiment, a user may elect to download a broadcast of an on-line radio station. For example, a user may want to listen to a radio station located in a remote location wherein conventional radio receivers could not receive the desired broadcast. For example, a person living in Houston, Tex. may not be able to receive a radio broadcast signal from a radio station in Seattle, Wash. utilizing a conventional radio receiver.

In accordance with the teachings of the present invention, a user may select an on-line broadcast or radio station as all or a part of the selected audio information. The user may then

**16**

receive radio broadcasts without having to use a home computer system or conventional radio receiver.

At step **804**, a user may select a device that does not require remote communication of information. For example, a user may elect to communicate the selected audio information to device, such as a personal computer, PDA device, MP3 player, etc. coupled via a network connection to the Internet or an Intranet. The user may receive the selected playlist at the determined device for eventual playing. In one embodiment, a user may select a plurality of devices as destination devices for receiving downloads of the selected audio information. For example, the user may want to download the information to a home stereo system, a PDA device, and an automobile stereo. As such, the selected information may be communicated to more than one destination device. In addition, the format of the download may match or conform to the selected destination device(s).

The present invention may be configured in a plurality of ways to communicate desirable audio information to users by allowing users to select desirable audio information and transmitting the desirable audio information to a specified destination thereby allowing a user to receive on-demand customized audio information. Moreover, the download may occur in an off-line environment, allowing a user to enjoy the selected audio information accessed on-line without having to be on-line or utilizing a browsing environment. In one embodiment of the present invention, the method of FIG. **8** may be modified to allow a user to select a "user group" for receiving customized audio information. For example, a "user group" may include users that prefer contemporary jazz wherein a user may request a certain song. Therefore, a virtual request line may be designed for a specific genre of music allowing "members" to transmit audio information to the "group".

In another embodiment of the present invention, the method may be modified to allow a user to select a specific genre to be transmitted to the users device. For example, a user may elect to have random country and western music transmitted to a destination device. The user could efficiently create a radio station format and have the format received at a destination device.

In a further embodiment, a user may select a group of genres to be downloaded to a desirable device. As such, the method may be modified to allow a user to select several different genres to download random music within the specified genres. In another embodiment, a user may elect to download the same music as another individual. For example, a user may want to download the same music as their best friend. Therefore the user could elect to download the same music as their friend or group of friends. In another example, a user may want to listen to the same music that an artist listens to on a specific weekday of evening. For example, a user may want to listen to the same music that Barry White listens to on a Saturday night.

Therefore, the user may select "Barry White's" Saturday night playlist and receive the same playlist Barry White receives on Saturday night. In another embodiment, the method of FIG. **8** may be modified to allow a user to manipulate song post download. For example, a user may want to store, delete, replay, copy, forward, etc. received audio information. Therefore, the method of FIG. **4** may be modified such that a user can manipulate or process the received audio information in a plurality of ways. In one embodiment of the present invention, an on-line radio station may be provided. For example, the radio station may be created for transmitting audio or on-line broadcasts. The on-line broadcasters or hosts

US 7,970,379 B2

**17**

may create their own format for broadcast. For example, an on-line radio station may be provided that transmits only children's songs.

Prior to conception of the present invention, conventional radio stations were monetarily limited to be capable of transmitting music such as children's songs to conventional radio receivers. The present invention, by providing a medium for transmitting selectable audio information, enables the existence of on-line broadcasting with little or no overhead cost for a host. A user may select an on-line broadcast for on-line or off-line delivery. In another embodiment, on-line broadcast of audio information representing books or novels may be provided to individuals such as the visually impaired. For example, an on-line broadcast station may provide several hours of audio information broadcast representing books or novels to be broadcast with very little overhead.

FIG. **9** illustrates an automobile console having a mount for an electronic device according to one embodiment of the present invention. Console **900** includes a conventional audio system **901** comprised of a receiver **902** and CD player **903**. Interface **904** may be coupled to audio system **901** via plug **905** and cable **908**, which may be coupled to an auxiliary line into audio system **901**. Interface **904** may also include contact **906** for contacting electronic device **907**. Cable **908** may be a multiple conductive cable for providing power from the automobiles power system via a protection circuit or fuse **909** for powering electronic device **907**. In one embodiment, interface **904** may be operable to recharge electronic device **907** utilizing a power source associated with an automobile.

During operation, electronic device **907** may be mounted within interface **904**. Electronic device **907** may also be powered or recharged via power line **910** and communicate with the systems audio system via interface cable or bus line **911**. Audio information communicated to electronic device **907** may be transferred to audio system **901** such that a user may listen to selected audio information. For example, a user may have previously selected a plurality of audio files to be transmitted to electronic device **907**. Electronic device **907** may communicate the selected audio information to the automobiles audio system that utilizes interface **901** thereby allowing the user to listen to selected audio information. In one embodiment, cable **908** may be custom-installed to audio system **901**. For example, the cable may be coupled to an auxiliary line for the system's radio or may be coupled to CD player line **912**.

In another embodiment, a radio manufacturer may provide interface **904** as a standard interface integrated into the audio system, thereby allowing communication between electronic device **907**, audio system **901** and/or console **900**. Electronic device **907** may include a plurality of different types of devices. For example, electronic device **907** may include a PDA device operable to store selected audio information. The information may be either remotely downloaded using an Internet web browser and wireless communication to the PDA device. In another embodiment, selected audio information may communicated to a PDA device via a hard wire coupled to a computer system interfacing with the Internet. In another embodiment, electronic device **907** may include an audio file player operable to play audio files such as MP3s, etc.

The audio files may be remotely or locally communicated to electronic device **907** and upon coupling to audio system **901**, the audio files may be transmitted to audio system **901** in a form receivable by audio system **901**. Although the disclosed embodiments have been described in detail, it should

**18**

be understood that various changes, substitutions and alterations can be made to the embodiments without departing from their spirit and scope.

The benefits, advantages, solutions to problems, and any element(s) that may cause any benefit, advantage, or solution to occur or become more pronounced are not to be construed as a critical, required, or essential feature or element of the present invention. Accordingly, the present invention is not intended to be limited to the specific form set forth herein, but on the contrary, it is intended to cover such alternatives, modifications, and equivalents, as can be reasonably included within the spirit and scope of the invention as provided by the claims below.

While the present invention has been described with respect to a limited number of embodiments, those skilled in the art will appreciate numerous modifications and variations therefrom. It is intended that the appended claims cover all such modifications and variations as fall within the true spirit and scope of this present invention.

What is claimed is:

**1**. A broadcast system, comprising:

a network based resource maintaining information associated with a network available representation of a regional broadcasting channel that can be selected by a user of a wireless cellular telephone device; and

a non-transitory storage medium including an application configured for execution by the wireless cellular telephone device that when executed, enables the wireless cellular telephone device:

to present a graphical user interface comprising at least a partial listing of available media sources on a display associated with the wireless cellular telephone device, wherein the listing includes a selectable item that enables user selection of the regional broadcasting channel;

to transmit a request for the regional broadcasting channel from the wireless cellular telephone device; and

to receive a streaming media signal in the wireless cellular telephone device corresponding to the regional broadcasting channel, wherein the wireless cellular telephone device is outside of a broadcast region of the regional broadcasting channel, wherein the wireless cellular telephone device is configured to receive the application via an over the air download.

**2**. The system of claim **1**, wherein the storage medium further comprises instructions to further receive information about a song included in the streaming media signal, and wherein the display is operable to present a graphical representation of at least a portion of the information.

**3**. The system of claim **1**, wherein the regional broadcasting channel is an FM radio signal, and wherein the FM radio signal is received in the wireless cellular telephone device via the Internet.

**4**. The system of claim **1**, wherein the storage medium further comprises instructions to enable the display to display a list of top songs.

**5**. The system of claim **1**, wherein the storage medium further comprises instructions to enable display of on-demand audio information selectable by a user.

**6**. The system of claim **1**, wherein the storage medium further comprises instructions to provide a search engine to search for a selected media information based on at least one of artist, song, and genre.

**7**. The system of claim **1**, wherein the storage medium further comprises instructions to receive a log in from a user of the wireless cellular telephone device and to display a preferred user environment associated with the user.

US 7,970,379 B2

19 20

**8**. The system of claim **7**, wherein the preferred user environment comprises a current playlist selected by the user.

**9**. The system of claim **8**, wherein the preferred user environment comprises a radio dial that is a separate user interface outside of a browsing environment.

**10**. The system of claim **1**, wherein the storage medium further comprises instructions to present the partial listing of available media sources within a graphical user interface displayed without use of a web browser.

**11**. The system of claim **1**, wherein the storage medium further comprises instructions to buffer at least a portion of the streaming media signal.

**12**. The system of claim **1**, wherein at least a portion of the streaming media signal represents video content, further wherein the wireless cellular telephone device is configured to output the video content.

**13**. The system of claim **1**, wherein the network based resource comprises an electronic device having a network address.

**14**. A method for providing broadcast content, comprising:
maintaining a system configured to deliver regionally broadcasted content to an electronic device located outside a region receiving the regionally broadcasted content, wherein the electronic device comprises a wireless cellular telephone, a display to display a menu of soft buttons selectable to enable selection of content by the electronic device, and a housing component at least partially defining a cavity in which a memory system is secured;

providing, via an over the air download, an application to the electronic device for storage and execution in the electronic device that when executed in the electronic device allows the electronic device to request a streaming media signal representing the regionally broadcasted content even if the electronic device is located outside of the region; and

communicating the streaming media signal to the electronic device responsive to a request of a user of the electronic device.

**15**. The method of claim **14**, wherein the streaming media signal comprises an audio signal and information about a song included in the streaming media signal, further wherein the display is operable to present a graphical representation of the information.

**16**. The method of claim **15**, wherein the information includes at least one of a song title, a song artist, a song decade, and a song genre.

**17**. The method of claim **14**, further comprising transmitting the regionally broadcasted content to a limited geographic area.

**18**. The method of claim **14**, wherein the regionally broadcasted content comprises video content.

**19**. The method of claim **14**, further comprising transmitting a software update to the electronic device that modifies the application.

**20**. The method of claim **14**, further comprising transmitting advertisements to the electronic device.

**21**. The method of claim **14**, further comprising transmitting advertisements to the electronic device, wherein the advertisements are targeted to a specific demographic.

\* \* \* \* \*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

The undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 13,777 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

The undersigned also hereby certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Book Antiqua type style, with 14-point or larger Franklin Gothic Book type style headings.

As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C)(i), the undersigned has relied upon the word count of this word processing system in preparing this certificate.


Dated: September 29, 2015          By: */s/ Ronald J. Schutz*
                                               Ronald J. Schutz
                                               *Counsel for Plaintiff-Appellant*

# PROOF OF SERVICE

I hereby certify that on September 29, 2015, the foregoing APPELLANT AFFINITY LABS OF TEXAS, LLC'S OPENING BRIEF and ADDENDUM was filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the appellate CM/ECF system which pursuant to Federal Rule of Appellate Procedure 25(c)(2) and Federal Circuit ECF-6(A) constitutes service on all parties represented by attorneys who have registered for the CM/ECF system, and that a copy was served on counsel of record for Defendants-Appellees via e-mail:

dweaver@velaw.com                     ncummings@cooley.com

hpreston@velaw.com                    ccampbell@cooley.com

jhan@velaw.com                        dsnyder@omm.com

Dated: September 29, 2015        By: */s/ Ronald J. Schutz*
                                      Ronald J. Schutz
                                      *Counsel for Plaintiff-*
                                      *Appellant*